1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

8

WESTERN DISTRICT OF WASHINGTON

9

AT SEATTLE

10

ADRIENNE BENSON, individually and on behalf of all others similarly situated,

Case No.

11
12

*Plaintiff,*

**COMPLAINT—CLASS ACTION**

13

*v.*

14

DOUBLE DOWN INTERACTIVE, LLC, a Washington limited liability company, and INTERNATIONAL GAME TECHNOLOGY, a Nevada corporation.

**JURY DEMAND**

15
16
17
18

*Defendant.*

19     Plaintiff Adrienne Benson brings this case, individually and on behalf of all others

20 similarly situated, against Double Down Interactive, LLC ("Double Down") and International

21 Game Technology ("IGT") (collectively "Defendants") to enjoin its operation of illegal online

22 casino games. Plaintiff alleges as follows upon personal knowledge as to herself and her own

23 acts and experiences, and upon information and belief, including investigation conducted by her

24 attorneys, as to all other matters.

25                               **<u>NATURE OF THE ACTION</u>**

26     1.     Defendants own and operate video game development companies in the so-called

27

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1    "casual games" industry—that is, computer games designed to appeal to a mass audience of

2    casual gamers. Defendants (at all relevant times) owned and operated a popular online casino

3    under the name Double Down Casino.

4        2.     Double Down Casino is available to play on Android, and Apple iOS devices, and

5    on Facebook.

6        3.     Defendants provide a bundle of free "chips" to first-time visitors of its Double

7    Down Casino that can be used to wager on its games. After consumers inevitably lose their

8    initial allotment of chips, Defendants attempt to sell them additional chips starting at $2.99 for

9    300,000 chips. Without chips, consumers cannot play the gambling game.

10       4.     Freshly topped off with additional credits, consumers wager to win more credits.

11   The credits won by consumers playing Defendants' games of chance are identical to the chips

12   that Defendants sells. Thus, by wagering 300,000 chips that have been purchased for $2.99,

13   consumers have the chance to win hundreds of thousands of additional chips that they would

14   otherwise have to purchase.

15       5.     By operating the Double Down Casino, Defendants have violated Washington

16   law and illegally profited from tens of thousands of consumers. Accordingly, Adrienne Benson,

17   on behalf of herself and a Class of similarly situated individuals, brings this lawsuit to recover

18   their losses, as well as costs and attorneys' fees.

19       **PARTIES**

20       6.     Plaintiff Adrienne Benson is a natural person and a citizen of the state of

21   Washington.

22       7.     Defendant Double Down Interactive, LLC is a limited liability company

23   organized and existing under the laws of the State of Washington with its principal place of

24   business at 605 Fifth Avenue South, Suite 300, Seattle, Washington 98104. Defendant conducts

25   business throughout this District, Washington State, and the United States.

26       8.     Defendant International Game Technology is a corporation existing and organized

27   under the laws of the State of Nevada with its principal place of business at 6355 South Buffalo

COMPLAINT—CLASS ACTION
Case No.

- 2 -

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Drive, Las Vegas, Nevada 89113. Defendant conducts business throughout this District, Washington State, and the United States.

## JURISDICTION AND VENUE

9.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from any Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

10.    The Court has personal jurisdiction over Defendant because Defendant conducts significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

11.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the evens giving rise to Plaintiff's claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

### I.     Free-to-Play and the New Era of Online Gambling

12.    The proliferation of internet-connected mobile devices has led to the growth of what are known in the industry as "free-to-play" videogames. The term is a misnomer. It refers to a model by which the initial download of the game is free, but companies reap huge profits by selling thousands of "in-game" items that start at $0.99 (purchases known as "micro-transactions" or "in-app purchases").

13.    The in-app purchase model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2017, free-to-play games of chance generated over $3.8 billion in worldwide revenue, and they are expected to grow by ten percent annually.[1] Even "large land-based casino operators are looking at this new space" for "a healthy growth

---

[1]     GGRAsia – Social casino games 2017 revenue to rise 7pct plus says report, http://www.ggrasia.com/social-casino-games-2017-revenue-to-rise-7pct-plus-says-report/ (last visited Apr. 9, 18)

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

potential."[2]

14.     With games of chance that employ the in-game purchase strategy, developers have begun exploiting the same psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

15.     Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

16.     The comparison to casinos doesn't end there. Just as with casino operators, mobile game developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[5]

17.     Game Informer, another respected videogame magazine, reported on the rise (and danger) of micro-transactions in mobile games and concluded:

> "[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is

---

[2]     *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat,* https://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Apr. 9, 18)
[3]     PC Gamer, *Microtransactions: the good, the bad and the ugly,* http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 5, 2018).
[4]     The Badger, *Are micro-transactions ruining video games? | The Badger,* http://thebadgeronline.com/2014/11/micro-transactions-ruining-video-games/ (last visited Apr. 5, 2018).
[5]     *Id.* (emphasis added).

