The Honorable Ronald B. Leighton

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

ADRIENNE BENSON and MARY
SIMONSON, individually and on behalf of all
others similarly situated,

                Plaintiff,

    v.

DOUBLE DOWN INTERACTIVE, LLC, et al.,

                Defendants.

NO. 2:18-cv-00525-RBL

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO
COMPEL ARBITRATION**

ORAL ARGUMENT REQUESTED

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................................. 1

**BACKGROUND** ................................................................................................................... 2

**ARGUMENT** ........................................................................................................................ 3

**I.**  **Legal Standard** ......................................................................................................... 3

     A.  Motions to compel arbitration, generally ........................................................ 3

     B.  Motions to compel arbitration based on Internet contracts ............................. 4

**II.**  **Defendants Cannot Enforce Purported Contracts To Which Plaintiffs Never Agreed** .......................................................................................................... 6

     A.  Ms. Benson, who played the App on Facebook, never assented to the Terms .................................................................................... 6

          *1.*  *Defendants do not obtain user assent to their Terms via Facebook's data-sharing alert window* ........................................................ 7

          *2.*  *Nor do Defendants obtain user assent to the Terms by intentionally hiding a hyperlink to those Terms in an obscure section of the App* ...................... 9

     B.  Ms. Simonson, who played the App on her Phone, never assented to the Terms ................................................................................. 12

     C.  Defendants' arguments are not supported by the cases they cite ................... 18

**III.**  **In Any Event, IGT Has No Right To Compel Plaintiffs To Arbitration** ............... 21

**CONCLUSION** ................................................................................................................... 23

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

1

## **TABLE OF AUTHORITIES**

2

**United States Supreme Court Cases**

3

*Buckeye Check Cashing, Inc. v. Cardegna*,

4
    546 U.S. 440 (2006) ........................................................................................ 20

5
*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941) .......................................................................................... 4

6

7

**United States Appellate Court Cases**

8

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
    207 F.3d 1126 (9th Cir. 2000) ......................................................................... 4

9

10
*Kater v. Churchill Downs Inc.*,
    886 F.3d 784 (9th Cir. 2018) ........................................................................... 1

11
*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ..................................................................... *passim*

12

13
*Mundi v. Union Sec. Life Ins. Co.*,
    555 F.3d 1042 (9th Cir. 2009) ....................................................................... 21

14

15
*Murphy v. DirecTV, Inc.*,
    724 F.3d 1218 (9th Cir. 2013) ................................................................. 21, 22

16

17
*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ................................................................... *passim*

18
*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ............................................................... *passim*

19

20
*Norcia v. Samsung Telecommun. Am., LLC*,
    845 F.3d 1279 (9th Cir. 2017) ......................................................................... 4

21
*Rajagopalan v. NoteWorld, LLC*,
    718 F.3d 844 (9th Cir. 2013) ........................................................... 21, 22, 23

22

23
*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ..................................................................... 18, 19

24
*Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17 (2d Cir. 2002) ..................................................................... *passim*

25

26

27

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

**United States District Court Cases**

*Cairo, Inc. v. Crossmedia Services, Inc.*,
    No. C 04-04825 JW, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005) ........................... 18, 19

*Doe v. Xytex Corp.*,
    No. C 16-02935 WHA, 2016 WL 3902577 (N.D. Cal. July 19, 2016) ......................... 17

*Fteja v. Facebook, Inc.*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012) .................................................................... 11, 19

*Himber v. Live Nation Worldwide, Inc.*,
    No. 16-cv-5001(JS)(GRB), 2018 WL 2304770 (E.D.N.Y. May 21, 2018) .................. 20

*Hines v. Overstock.com, Inc.*,
    668 F. Supp. 2d 362 (E.D.N.Y. 2009) .......................................................................... 5

*Joseph v. TrueBlue, Inc.*,
    No. 14-cv-5963 BHS, 2015 WL 575289 (W.D. Wash. Feb. 11, 2015) ........................ 22

*McKee v. Audible, Inc.*,
    No. 17-cv-1941-GW(EX), 2017 WL 4685039 (C.D. Cal. Jul. 17, 2017) ...................... 8

*Schmidt v. Samsung Elecs. Am., Inc.*,
    No. 16-cv-1725-JCC, 2017 WL 2289035 (W.D. Wash. May 25, 2017) ................. 21, 22

*Snap-on Bus. Sols. Inc. v. O'Neil & Assocs., Inc.*,
    708 F. Supp. 2d 669 (N.D. Ohio 2010) ...................................................................... 20

*Van Tassell v. United Mktg. Grp., LLC*,
    795 F. Supp. 2d 770 (N.D. Ill. 2011) ................................................................. 5, 6, 17

**State Cases**

*Hubbert v. Dell Corp.*,
    359 Ill. App. 3d 976 (5th Dist. 2005) ........................................................................ 11

*Johnson v. Spider Staging Corp.*,
    87 Wash. 2d 577 (1976) ............................................................................................... 4

*Major v. McCallister*,
    302 S.W.3d 227 (Mo. Ct. App. 2009) ........................................................................ 11

*Romney v. Franciscan Med. Grp.*,
    186 Wash. App. 728 (2015) ................................................................................. 22, 23

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Townsend v. Quadrant Corp.*,
    153 Wash. App. 870 (2012) ...................................................................................... 22, 23

**Other Authorities**

9 U.S.C. § 1 ............................................................................................................................ 3

9 U.S.C. § 3 ............................................................................................................................ 4

Kevin Granville, *Facebook and Cambridge Analytica: What You Need to Know as Fallout Widens*, N. Y. TIMES, Mar. 19, 2018,
    https://www.nytimes.com/2018/03/19/technology/facebook-cambridge-analytica-explained.html ................................................................................................................. 7

Terms of Use (May 2018), *DoubleDownInteractive.com*,
    https://cite.law/WRZ3-ZBD6 ........................................................................................... 3

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1

**INTRODUCTION**

2      Defendants Double Down Interactive LLC and International Game Technology operate

3 an application called "DoubleDown Casino," where players can gamble at slots on their phones

4 or computers. In no uncertain terms, the Ninth Circuit recently held that such applications

5 constitute illegal gambling under Washington law. *Kater v. Churchill Downs Inc.*, 886 F.3d 784

6 (9th Cir. 2018). Plaintiffs Adrienne Benson and Mary Simonson sued Defendants to recover

7 money they lost gambling in DoubleDown Casino (the "App"). Defendants now move this

8 Court to compel arbitration, arguing that Plaintiffs both agreed to a contract, which included a

9 mandatory arbitration clause, by using the App. The fundamental defect in Defendants' motion,

10 however, is that Plaintiffs never agreed to those purported contracts.