COMPLAINT—CLASS ACTION
Case No.

- 4 -

of a different magnitude, a similar profitability model governs casino gambling."[6]

18.     Academics have also studied the socioeconomic effect games that rely on in-app purchases have on consumers. In one study, the authors compiled several sources analyzing so-called free-to-play games of chance (called "casino" games below) and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."
>
> …
>
> "According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

19.     The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

---

[6]     Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited Apr. 5, 2018)

[7]     Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

[8]     *Id.* (emphasis added).

COMPLAINT—CLASS ACTION
Case No.

- 5 -

20.     The similarity between micro-transaction games of chance and games of chance found in casinos has caused governments across the world to intervene to limit their availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, Defendants' online casino games have thrived and thousands of consumers have spent millions of dollars unwittingly playing Defendants' unlawful games of chance.

**II.     A Brief Introduction to Double Down and IGT**

21.     Double Down is a leading casual game developer with an extensive library of free-to-play online casino games. Double Down sells in-app chips to consumers in the Double Down Casino so that consumers can play its various online casino games.

22.     IGT is a global leader in gaming industry with long ties to the traditional casino market. It has developed a multitude of casino and lottery games, including traditional slot machines and video lottery terminals. In 2012, IGT acquired Double Down and its library of online casino games, and has since "grown into one of the largest and most successful brands in the North American social casino market."[10]

23.     In 2017, IGT sold Double Down for $825 million to DoubleU Games.[11] In addition to the sale, IGT has also entered into a long-term game development and distribution agreement with DoubleU to offer its online casino games in Double Down Casino.[12] IGT notes that it will continue to collect royalties from its online casino game content.[13]

24.     Defendants have made large profits through their online casino games. In 2016,

---

[9]     In late August 2014, South Korea began regulating "social gambling" games, including games similar to Defendant's, by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, https://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited Apr. 5, 2018). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

[10]     *IGT To Sell Online Casino Unit DoubleDown To South Korean Firm For $825 Million - Poker News*, https://www.cardplayer.com/poker-news/21554-igt-to-sell-online-casino-unit-doubledown-to-south-korean-firm-for-825-million (last visited Ap. 6, 2018).

[11]     *Id.*

[12]     *IGT Completes Sale Of Double Down Interactive LLC To DoubleU Games*, https://www.prnewswire.com/news-releases/igt-completes-sale-of-double-down-interactive-llc-to-doubleu-games-300467524.html (last visited Apr. 6, 2018).

[13]     *Id.*

**Tousley Brain Stephens, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600  •  Fax: 206.682.2992

alone, Double Down generated $280 million in revenue. As explained further below, however, the revenue Defendants receives from Double Down Casino is the result of operating unlawful games of chance camouflaged as innocuous videogames.

**III.  Defendants' Online Casino Contains Unlawful Games of Chance**

25.    Consumers visiting Double Down Casino for the first time are awarded 1 million free chips. *See* Figure 1. These free sample chips offer a taste of gambling and are designed to encourage player to get hooked and buy more chips for real money.



(**Figure 1.**)

26.    After they begin playing, consumers quickly lose their initial allotment of chips. Immediately thereafter, Double Down Casino informs them via a "pop up" screen that they have "insufficient funds." *See* Figure 2. Once a player runs out of their allotment of free chips, they cannot continue to play the game without buying more chips for real money.

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1
2
3
4
5
6
7
8
9



10      (**Figure 2**.)

11      27.    To continue playing the online casino game, consumers navigate to Double Down

12  Casino's electronic store to purchase chips ranging in price from $2.99 for 300,000 chips to

13  $99.99 for 100,000,000 chips. *See* Figure 3.

14
15
16
17
18
19
20
21
22
23



24      (**Figure 3.**)

25      28.    The decision to sell chips by the thousands isn't an accident. Rather, Defendants

26  attempt to lower the perceived cost of the chips (costing just a fraction of a penny per chip) while

27  simultaneously maximizing the value of the award (awarding millions of chips in jackpots),

1   further inducing consumers to bet on its games.