11      The advent of digital technology—and the digital contract—has not changed traditional

12 contract principles of offer, consideration, and acceptance. Just like in the physical world, a

13 digital contract is formed only if both parties agree to it. And just like in the physical world, a

14 person cannot have agreed to a contract that they did not know about. Because Plaintiffs were

15 never given notice of, and thus, had no knowledge of, Defendants' contract terms, no contract

16 was ever formed.

17      To be sure, it is not difficult to obtain assent to contract terms from users of digital

18 applications. Most reputable Internet companies, for example, present their users with terms of

19 use and then ask the user to check a box as well as click a button (*e.g.*, an "I agree" button)

20 acknowledging their assent to the terms. For whatever reason, Defendants here opted for a

21 different approach: they chose to bury an inconspicuous hyperlink to their terms behind a

22 subsidiary in-game menu and to hide other hyperlinks to their terms well below any screen a

23 typical user encounters. Unfortunately for Defendants, those choices mean they have fallen far

24 short of obtaining user assent to their terms. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d

25 1171, 1177–79 (9th Cir. 2014) (holding that even "conspicuous" hyperlinks to terms fail to

26 bind users where website otherwise provides "no notice to users nor prompts them to take any

27

PLS.' OPP. TO DEFS.' MOT. TO COMPEL
(2:18-cv-00525-RBL) - 1

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

affirmative action to demonstrate assent"); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236 (2d Cir. 2016) (under Washington law, denying motion to compel arbitration where hyperlinks to "conditions of use" appearing on Amazon website were not conspicuous in context of page). Regardless of whether Defendants' inconspicuous placement of hyperlinks was a simple oversight or whether it reflects a conscious choice to obscure the terms of its purported consumer contracts, Defendants failed to give meaningful notice of the contracts—and, consequently, the arbitration clause—they now seek to enforce. Because no agreement was formed with either Plaintiff, Defendants' motion must be denied.

## BACKGROUND

Defendant Double Down Interactive is the developer of a number of online casino games, including DoubleDown Casino. (First Am. Compl., dkt. 41 at ¶ 22.) International Game Technology ("IGT") is a global leader in the casino gaming industry as a maker of slot machines and lottery games. (*Id.* ¶ 23.) IGT acquired Double Down Interactive in 2012, and later sold it in 2017 for $825 million. (*Id.* ¶ 24.) IGT remains involved in DoubleDown Casino by providing its online casino games within the App. (*Id.*)

Both Plaintiffs wagered and lost money playing in DoubleDown Casino, beginning in 2013 for Benson and 2017 for Simonson. (*Id.* ¶¶ 33–36.) Plaintiffs played through different platforms, however: Ms. Benson through Facebook on her computer (*id.* ¶ 33), and Ms. Simonson on her mobile phone. (*Id.* ¶ 35.) Defendants contend that they have formed a contract with Plaintiffs through Plaintiffs' gameplay because a Terms of Use document (the "Terms") was available to Plaintiffs through hyperlinks placed in the App download and play process. (*See generally* Declaration of Joe Sigrist ("Sigrist Decl."), dkt. 45.)

The placement and design of each of those hyperlinks is discussed in detail—with relevant screenshots—later in this brief. In short, the critical flaw with Defendants' approach to obtaining user assent is that the hyperlinks produced by Defendants (labeled "App Terms" or "Terms of Use") appear, if at all, only inconspicuously at the bottom of relevant windows, out

of sight altogether, or hidden behind a menu. Critically, mobile App users can easily download the App, play the game, and purchase chips without ever seeing a notice that the Terms even exist, as demonstrated in a video provided to the Court. (*See* Exhibit B to the Declaration of J. Eli Wade-Scott ("Wade-Scott Decl.").) Moreover, the single hyperlink that is ever actually visible to a Facebook user is not conspicuous and, as demonstrated below, does not advise the user that she will be bound by the Terms—or of the arbitration clause and class waiver contained therein.

Defendants updated the Terms several times during the relevant period. (Sigrist Decl. ¶ 39.) The version of the Terms in effect when Plaintiffs filed suit in April 2018 described the parties to the agreement as follows:

> The terms of this Agreement ("Terms of Use") you are reading are a legal agreement that governs your relationship with DoubleDown Interactive LLC (hereinafter collectively referred to as "DoubleDown" or "We") regarding your use of DoubleDown's social games and related services . . . .

(DDC Terms and Conditions (July 2017), Ex. A to Sigrist Decl., dkt. 45 at 13.) Almost immediately after this lawsuit was filed, however, Defendants updated the Terms to broaden the definition of the parties, asserting that the agreement "governs your relationship with DoubleDown Interactive LLC *and its affiliated companies*." Terms of Use (May 2018), *DoubleDownInteractive.com*, https://cite.law/WRZ3-ZBD6 (emphasis added). Defendants concede—as they must—that International Game Technology is "nonsignator[y]" to the relevant Terms. (Defs.' Br., dkt. 44, at 12 n.10.)

## ARGUMENT

## I.    Legal Standard

### A.    Motions to compel arbitration, generally

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, requires district courts to stay judicial proceedings and compel arbitration of claims covered by a written arbitration provision when

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

the arbitration provision is valid and enforceable. *Id.* § 3. The Court must determine whether a valid arbitration agreement exists and whether the agreement encompasses the disputes at issue. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The party seeking to compel arbitration—here, Defendants—bears the burden of proving that a valid agreement to arbitrate exists based on a preponderance of the evidence. *Norcia v. Samsung Telecommun. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 203 (2017).