2        29.    To begin wagering, players select the "LINE BET" that will be used for a spin, as

3   illustrated in <u>Figure 4</u>. Double Down Casino allows players to increase or decrease the amount

4   he or she can wager and ultimately win (or lose). Double Down Casino allows players to

5   multiply their bet by changing the number of "lines" (*i.e.*, combinations) on which the consumer

6   can win, shown in <u>Figure 4</u> as the "LINE" button.



10        (**Figure 4.**)

11        30.    Once a consumer spins the slot machine by pressing "SPIN" button, no action on

12   his or her part is required. Indeed, none of the Double Down Casino games allow (or call for)

13   any additional user action. Instead, the consumer's computer or mobile device communicates

14   with and sends information (such as the "TOTAL BET" amount) to the Double Down Casino

15   servers. Its servers then execute the game's algorithms that determine the spin's outcome.

16   Notably, none of Defendants' games depend on any amount of skill to determine their

17   outcomes—all outcomes are based entirely on chance.

18        31.    Consumers can continue playing with the chips that they won, or they can exit the

19   game and return at a later time to play because Double Down Casino maintains win and loss

20   records and account balances for each consumer. Indeed, once Defendants' algorithms determine

21   the outcome of a spin and Double Down Casino displays the outcome to the consumer,

22   Defendants adjusts the consumer's account balance. Defendants keep records of each wager,

23   outcome, win, and loss for every player.

24                  **FACTS SPECIFIC TO PLAINTIFF BENSON**

25        32.    Since 2013, Plaintiff Benson has been playing Double Down Casino on

26   Facebook. After Plaintiff lost the balance of her initial allocation of free chips, she purchased

27   chips from the Double Down Casino electronic store.

COMPLAINT—CLASS ACTION
Case No.

- 9 -

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

33.     Thereafter, Benson continued playing various slot machines and other games of chance within the Double Down Casino where she would wager chips for the chance of winning additional chips. Since 2016, Plaintiff Benson wagered and lost (and Defendants therefore won) over $1,000 at Defendants' games of chance.

## CLASS ALLEGATIONS

34.     **Class Definition**: Plaintiff Benson brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of herself and a Class of similarly situated individuals, defined as follows:

> All persons in the State of Washington who purchased and lost chips by wagering at the Double Down Casino.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

35.     **Numerosity**: On information and belief, tens of thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendants' records, discovery, and other third-party sources.

36.     **Commonality and Predominance**: There are many questions of law and fact common to Plaintiff's and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

    a.     Whether Double Down Casino games are "gambling" as defined by RCW 9.46.0237;

COMPLAINT—CLASS ACTION
Case No.

- 10 -

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

b.     Whether Defendants are the proprietors for whose benefit the online

casino games are played;

c.     Whether Plaintiff and each member of the Class lost money or anything of

value by gambling;

d.     Whether Defendants violated the Washington Consumer Protection Act,

RCW 19.86.010, *et seq.*; and

e.     Whether Defendants have been unjustly enriched as a result of its conduct.

37.     **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff's and the members of the Class sustained damages arising out of Defendant's wrongful conduct.

38.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money playing Defendants' games of chance. Plaintiff also has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the Class.

39.     **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies that Plaintiff challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class are the same.

COMPLAINT—CLASS ACTION
Case No.

- 11 -

40. **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

41. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## FIRST CAUSE OF ACTION
### Violations of Revised Code of Washington 4.24.070
### (On behalf of Plaintiff and the Class)

42. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

43. Plaintiff, members of the Class, and Defendants are all "persons" as defined by RCW 9.46.0289.

44. The state of Washington's "Recovery of money lost at gambling" statute, RCW 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

45. "Gambling," defined by RCW 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

46. Defendants' "chips" sold for use at the Double Down Casino are "thing[s] of value" under RCW § 9.46.0285.

47. Double Down Casino games are illegal gambling games because they are online games at which players wager things of value (the chips) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional chips).

48. Defendants Double Down and IGT are the proprietors for whose benefit the online gambling games are played because they operate the Double Down Casino games and/or derive profit from its operation.

49. As such, Plaintiff and the Class gambled when they purchased chips to wager at Double Down Casino. Plaintiff and each member of the Class staked money, in the form of chips purchased with money, at Defendants' games of chance (*e.g.*, Double Down Casino slot machines and other games of chance) for the chance of winning additional things of value (*e.g.*, chips that extend gameplay without additional charge).

50. In addition, Double Down Casino games are not "pinball machine[s] or similar mechanical amusement device[s]" as contemplated by the statute because:

    a. the games are electronic rather than mechanical;

    b. the games confer replays but they are recorded and can be redeemed on separate occasions (*i.e.*, they are not "immediate and unrecorded"); and

    c. the games contain electronic mechanisms that vary the chance of winning free games or the number of free games which may be won (*e.g.*, the games allow for different wager amounts).