B.      Motions to compel arbitration based on Internet contracts

The Ninth Circuit outlined the basics of contract formation on the Internet and other technological contexts, such as mobile phone applications, in *Nguyen*:

> While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract. One such principle is the requirement that mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.

*Nguyen*, 763 F.3d at 1175–76 (citations and internal quotations omitted). Courts turn to traditional state-law contract principles to ascertain whether a contract has been formed. *Id.* at 1175.[1] But the explosion of web- and app-based services has arrived in tandem with several new species of web- and app-based contracts; courts have, accordingly, begun developing a taxonomy to fix these new entrants' merit into the traditional requirements of offer, acceptance, and consideration.

First, "clickwrap" agreements present a user with terms and conditions, and require the user to affirmatively click a button to agree to the terms. *Id.* at 1175–76; *see also Meyer v. Uber*

---

[1]      Double Down agrees that Washington law applies. (Defs.' Br. at 12 n.11.) Even without the choice-of-law provision in the Terms of Use—which is not binding—Plaintiffs bring Washington state-law claims against a Washington-based company, so Washington law applies. *See Johnson v. Spider Staging Corp.*, 87 Wash. 2d 577, 583 (1976) (finding that Washington had interest in regulating Washington corporations); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that federal courts must apply choice-of-law rules of state in which they sit).

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

*Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017). These agreements are the most evolved of the new electronic contract family, and the most recognizable cousins of a traditional paper-across-the-table contract presentation; courts find them the least questionable method for achieving electronic assent and they are generally found to be enforceable. *See Meyer*, 868 F.3d at 75. It is the less meritorious sibling of clickwrap—"browsewrap"—that is at issue between the Parties here.

Rather than requiring a user to affirmatively acknowledge the terms of use like clickwrap does, a browsewrap presentation relies on the consumer's mere use of the app or website to demonstrate agreement. *Nguyen*, 763 F.3d at 1176. The viability of this type of agreement is precarious because absent actual knowledge of the terms, assent turns on "whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id.* at 1177. This is, of course, possible: a website or app can prominently "contain[] an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Id.*; *see, e.g., Meyer*, 868 F.3d at 78 (enforcing agreement where Uber provided prominent warning of terms immediately below registration button).

Much more often, however, courts find a developer's choice to put notice of contractual provisions on a different page, or buried beneath other text, to be insufficient notice of terms to produce constructive assent. *See, e.g., Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23 (2d Cir. 2002) (finding no assent where terms of use were visible only by scrolling down); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009), *aff'd,* 380 F. App'x 22 (2d Cir. 2010) (cited with approval by *Nguyen*, refusing to enforce terms of use where user "could not even see the link to them without scrolling down to the bottom of the screen—an action that was not required to effectuate her purchase."); *Van Tassell v. United Mktg. Grp., LLC*, 795 F.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

Supp. 2d 770, 793 (N.D. Ill. 2011) (cited with approval by *Nguyen*, refusing to enforce arbitration clause in browsewrap agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links). And even where the notice is visible, the user must be given some reason to look at it: a consumer is not bound by a contract that they have no reason to view. *Compare Nguyen*, 763 F.3d at 1178–79 (finding that link to "Terms of Use" immediately next to an order button did not notify users) *with Meyer*, 868 F.3d at 78 (finding that warning "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY" immediately next to button to create account gave notice). Generally, courts are "reluctan[t] to enforce browsewrap agreements against individual consumers[.]" *Nguyen*, 763 F.3d at 1178.[2]

## II. Defendants Cannot Enforce Purported Contracts To Which Plaintiffs Never Agreed.

Defendants give no effective notice of their Terms. A typical user of the mobile app that Ms. Simonson played downloads the App, begins playing, and purchases chips without seeing any hint that any Terms of Use exist. And a typical Facebook user like Ms. Benson experiences essentially identical facts to those presented in *Nguyen*: the user is never asked to agree to (and thus is not made aware of the existence of) Defendants' Terms, and Defendants' inconspicuous placement of hyperlinks to its Terms—in an unrelated window, and then in obscured areas of Defendants' digital casino—fails to put a reasonable person on notice that playing the App means accepting Defendants' Terms (and arbitration provision). Accordingly, Defendants have not formed a contract with either Plaintiff, and their motion must be denied.

A.    Ms. Benson, who played the App on Facebook, never assented to the Terms.

Defendants point to two locations where the Terms are available within the sign-up and play process for the Facebook App. (Defs.' Br. at 3–6.) But *availability* is not the standard; a

---

[2]    While these courts are not applying Washington law, the state follows the same inquiry notice standard, *see Nicosia*, 834 F.3d at 233, which *Nguyen* and its followers apply to similar facts presented to the Court here.

1   user need not "ferret out" terms to which they have no reason to suspect they will be bound.

2   *Nguyen*, 763 F.3d at 1179. Defendants give Facebook users no indication that they must find

3   and read the extensive Terms that purportedly waive the users' right to bring an action in court

4   or represent a class. Instead, Defendants hide the Terms under a confusing and inconspicuous

5   hyperlink during the App signup process, and then *deliberately hide* the Terms—despite

6   Defendants' evasive language about the visibility of those Terms—below the gameplay screen.

7            1.    *Defendants do not obtain user assent to their Terms via Facebook's*
                   *data-sharing alert window.*
8

9        Defendants rely on the purported notice of Terms exemplified in <u>Figure 1</u>, which is a

10  small pop-up window rendered only the first time a user logs into the App through Facebook:

11

12                                

13

14

15

16

17

18

19

20

21            Figure 1                                    Figure 2

22  (Sigrist Decl. ¶ 23.) The window primarily concerns the information that the App will receive

23  from Facebook—a question of considerable interest in the wake of the Cambridge Analytica

24  scandal, but not at issue in this case.[3] The hyperlink to which Defendants refer and seek to rely

25  _____

26  [3]      Kevin Granville, *Facebook and Cambridge Analytica: What You Need to Know as Fallout Widens*, N.
    Y. TIMES, Mar. 19, 2018, https://www.nytimes.com/2018/03/19/technology/facebook-cambridge-analytica-
    explained.html.