51. RCW 9.46.0285 states that a "'Thing of value,' as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form

COMPLAINT—CLASS ACTION
Case No.

- 13 -

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1   of credit or promise, directly or indirectly, contemplating transfer of money or property or of any

2   interest therein, or involving extension of a service, entertainment or a privilege of playing at a

3   game or scheme without charge."

4         52.    The "chips" Plaintiff and the Class had the chance of winning in Double Down

5   Casino games are "thing[s] of value" under Washington law because they are credits that involve

6   the extension of entertainment and a privilege of playing a game without charge.

7         53.    Double Down Casino games are "Contest[s] of chance," as defined by RCW

8   9.46.0225, because they are "contest[s], game[s], gaming scheme[s], or gaming device[s] in

9   which the outcome[s] depend[] in a material degree upon an element of chance, notwithstanding

10   that skill of the contestants may also be a factor therein." Defendants' games are programmed to

11   have outcomes that are determined entirely upon chance and a contestant's skill does not affect

12   the outcomes.

13         54.    RCW 9.46.0201 defines "Amusement game[s]" as games where "The outcome

14   depends in a material degree upon the skill of the contestant," amongst other requirements.

15   Double Down Casino games are not "Amusement game[s]" because their outcomes are

16   dependent entirely upon chance and not upon the skill of the player and because the games are

17   "contest[s] of chance," as defined by RCW 9.46.0225.

18         55.    As a direct and proximate result of Defendants' operation of its Double Down

19   Casino games, Plaintiff Benson and each member of the Class have lost money wagering at

20   Defendants' games of chance. Plaintiff Benson, on behalf of herself and the Class, seeks an order

21   (1) requiring Defendants to cease the operation of its gambling games; and/or (2) awarding the

22   recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the

23   extent allowable.

24

25                            **SECOND CAUSE OF ACTION**

**Violations of the Washington Consumer Protection Act, RCW 19.86.010, *et seq.***

26                         **(On behalf of Plaintiff and the Class)**

27

COMPLAINT—CLASS ACTION
Case No.

- 14 -

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1   56.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

2   57.    Washington's Consumer Protection Act, RCW § 19.86.010 *et seq.* ("CPA"),

3   protects both consumers and competitors by promoting fair competition in commercial markets

4   for goods and services.

5   58.    To achieve that goal, the CPA prohibits any person from using "unfair methods of

6   competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

7   RCW § 19.86.020.

8   59.    The CPA states that "a claimant may establish that the act or practice is injurious

9   to the public interest because it . . . Violates a statute that contains a specific legislative

10   declaration of public interest impact."

11   60.    Defendants violated RCW § 9.46.010, *et seq.* which declares that:

12   "The public policy of the state of Washington on gambling is to keep the criminal
    element out of gambling and to promote the social welfare of the people by limiting
13   the nature and scope of gambling activities and by strict regulation and control.

14   It is hereby declared to be the policy of the legislature, recognizing the close
    relationship between professional gambling and organized crime, to restrain all
15   persons from seeking profit from professional gambling activities in this state; to
    restrain all persons from patronizing such professional gambling activities; to
16   safeguard the public against the evils induced by common gamblers and common
    gambling houses engaged in professional gambling; and at the same time, both to
17   preserve the freedom of the press and to avoid restricting participation by
    individuals in activities and social pastimes, which activities and social pastimes
18   are more for amusement rather than for profit, do not maliciously affect the public,
    and do not breach the peace."

19   61.    Defendants have violated RCW § 9.46.010, *et seq.*, because the Double Down

20   Casino games are illegal online gambling games as described in ¶¶ 42-55 *supra*.

21   62.    Defendant's wrongful conduct occurred in the conduct of trade or commerce—

22   *i.e.*, while Defendants were engaged in the operation of making computer games available to the

23   public.

24   63.    Defendants' acts and practices were and are injurious to the public interest

25   because Defendant, in the course of its business, continuously advertised to and solicited the

26   general public in Washington state and throughout the United States to play its unlawful online

27

COMPLAINT—CLASS ACTION
Case No.

- 15 -

1   casino games of chance. This was part of a pattern or generalized course of conduct on the part

2   of Defendants, and many consumers have been adversely affected by Defendants' conduct and

3   the public is at risk.