27

1  on appears in small, faint print below the data-sharing disclosure, two buttons, and a further

2  notification about the App's ability to post to Facebook—crucially—the button the user needs

3  to press in order to continue to gameplay. The hyperlink to the Terms is circled in <u>Figure 2</u>.

4      This small "App Terms" link is essentially identical to the link that the Ninth Circuit

5  found not to constitute good notice in *Nguyen*. In *Nguyen*, the Ninth Circuit found that a link to

6  "Terms of Use" that appeared "directly below" a purchase button did not put a reasonable user

7  on inquiry notice. 763 F.3d at 1178. Worse here: the generic "App Terms" link appears well

8  below the "Continue as [Player]" button in a box that has the specific, unrelated purpose of

9  notifying the user of what information Facebook is sending to DoubleDown. Though this

10 would be an ideal place to affirmatively notify the user that the App has a host of other terms,

11 Defendants instead simply placed an inconspicuous hyperlink below the disclosure that is the

12 purpose of the box and well below the only button the user needs to push in order to proceed.

13     More importantly, the "App Terms" link shares a fundamental problem with the

14 hyperlink in *Nguyen*: it does not advise the user that, by proceeding, she will be bound by the

15 terms. Instead, Defendants seek here—just as Barnes & Noble unsuccessfully sought in

16 *Nguyen*—to bind their users through a subtle link to the Terms without any other warning that

17 continued use would bind them to the contract. *Nguyen*, 763 F.3d at 1178 ("[T]he proximity or

18 conspicuousness of the hyperlink alone is not enough to give rise to constructive notice, and

19 Barnes & Noble directs us to no case law that supports this proposition."); *see also McKee v.*

20 *Audible, Inc.*, No. 17-cv-1941-GW(EX), 2017 WL 4685039, at *8 (C.D. Cal. Jul. 17, 2017)

21 (applying Washington law, and finding that "a reasonable consumer would not be put on notice

22 that the disclosure below the 'Start Now' button actually attached any contractual consequences

23 to clicking *that particular button* to begin a free membership, much less an arbitration

24 agreement contained in an agreement titled 'Terms of Use.'"). By comparison, the Second

25 Circuit in *Meyer v. Uber Technologies, Inc.* (on which Defendants rely), found that a user was

26 bound when the notification itself advised the user that she would be bound: the text beneath

27

the button warned that "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY." 868 F.3d at 78. Instead, identical to *Nguyen*, Defendants placed a hyperlink below a button that a diligent user could have seen, with no warning that, by continuing on, the user would be bound by the Terms. Thus, even if the user was made aware of the link to the Terms, this is not sufficient. *Nguyen*, 763 F.3d at 1179.

> 2.    *Nor do Defendants obtain user assent to the Terms by intentionally hiding a hyperlink to those Terms in an obscure section of the App.*

Defendants also argue that they obtain assent from Facebook-based App users by presenting an ostensibly visible hyperlink to the Terms at the bottom of their App. (*See* Defs.' Br. at 5 ("Screenshot No. 1"); *see also* Sigrist Decl. ¶ 17.) Defendants base that argument on an image, reproduced below as <u>Figure 3</u>, which Defendants claim (1) represents what the normal App gameplay experience looks like, and (2) includes a "Terms of Use" hyperlink near the very bottom (in a blue bar). Even if Screenshot No. 1 accurately represented gameplay experience, *Nguyen* would hold Defendants' Terms unenforceable. *Nguyen*, 763 F.3d at 1178. But Defendants' argument suffers from an even more fundamental flaw: Screenshot No. 1 is misleading.



Figure 3

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

Exhibit A to the Declaration of J. Eli Wade-Scott is a video of a Facebook user opening the App, playing the game, and moving on to purchase chips.[4] (Wade-Scott Decl. ¶ 2.) As Exhibit A demonstrates, the blue bar depicted at the bottom of Screenshot No. 1 is placed below the play screen and requires a user to scroll down to find it. This is by design: the App could simply be designed to render the blue bar in view with the rest of the play screen. Instead, Defendants intentionally obscure the blue bar with other parts of the play screen.

Defendants are careful with the way they describe the availability of the Terms within the App. Defendants repeatedly note that the bar is visible only if the game is played in "full-screen mode." (Sigrist Decl. ¶ 17 ("full-screen," "full-sized")); Defs.' Br. at 4 ("full-screen"), 14 ("No scrolling was necessary for her to see the link when playing on a full-screen.").) Even that is not always true: as Exhibit A demonstrates, a user in full-screen mode does not always see the bar. Defendants, at least once, acknowledge this fact as well. (Defs.' Br. at 14 ("On the Facebook Platform, the link is immediately available to the user and located in the user's field of vision (depending on the size of the computer screen) when they access the Platform via their computer's web browser.").) Thus, Defendants' suggestion that the bar is visible without additional action or searching by a user is misleading at best.

In any event, Defendants' "Terms of Use" link, hidden underneath the play screen, is deficient under *Nguyen*. It is also substantially identical to notice the Second Circuit rejected in another browsewrap case, *Specht v. Netscape Communications Corp.*, 306 F.3d at 23 (cited with approval in *Nguyen*, 763 F.3d at 1177). The *Specht* court found a user did not agree to the terms of a piece of software where a hyperlink appeared below the download button for the software, on the "next scrollable screen." *Id.* at 30. Here, on the next scrollable screen below the play area—where a normal user would have no reason to go—a link similarly appears. The requirement to play the game in "full screen" to view the Terms link is no different than the

---

[4]    The "Terms Apply" link in the Facebook payment screen does not link to any version of the Terms relied upon by Defendants. (Wade-Scott Decl. ¶ 4.) Instead, it links to Facebook's own payment terms. (*Id.*)

1  additional step of scrolling down: the Terms are not visible without an additional search. Both

2  *Nguyen* and *Specht* hold clearly that these hidden Terms fail to produce assent.