4          64.    Defendants have profited immensely from its operation of unlawful games of

5   chance, amassing hundreds of millions of dollars from the losers of its games of chance.

6          65.    As a result of Defendants' conduct, Plaintiff and the Class members were injured

7   in their business or property—*i.e.*, economic injury—in that they lost money wagering on

8   Defendants' unlawful games of chance.

9          66.    Defendants' unfair or deceptive conduct proximately caused Plaintiff's and the

10  Class members' injury because, but for the challenged conduct, Plaintiff and the Class members

11  would not have lost money wagering at or on Defendants' games of chance, and they did so as a

12  direct, foreseeable, and planned consequence of that conduct.

13         67.    Plaintiff, on her own behalf and on behalf of the Class, seeks to enjoin further

14  violation and recover actual damages and treble damages, together with the costs of suit,

15  including reasonable attorneys' fees.

16                          **THIRD CAUSE OF ACTION**
                                **Unjust Enrichment**
17                      **(On behalf of Plaintiff and the Class)**

18         68.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth

19  herein.

20         69.    Plaintiff and the Class have conferred a benefit upon Defendants in the form of

21  the money Defendants received from them for the purchase of chips to wager on Double Down

22  Casino games.

23         70.    Defendants appreciate and/or have knowledge of the benefits conferred upon

24  them by Plaintiff and the Class.

25         71.    Under principles of equity and good conscience, Defendants should not be

26  permitted to retain the money obtained from Plaintiff and the members of the Class, which

27  Defendants have unjustly obtained as a result of its unlawful operation of unlawful online

1   gambling games. As it stands, Defendants have retained millions of dollars in profits generated

2   from their unlawful games of chance and should not be permitted to retain those ill-gotten

3   profits.

4       72.     Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any

5   money Defendants have retained as a result of the unlawful and/or wrongful conduct alleged

6   herein.

7                           **PRAYER FOR RELIEF**

8       Plaintiff Adrienne Benson, individually and on behalf of all others similarly situated,

9   respectfully requests that this Court enter an Order:

10      a)      Certifying this case as a class action on behalf of the Class defined above,

11  appointing Adrienne Benson as representative of the Class, and appointing her counsel as class

12  counsel;

13      b)      Declaring that Defendants' conduct, as set out above, violates the CPA;

14      c)      Entering judgment against Defendants, in the amount of the losses suffered by

15  Plaintiff and each member of the Class;

16      d)      Enjoining Defendants from continuing the challenged conduct;

17      e)      Awarding damages to Plaintiff and the Class members in an amount to be

18  determined at trial, including trebling as appropriate;

19      f)      Awarding restitution to Plaintiff and Class members in an amount to be

20  determined at trial, and requiring disgorgement of all benefits that Defendants unjustly received;

21      g)      Awarding reasonable attorney's fees and expenses;

22      h)      Awarding pre- and post-judgment interest, to the extent allowable;

23      i)      Entering judgment for injunctive and/or declaratory relief as necessary to protect

24  the interests of Plaintiff and the Class; and

25      j)      Awarding such other and further relief as equity and justice require.

26                              **JURY DEMAND**

27      Plaintiff requests a trial by jury of all claims that can be so tried.

COMPLAINT—CLASS ACTION
Case No.

- 17 -

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1

2
Dated: April 9, 2018

3
                                        By:  */s/Janissa A. Strabuk*
4                                              */s/Cecily C. Shiel*

5
                                        TOUSLEY BRAIN STEPHENS, PLLC
6                                        Janissa A. Strabuk, WSBA No. 21827
                                         jstrabuk@tousley.com
7                                        Cecily C. Shiel, WSBA No. 50061
                                         cshiel@tousley.com
8                                        1700 Seventh Avenue, Suite 2200
                                         Seattle, Washington 98101-4416
9                                        Tel: 206.682.5600
                                         Fax: 206.682.2992
10

11                                       EDELSON PC
                                         Benjamin H. Richman*
12                                       brichman@edelson.com
                                         350 North LaSalle Street, Suite 1400
13                                       Chicago, Illinois 60654
                                         Tel: 312.589.6370
14                                       Fax: 312.589.6378

15
                                         Rafey Balabanian*
16                                       rbalabanian@edelson.com
                                         123 Townsend Street, Suite 100
17                                       San Francisco, California 94107
                                         Tel: 415.212.9300
18                                       Fax: 415.373.9435

19
                                         *Pro hac vice admission to be sought.
20
                                         *Attorneys for Plaintiff and the Putative Class*
21

22

23

24

25

26

27

COMPLAINT—CLASS ACTION
Case No.                          - 18 -