3      Defendants also rely on the nearly indecipherable phrase "DoubleDown Casino is

4  provided by Double Down Interactive, LLC in accordance with the Double Down Interactive,

5  LLC Privacy Policy and Terms of Service," which appears in small font, further underneath the

6  links on the blue bar. Defendants argue that this notification is superior to a simple link to the

7  Terms like that rejected in *Nguyen*, but that argument leapfrogs the requirement that a user

8  would ever see this language. *See Specht*, 306 F.3d at 30. Furthermore, in those rare

9  browsewrap cases on which Defendants rely that do find contract formation, the language is not

10  only *visible*, but far more directive and clear that continuing use of the product subjects the user

11  to terms. *See Meyer*, 868 F.3d at 78 (holding that visible and prominent language advising users

12  "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY"

13  immediately beneath a sign-up button was sufficient to put a reasonable consumer on notice),

14  *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (where phrase "By

15  clicking Sign Up, you are indicating that you have read and agree to the Terms of Service"

16  appeared immediately below "Sign Up" button, user agreed to terms); *see also Major v.*

17  *McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009) (same, where phrase "By submitting

18  you agree to the Terms of Use" appeared directly next to "Submit" button); *see also Hubbert v.*

19  *Dell Corp.*, 359 Ill. App. 3d 976, 979 (5th Dist. 2005) (same, where "All sales are subject to

20  Dell's Term[s] and Conditions of Sale" was visible eight times to purchaser). Defendants'

21  phrase is not visible, and it is peculiarly constructed: framed in the passive voice and with only

22  DoubleDown as the subject and direct object of the sentence; if detected, it does little to advise

23  the *user* that she will be bound by Defendants' terms.

24      Finally, Defendants half-heartedly argue that Ms. Benson had actual knowledge of the

25  Terms because she requested customer support from Defendants. To be clear: though

26  Defendants maintain detailed records about Ms. Benson's use of the App, they have failed to

27

produce any evidence that Ms. Benson was ever presented with, read, or otherwise given actual notice of the Terms. There's a simple reason for that failure: Ms. Benson was never presented with, read, or otherwise given actual notice of the Terms. See *Nguyen*, 763 F.3d at 1176–77 (when—as here—the record does not indicate that user actually reviewed contract terms, the proper inquiry is whether a reasonable user was put on constructive notice). Defendants simply deduce that the Terms link must have come into her view because she clicked on a *different* link in the bar. (Sigrist Decl. ¶ 22.) As noted above, even if Ms. Benson did see the blue bar, these kinds of generic links are insufficient under *Nguyen* because she (like the rest of Defendants' users) was never told that she was being bound by Terms. *Nguyen*, 763 F.3d at 1179 ("[E]ven close proximity of the hyperlink to relevant buttons users must click on— without more—is insufficient to give rise to constructive notice."). Thus, even Defendants' strongest version of the facts—*i.e.*, that the link to the Terms must have come within Ms. Benson's view at some point—was flatly rejected in *Nguyen*, and it must be rejected here.

B.      Ms. Simonson, who played the App on her phone, never assented to the Terms.

Defendants' arguments regarding Ms. Simonson fare no better. Defendants contend that because the Terms were available to Ms. Simonson when she downloaded the App onto her mobile phone through the Apple App Store, and because the Terms were available within the App, that they have formed a contract with her. (Defs.' Br. at 6–8.) But, as with Ms. Benson, Defendants' links to the Terms were not visible to Ms. Simonson, and Defendants never provided any warning that Ms. Simonson would be bound by any Terms. Consequently, Ms. Simonson never agreed to Defendants' Terms.

Defendants first argue that the "App Store page . . . hyperlinks in bright blue font to DDI's License Agreement . . . . Users are provided the opportunity to review the Terms prior to downloading the Mobile Platform from the Apple App Store." (Defs.' Br. at 7.) What Defendants carefully omit is the critical fact about whether this hyperlink is *actually shown* to a user before downloading. It is not.

1      Attached as Exhibit B to the Declaration of J. Eli Wade-Scott is a video of a user

2   downloading the App through the Apple App Store. (Wade-Scott Decl. ¶ 3.) The video

3   demonstrates the crucial flaws with Defendants' argument. First, the user is able to download

4   the App directly from the list of Apps, without *ever opening* the App page that contains the

5   purported notice of terms. (*See* Exhibit B.) This alone demonstrates that no contract is formed.

6   Second, even if a user were to open the App page, at no point is the hyperlink to the terms even

7   visible without scrolling down to the very bottom. The screen the user sees after opening the

8   App page is demonstrated in Exhibit B, as well as in <u>Figure 4</u> below (Wade-Scott Decl. ¶ 5):

9

10

11

12

13                     

14

15

16

17

18

19

20

21

22

23                     <u>Figure 4.</u>

24

25

26

27

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

1  Figure 4 is only shown to users who choose to "preview" the App before downloading; the App

2  can be downloaded without opening this page.[5]

3  And even if a particularly curious user scrolls down to open the App Store page and

4  preview content like "What's New," "Preview" and "Ratings & Reviews," as represented in

5  Figures 5, 6, and 7, no Terms appear.

  

Figure 5                    Figure 6                    Figure 7

Only after a user scrolls down past "What's New," past "Preview," and past "Ratings &

Reviews"—that is, scrolls past several pages of content—might that user finally find the

"Information" section, represented in Figure 8 and Figure 9 below.

//

//

---

5  The download button typically begins as a small blue button labeled "GET," but becomes a cloud icon with a downward pointing arrow—as shown in Figure 4—after the user has downloaded the App once. (Wade-Scott Decl. ¶ 7.)

1
2
3
4
5
6
7
8
9
10
11
12



Figure 8



Figure 9

13    Thus, this link—which Defendants claim "Simonson would have viewed when using

14 the Mobile Platform on a device," (Defs.' Br. at 7 n.9)—is actually not visible at all without

15 considerable exploration by the user. Defendants' singular presentation of the screenshot

16 containing this link ignores the voyage required to get there. This demonstrates a fundamental

17 misunderstanding of what is required to form a contract in digital space, which is not

18 *availability* of the Terms, but *notice* of them. *See Nguyen*, 763 F.3d at 1177; *see also Nicosia*,

19 834 F.3d at 236–37. And, because the relevant hyperlink—which appears at the bottom of the

20 App's page—provides no notice of the Terms to users, courts have routinely rejected them as

21 insufficient to form a contract.

22    This hidden hyperlink is much more difficult to locate than that rejected in *Specht*,

23 where the link appearing on the "next scrollable screen" was held to be insufficient. 306 F.3d at

24 30. And more recently, in *Nicosia*, the Second Circuit also rejected—under Washington law—a

25 far superior notice of Terms. There, Amazon claimed to have gained assent from customers by

26 putting the sentence "By placing your order, you agree to Amazon.com's privacy notice and

27

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1  conditions of use" on the page required to complete an order, just under the "Review your

2  order" heading at the top of the page. 834 F.3d at 236. Notice of the terms and conditions

3  appeared again on the bottom of the page. *Id.* And customers completed the transaction by

4  clicking a "Place your order" button on the top right of the page. *Id.* The court found that this

5  did not produce assent: "Nothing about the 'Place your order' button alone suggests that

6  additional terms apply, and the presentation of terms is not directly adjacent to the 'Place your

7  order' button so as to indicate that a user should construe clicking as acceptance." *Id.* at 236–

8  37. Even though the links to the terms were visible, they were not sufficient.

9       The Terms here were not visible without a considerable search, failing under *Specht*.

10 And nothing about the "GET" button suggests that the user will be bound by a contract that

11 relieves the user of her rights to bring her claims in court. *Cf. Nguyen*, 834 F.3d at 178–79.

12 Under essentially every case to consider these questions, Defendants' hyperlink fails to provide

13 "reasonably conspicuous" notice of the terms, and thus, cannot be said to form a contract.

14       Finally, Defendants contend that the Terms "were made available" within the App

15 itself. (Defs.' Br. at 8.) Again, Defendants skirt the actual issue, which is how the Terms were

16 presented to users. To reach them, the user would have to click on this box with three lines in it,

17 which serves as a button:                    Figure 10



TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1   (Wade-Scott Decl. ¶ 6.) But while Defendants provide assurances that their menu is "apparent

2   to Simonson through every session of gameplay" (Defs.' Br. at 8), they do not explain why any

3   user would ever actually go there.

4       The video attached as Exhibit B demonstrates that a user can both play the game and

5   buy chips without ever visiting the menu. (Wade-Scott Decl. ¶ 3.) As those are the two critical

6   functions of DoubleDown Casino, a user never needs to open the menu. Thus, not only are the

7   Terms hidden behind a menu button, but also Defendants cannot explain why—beyond the

8   menu button being "apparent"—a reasonable user would ever see this link or need to click on

9   it. Finally, even if a user did click on the menu, the link is still not visible: the user has to scroll

10  down to the second screen of the menu to reach what Defendants present as Screenshot No. 5,

11  (Defs.' Br. at 8). (Wade-Scott Decl. ¶ 8.)

12      The menu link falls well below the standards of *Nguyen* and *Nicosia*, both of which

13  rejected actually-visible notices. And again, nothing about playing the App or buying chips

14  would suggest to the user that they are bound by a host of terms. *Nguyen*, 763 F.3d at 1179

15  ("[C]onsumers cannot be expected to ferret out hyperlinks to terms and conditions to which

16  they have no reason to suspect they will be bound."). In *Doe v. Xytex Corp.*, the court held on

17  very similar facts that the hyperlink was poor notice even as compared to the links at issue in

18  *Nguyen*; the defendant "placed the link to its site-usage agreement *even more inconspicuously*

19  than the defendant in *Nguyen* had, inasmuch as the link on xytex.com could only be accessed

20  *after* a user pulled down an additional menu, which menu itself had no indication of the nature

21  of the contract hidden within." No. C 16-02935 WHA, 2016 WL 3902577, at *3 (N.D. Cal.

22  July 19, 2016) (emphasis in original); *see also Van Tassell*, 795 F. Supp. 2d at 792 (finding no

23  assent where user would have to click on non-obvious link to get to terms). The menu link is,

24  under clear precedent, not reasonably conspicuous.

25

26

27

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

C.    <u>Defendants' arguments are not supported by the cases they cite.</u>

The mismatch between Defendants' hyperlinks and virtually any precedent on this subject is notable—indeed, Defendants' brief is slim on the application of law to fact. Defendants do, however, advance one argument against both Plaintiffs, however: that by using the App many times, both Ms. Benson and Ms. Simonson should be bound by the Terms. (Defs.' Br. at 16.) This argument is not founded in law, nor in the cases cited by Defendants. And, as several courts have recognized, Defendants' cases are distinguishable from the consumer use case presented here.

In both *Cairo, Inc. v. Crossmedia Services, Inc.*, No. C 04-04825 JW, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005) and *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004), a party sought to enforce its website's terms of use against a company in a particular business: the companies used software known as "web crawlers," also called "spiders," which automatically visited websites owned by the enforcing parties, gathered information, and placed that information in the companies' databases. *Register.com*, 356 F.3d at 396 (enforcing contractual prohibition against Verio, Inc., which used website crawlers to scrape information from plaintiff's website); *Cairo, Inc.*, 2005 WL 756610 at *3 (enforcing forum selection clause against plaintiff company, which had scraped sales information from defendant's websites hosting grocery store circulars). As Defendants correctly point out, in both cases, the court mentioned the repeated nature of the "crawling" in finding that the companies were aware of the terms of use.

But that is not the whole story: in *Register.com*, the Second Circuit found that the defendant, Verio, Inc., had *actual knowledge* of a contractual restriction because it received it as a caption along with the results each time the crawling software made an inquiry to the website—Verio conceded "full knowledge" of the terms after an inquiry. *Register.com*, 356 F.3d at 396, 401–02. Thus, the Second Circuit concluded, even if it was plausible that Verio was not aware of the terms the *first* time the software submitted a query, Verio certainly was

aware because it submitted numerous queries every day. *Id.* The court did not discuss the conspicuousness of the terms; the opinion is clear that Verio received actual knowledge of the terms after making the first inquiry. *Id.* at 402; *see also Nguyen*, 763 F.3d at 1176 (distinguishing *Register.com* due to actual knowledge). Similarly, in *Cairo, Inc.*, though the court found that the "repeated and automated use" of the website imputed actual knowledge to Cairo, the basis on which notice was found was that the company had been put on actual notice of the terms via a demand letter. 2005 WL 756610, at *5. Furthermore, as the *Cairo* court's language suggests, both cases concern businesses using the website unlike a normal consumer, with automated programs making numerous automated views on the website. As the Court in *Fteja* observed in discussing *Cairo, Inc.*, "the cases in which courts have enforced browsewrap agreements have involved users who are businesses rather than, as in *Specht* and in this case, consumers." *Fteja*, 841 F. Supp. 2d at 836. So too here: Plaintiffs and the putative class are consumers who did not perform an automated "crawl" of the App, and no basis exists to impute actual knowledge when the terms in the App are hidden below the play screen or behind a menu button, neither of which the user needs to visit to play the game or buy chips. Accordingly, Defendants cannot assert that repeated use satisfies the notice requirement.

Defendants also place great stock by dicta in the Second Circuit's *Meyer* decision, noting that the plaintiff in *Meyer* was contemplating a "forward-looking relationship with Uber," which reinforced the court's finding that the visible, declarative language directly below the sign-up button subjected the user to the terms. *Meyer*, 868 F.3d at 80. This dicta cannot stand alone to suggest that repeat users like Ms. Benson and Ms. Simonson should be bound by terms of which they otherwise never had effective notice no matter how many times they played Defendants' games. Both the Second Circuit under Washington law, *Nicosia*, 834 F.3d at 233, and the Ninth Circuit, *Nguyen*, 763 F.3d at 1178, continue to require companies seeking to enforce browsewrap agreements to give the user conspicuous notice of terms. Where

1    Defendants have failed to do that, they have no contract with Plaintiffs—forward-looking

2    relationship or otherwise.

3        Defendants also make the point that a user can signal agreement to website terms by

4    advancing beyond the initial page of an App. (Defs.' Br. at 17–18.) This is uncontroversial to

5    the extent that, as in the cases Defendants cite for this proposition, the App otherwise provides

6    clear notice of the terms. *See Snap-on Bus. Sols. Inc. v. O'Neil & Assocs., Inc.*, 708 F. Supp. 2d

7    669, 682–83 (N.D. Ohio 2010) (holding that user could be bound by "single page access

8    screen," that informs the user that "[t]he use of and access to the information on this site is

9    subject to the terms and conditions set out in our legal statement" immediately below an enter

10   button); *Himber v. Live Nation Worldwide, Inc.*, No. 16-cv-5001(JS)(GRB), 2018 WL

11   2304770, at *4 (E.D.N.Y. May 21, 2018). This argument begs the question of whether the

12   notice reasonably apprised the user of the terms; on that question, Defendants' citations do not

13   support their argument.[6]

14       Defendants' choice to squirrel away hyperlinks to their Terms—in corners of or at the

15   bottom of the Facebook screens, at the bottom of the App's store page in the mobile store, and

16   behind an inconspicuous menu button in the App that no user needs to access—is simply not

17   sufficient to secure Plaintiffs' agreement to that contract. *Nguyen* rejected exactly those kinds

18   of "notice," which would require a user to find Terms to which she had not been told she will

19   be bound. 763 F.3d at 1178-79. Consistent with "courts' traditional reluctance to enforce

20   browsewrap agreements against individual consumers," *id.*, this Court should deny Defendants'

21   motion to compel arbitration in its entirety.[7]

22

23   *//*

24   _____

25   [6]    Defendants cite the Terms themselves, which warn that by using the "Services," the user is subject to the
     Terms. (Defs.' Br. at 18.) This, too, begs the relevant question of how one would get notice of the Terms.

26   [7]    Plaintiffs note that there are a number of arguments—such as the illegality of the contract—that Plaintiffs
27   will present to the arbitrator if Defendants' motion is granted. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546
     U.S. 440, 449 (2006).

1    **III.    In Any Event, IGT Has No Right To Compel Plaintiffs To Arbitration.**

2            In a footnote, Defendants argue that even though IGT is a nonparty to Defendants'

3    purported arbitration agreements with Plaintiffs, IGT may nevertheless compel arbitration of

4    Plaintiffs' claims under those purported agreements. (Defs.' Br. at 12 n.10.) Though left unsaid,

5    Defendants' argument appears rooted in one of two contract doctrines: equitable estoppel or the

6    third-party beneficiary doctrine. Either way, Defendants are wrong.

7            The third-party beneficiary doctrine is a nonstarter. Under Washington law, "both

8    contracting parties must intend that a third party beneficiary contract be created" and "the

9    creation of a third party beneficiary contract requires that the parties intend that the promisor

10   assume a direct obligation to the intended beneficiary at the time they enter into the contract."

11   *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) (quotations omitted). Here,

12   the relevant Terms do not mention IGT, as Defendants evidently acknowledge. (*See* Ex. A to

13   Sigrist Decl.) Moreover, no evidence in the record suggests that "[Plaintiffs] intended to

14   designate [IGT] as a third-party beneficiary, that [IGT] assumed any duties or obligations under

15   the [] contract, or that any party assumed direct obligations to [IGT]." *Rajagopalan*, 718 F.3d at

16   847. So IGT has no right to enjoy—as a third-party beneficiary—the benefits of any purported

17   contract between Plaintiffs and Double Down Interactive, LLC.

18           IGT's claim to equitable estoppel, a rarely-invoked doctrine meant to "preclude[] a

19   party from claiming the benefits of a contract while simultaneously attempting to avoid the

20   burdens that contract imposes," fares no better. *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d

21   1042, 1046 (9th Cir. 2009) (quoting *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir.

22   2006)). Under Washington law, equitable estoppel is appropriate only when the plaintiff's

23   claims are "intertwined with the contract providing for arbitration" or otherwise "arise out of or

24   relate to the contract that contained the arbitration agreement." *Rajagopalan*, 718 F.3d at 846–

25   47 (quotations omitted); *see also Schmidt v. Samsung Elecs. Am., Inc.*, No. 16-cv-1725-JCC,

26   2017 WL 2289035, at *7 (W.D. Wash. May 25, 2017) (citing *Murphy v. DirecTV, Inc.*, 724

27

F.3d 1218, 1229 (9th Cir. 2013)). By contrast, when—as here—a plaintiff alleges "statutory claims that are separate from the [ ] contract itself," a nonsignatory defendant may not compel arbitration under an equitable estoppel theory. *Rajagopalan*, 718 F.3d at 847; *see also Joseph v. TrueBlue, Inc.*, No. 14-cv-5963 BHS, 2015 WL 575289, at *3 (W.D. Wash. Feb. 11, 2015) (quoting *Rajagopalan*). That is exactly the case here: the claims of Ms. Benson and Ms. Simonson, which arise under Washington state statutes, are "statutory claims that are separate from," and in fact have nothing to do with, any purported contract with either defendant in this case. *Id.*

Defendants' cases do not help their argument. In *Schmidt*, the contract that Plaintiffs agreed to with one Samsung entity, SEA, explicitly provided SEA's "affiliates" the right to enforce the contract's terms. *Schmidt*, 2017 WL 2289035, at *7. So it was of no moment that SEA's parent entities—in that court's opinion, "affiliates" under the contract to which plaintiffs agreed—could compel arbitration. *Id.* By contrast here, the Terms in effect when Plaintiffs filed suit do not refer to any entity other than Double Down Interactive. (*See* Ex. A to Sigrist Decl., dkt. 45 at 13.) Furthermore, in *Schmidt*, the court seemingly assumed that the dispute was "founded in or intimately connected with the obligations of the underlying agreement," citing *Murphy* for this proposition of equitable estoppel law and finding that "[a]t least [that] element is met here." 2017 WL 2289035, at *7. Again, here, Plaintiffs' claims are statutory, and Plaintiffs have extensively argued that no contract exists—much less relying upon it as the foundation of their claims.

Neither *Townsend* nor *Romney*—Defendants' other cited cases—alter the calculus. In *Townsend v. Quadrant Corp.*, the plaintiffs sought—among other remedies—rescission of a purchase and sale agreement (*i.e.*, a contract) that governed their purchase of four homes and included an arbitration clause. 153 Wash. App. 870, 875 (2009). Because the plaintiffs' claims arose "from the sale of the home," they were sufficiently related to the purchase and sale agreement so as to allow the defendant's parent entities to compel arbitration under that

1    purchase and sale agreement. *Id.* at 888. But here, where Plaintiff's claims have nothing to do

2    with the purported contract between Plaintiffs and Double Down, *Townsend* is of no help to

3    IGT. *Romney*'s off-handed, single-sentence citation to *Townsend* does not help, either. *See*

4    *Romney v. Franciscan Med. Grp.*, 186 Wash. App. 728, 747 (2015). *Romney* simply cited the

5    rule from *Townsend* and concluded that three employees who signed an arbitration agreement

6    with their employer, FMG, could not escape arbitration of their claims against FMG. *Id.* Those

7    facts are inapposite and consequently the cases are irrelevant here.

8        In *Rajagopalan*, the Ninth Circuit noted—in applying Washington law—that "[w]e

9    have never previously allowed a non-signatory defendant to invoke equitable estoppel against a

10   signatory plaintiff, and we decline to expand the doctrine here." *Rajagopalan*, 718 F.3d at 847.

11   The Court should likewise decline to do so in this case.

12                                    **CONCLUSION**

13       Plaintiffs respectfully request that the Court deny Defendants' motion to stay and

14   compel arbitration, dkt. 44, in its entirety. In the alternative, Plaintiffs respectfully request that

15   the Court deny Defendants' motion as to Defendant International Game Technology, and for

16   such other and further relief as the Court deems equitable and just.

17       DATED this 10th day of September, 2018.

18                                    TOUSLEY BRAIN STEPHENS PLLC

19                                    By: *s/ Janissa A. Strabuk*
20                                        *s/ Cecily C. Shiel*
                                         Janissa A. Strabuk, WSBA #21827
21                                       Cecily C. Shiel, WSBA #50061
                                         jstrabuk@tousley.com
22                                       cshiel@tousley.com
                                         1700 Seventh Avenue, Suite 2200
23                                       Seattle, Washington 98101
                                         Tel:  206.6825600
24                                       Fax:  206.682.2992

25

26

27

1

*Admitted Pro Hac Vice*

2     EDELSON PC
Benjamin H. Richman

3     brichman@edelson.com
J. Eli Wade-Scott

4     ewadescott@edelson.com
350 North LaSalle Street, Ste. 1400

5     Chicago, Illinois 60654
Tel: 312.589.6370

6

7     Rafey Balabanian
rbalabanian@edelson.com

8     Eve-Lynn Rapp
erapp@edelson.com

9     Todd Logan
tlogan@edelson.com

10     123 Townsend Street, Ste. 100

11     San Francisco, California 94107
Tel: 415.638.9660

12

13     *Attorneys for Plaintiff and the Putative Class*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties registered on the CM/ECF system.  All other parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure.

DATED at Seattle, Washington, this 10th day of September, 2018.


By: *s/ Janissa A. Strabuk*
Janissa A. Strabuk, WSBA #21827
jstrabuk@tousley.com

6471/001/520973.1

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992