UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ADRIENNE BENSON AND MARY SIMONSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DOUBLE DOWN INTERACTIVE, LLC, a Washington limited liability company, and INTERNATIONAL GAME TECHNOLOGY, a Nevada corporation,<br><br>Defendant. | CASE NO. 2:18-cv-00525-RBL<br><br>ORDER DENYING DEFENDATS' MOTION TO COMPEL ARBITRATION<br><br>DKT. #44 |

**INTRODUCTION**

THIS MATTER is before the Court on Defendants Double Down Interactive, LLC, and International Game Technology's (collectively "Double Down") Motion to Compel Arbitration. Dkt. #44. The underlying dispute is a class action to recover money lost playing electronic gambling games available through different platforms, including Facebook and iPhone. Hyperlinks to Double Down's Terms of Use, which include an arbitration provision, exist at various points from when a user initially accesses the game through the gameplay experience.

1  Double Down argues that these hyperlinks are sufficiently conspicuous to put a
2  reasonable user on inquiry notice that playing the Double Down Casino game entails agreeing to
3  the Terms of Use. Benson and Simonson respond that they were never bound by Double Down's
4  Terms because the hyperlinks were either hidden at the bottom of the window or obscured from
5  view. Furthermore, they argues that none of the hyperlinks were coupled with a notification
6  alerting a user that they were entering a binding contract.

**BACKGROUND**

Plaintiffs filed their Complaint against Double Down on April 17, 2018, alleging that Double Down Casino constitutes illegal gambling in violation of RCW § 4.24.070. Dkt. #1, at 12-14. Double Down Casino is a game available as a computer or mobile app and allows users to play gambling games with virtual "chips" that may be purchased in the app after users run out of the initial free allotment. *Id.* at 7-8. Despite the fact that these chips cannot be redeemed for actual money, Plaintiffs allege that they are nonetheless valuable because they can be used to continue playing. *Id.* at 13-14. Therefore, Plaintiffs allege that Double Down's game amounts to



gambling as defined by statute and that they are entitled to recover the money they lost playing. *Id.* at 14.

Benson played Double Down Casino on Facebook. Motion, Dkt. #44, at 3. When a user plays the game on Facebook for the first time, they are confronted with a pop-up window, as depicted on the left. *Id.* at 6. This pop-up informs the user about the data sharing practices between Facebook and Double



Down and contains a hyperlink to the "App Terms" at the bottom of the screen, which contain an arbitration provision. *Id*. at 6, 9.

Once the user continues on to play the game, there is another hyperlink to the "Terms of Use" at the bottom of the gameplay screen. *Id*. at 4. This hyperlink is located adjacent to several other links, and below the links is a small notification stating, "DoubleDown Casino is provided by DoubleDown Interactive, LLC in accordance with the DoubleDown Interactive, LLC Privacy Policy and Terms of Service." *Id*. However, both the hyperlink and notification are only viewable if a player scrolls to the bottom of the screen. Dkt. #51, Ex. A (video of user accessing and playing the Facebook app). The gameplay screen is depicted below. Motion, Dkt. #44, at 5.



| | |
|---|---|
| 1 | Simonson played Double Down Casino by downloading it as an iPhone app. *Id*. at 3. To |
| 2 | download the app, a user must first search for it. This brings up a list of apps, and the Double |
| 3 | Down Casino app can be downloaded directly from this list. *See* Dkt. #51, Ex. B (video of a user |
| 4 | searching for, downloading, and playing the Double Down Casino app). If a user opts to |
| 5 | download the app this way, no hyperlink to the Terms of Use appears at all. *Id*. However, if a |
| 6 | user chooses to view the app's individual page before downloading it, a "License Agreement" |
| 7 | hyperlink is visible after a significant amount of scrolling. Opp'n, Dkt. #49, at 14-15. The initial |
| 8 | display of the app page and the bottom of the page with the link are depicted below. *Id*. |

 

1  Finally, once a user downloads the app, the Terms of Use can also be viewed by clicking
2  a link in the settings menu of the app. Motion, Dkt. #44, at 8. However, this menu is not
3  necessary to play the game or buy chips, can only be accessed by clicking a button in the upper
4  corner of the game screen, and only shows the "Terms of Use" link after scrolling down. Wade-
5  Scott Decl., Dkt. #50, at ¶ 8; Dkt. #51, Ex. B. The iPhone app game screen and the bottom of the
6  menu are depicted below. Dkt. #49, at 16; Dkt. #45, at 9.





## DISCUSSION

**1.      Legal Standard**

The Federal Arbitration Act provides for the enforceability of valid arbitration agreements and "permits a party 'aggrieved by the alleged ... refusal of another to arbitrate' to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting 9 U.S.C. § 4). A court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Id.* (citation omitted).

However, a court may "submit to arbitration only those disputes . . . that the parties have agreed to submit." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (internal quotations omitted). Determining whether parties have agreed to submit to arbitration requires applying "general state-law principles of contract interpretation." *Id.* (quoting *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir.2009)). "If the parties contest the existence of an arbitration agreement, the presumption in favor of arbitrability does not apply," *id.*, and the burden of proving the existence of an agreement rests with the party trying to compel arbitration. *Norcia v. Samsung Telecomms. America*, LLC, 845 F.3d 1279, 1283 (9th Cir. 2017). In addition, such formation issues are decided by a district court, not an arbitrator. *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007).

**2.      Formation of an Agreement to Arbitrate**

Whether Double Down can compel arbitration turns on whether its "Terms of Use" hyperlinks put Benson and Simonson sufficiently on notice of their obligation to arbitrate disputes – in other words, this is a "browsewrap" case. Browsewrap agreements, along with

clickwrap agreements, are the spawn of consumer contracts and the Internet age. While clickwrap agreements require a consumer to affirmatively click a box manifesting their assent to a website's terms, browsewrap agreements may sometimes be formed simply by using a website containing a hyperlink to its terms. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014). Several courts have observed that the law of other jurisdictions is similar to Washington law on this topic. *See, e.g., Domain Name Comm'n Ltd. v. DomainTools, LLC*, No. C18-0874RSL, 2018 WL 4353266, at *3 (W.D. Wash. Sept. 12, 2018) (applying Washington law in a case involving browsewrap and relying on Ninth and Second Circuit cases applying the law of other states); *Spam Arrest, LLC v. Replacements, Ltd.*, No. C12-481RAJ, 2013 WL 12108077, at *7 n.10 (W.D. Wash. Aug. 20, 2013) (observing that Washington law does not differ greatly from the law of other states with respect to online contracts).

The Ninth Circuit has stated that "the validity of [a] browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d at 1176 (quoting *Van Tassell v. United Mktg. Grp., LLC*, 795 F.Supp.2d 770, 790 (N.D.Ill.2011)). "Courts have consistently enforced browsewrap agreements where the user had actual notice of the agreement." *Id*. However, where this is not the case, whether a website would put a reasonably prudent user on inquiry notice of its terms "depends on the design and content of the website and the agreement's webpage." *Id*. at 1177. Courts should distinguish between cases where the terms of use are "buried at the bottom of the page or tucked away in obscure corners of the website" and cases "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Id*. Ultimately, "the conspicuousness and placement of the 'Terms of Use' hyperlink,

other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *Id*.

In *Nguyen*, the Ninth Circuit held that a browsewrap agreement was not formed despite the fact that the hyperlinks to the website's terms of use were either visible without scrolling or located so close to the "checkout" button that a user would necessarily see them. *Id*. at 1178. The court distinguished *PDC Labs., Inc. v. Hach Co.*, where the website's hyperlinks were similarly conspicuous but users were also prompted to "review terms" before placing their final order. *Id*. (quoting No. 09–1110, 2009 WL 2605270 (C.D.Ill. Aug. 25, 2009)). The court held that websites with conspicuous hyperlinks but that "provide[] no notice to users nor prompt[] them to take any affirmative action to demonstrate assent" do not give inquiry notice. *Id*. at 1179; *see also McKee v. Audible, Inc.*, No. CV 17-1941-GW(EX), 2017 WL 4685039, at *8 (C.D. Cal. July 17, 2017) (finding no inquiry notice where the website's notification stated that "completing your purchase" would bind the user to the terms, but did not state that clicking the "start now" button to begin a free trial would carry this consequence).

In contrast, in *Meyer v. Uber Technologies, Inc.*, the Second Circuit held that a browsewrap agreement was formed where the notification and hyperlink regarding terms of use were "spatially . . . [and] temporally coupled" with the mechanism for manifesting assent. 868 F.3d 66, 78 (2d Cir. 2017). As the court described, "The Payment Screen [was] uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account . . . , and the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY.'" *Id*. The court held that a reasonable consumer would understand that this configuration "connect[ed] the contractual terms to the services to which they appl[ied]." *Id*.

1    These cases illustrate that, if there is no actual notice, a browsewrap agreement must at
2 least provide a conspicuous link with some accompanying notification alerting a user that they
3 are entering into a contract. Here, Double Down has not met these requirements for inquiry
4 notice. When a user first accesses the Facebook app, the "App Terms" link on the initial pop-up
5 window is located far below the "Continue" button in small grey text. *See* Motion, Dkt. #44, at 6.
6 Furthermore, the pop-up window's main purpose is to gain permission for data sharing between
7 Facebook and Double Down, which is not a point traditionally associated with binding terms
8 unrelated to the data sharing itself. *See Meyer*, 868 F.3d at 78. When a user first downloads the
9 iPhone app, the app page contains a link to the "License Agreement" that may only be viewed
10 after significant scrolling, and the app may be downloaded directly from the search results list
11 without ever accessing the particular Double Down Casino app page. Opp'n, Dkt. #49, at 13-14.
12 Neither the initial link on Facebook or on the mobile app is coupled with a notification informing
13 a user that downloading or playing Double Down Casino creates a binding agreement.
14    The hyperlinks within the game itself also do not put a user on inquiry notice. On
15 Facebook, the "Terms of Use" hyperlink is located at the very bottom of the gameplay screen in
16 small font next to several other links, and is not visible unless a user scrolls down. *See*
17 *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. CV997654HLHVBKX, 2003 WL 21406289, at *2
18 (C.D. Cal. Mar. 7, 2003) (distinguishing between cases where the notification and link are
19 prominent and cases where they are only visible by scrolling). On the mobile app, the link to the
20 Terms of Use is located within a settings menu that a player may never even need to access.
21 Furthermore, links that are available only via the settings menu are not "temporally coupled"
22 with a discrete act of manifesting assent, such as downloading an app or making a purchase, and
23 are thus less likely to put a reasonable user on inquiry notice. *See Meyer*, 868 F.3d at 78.
24

1     Double Down contends that the notification underneath the Terms link in the Facebook

2     app provides the additional reinforcement that was absent in *Nguyen* to create inquiry notice.

3     Reply, Dkt. #53, at 4. However, Double Down's generic notification that its game "is

4     provided. . . in accordance with the . . . Privacy Policy and Terms of Service" is a far cry from

5     the more specific notifications found in cases reaching different conclusions than *Nguyen*. *See,*

6     *e.g., Rodriguez v. Experian Servs. Corp.*, No. CV 15-3553-R, 2015 WL 12656919, at *2 (C.D.

7     Cal. Oct. 5, 2015) ("Their website contained a hyperlink to the Terms of Use at the bottom of

8     every page and included an express disclosure and acknowledgment, which stated, 'By clicking

9     the button above ... you agree to our Terms of Service.'"); *Fteja v. Facebook, Inc.*, 841 F. Supp.

10    2d 829, 835, 839 (S.D.N.Y. 2012) (enforcing an agreement where "[the] following sentence

11    appears immediately below that button: 'By clicking Sign Up, you are indicating that you have

12    read and agree to the Terms of Service.'"); *Major v. McCallister*, 302 S.W.3d 227, 230 (Mo. Ct.

13    App. 2009) ("ServiceMagic did put 'immediately visible notice of the existence of license

14    terms'—i.e., 'By submitting you agree to the Terms of Use' and a blue hyperlink—right next to

15    the button that Appellant pushed.").

16        Here, the notification does not identify any action by the user that would manifest assent,

17    nor does the reference to "Terms of Service" in the notification even match the "Terms of Use"

18    hyperlink above it. *See* Sigrist Decl., Dkt. #45, at ¶ 21; *McKee v. Audible, Inc.*, No. CV 17-1941-

19    GW(EX), 2017 WL 4685039, at *8 (C.D. Cal. July 17, 2017) (noting that "even were a

20    consumer to understand that selecting the 'Start Now' button bound that user to Audible's

21    Conditions of Use, that consumer would also need to surmise that Audible really meant the

22    document titled 'Terms of Use' that appears on the following page"). Furthermore, the

23    notification is in extremely small print and in no way demands a user's attention or alerts them

24

that the information is important. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 404 (E.D.N.Y. 2015) (holding that an agreement was invalid where "[t]he hyperlink to the 'terms of use' was not in large font, all caps, or in bold").

Double Down also insists that, because Plaintiffs played their game many times, insufficient notice is somehow made sufficient through shear repetition. Double Down bases this theory primarily on the reasoning from *Register.com, Inc. v. Verio, Inc.* and *Cairo, Inc. v. Crossmedia Services, Inc.* In *Register.com*, a user was charged with actual knowledge of website terms because, after each automated search on the website, they saw the terms attached to each response. 356 F.3d 393, 396-97, 401-02 (2d Cir. 2004). Crucially, the user admitted to being "fully aware of the terms." *Id*. at 402. The user in *Cairo* also engaged in automated searching of the defendant's web pages, each of which included a prominent notification upon entry that using the site required agreeing to its terms. No. C 04-04825 JW, 2005 WL 756610, at *2 (N.D. Cal. Apr. 1, 2005). In addition to the user admitting to actual knowledge, the court also held that the "repeated and automated use" of the web pages meant that knowledge of the terms could be imputed. *Id*. at *5.

The holdings in *Register.com* and *Cairo* are simply inapplicable in a case like this where there is no actual knowledge or prominent notification. *Register.com* rested on the user's admission of actual knowledge, but neither Benson nor Simonson made such an admission. To the extent that the reference to "imputing knowledge" in *Cairo* may be compared to putting a user on inquiry notice, the website in *Cairo* contained an "explicit textual notice" that informed users that they would be bound by the terms. *See Nguyen*, 763 F.3d at 1177 (distinguishing *Cairo*). That is not true here, and Double Down has given the Court no reason to extend the reasoning in *Cairo*. Indeed, on a logical level, Double Down's position is not compelling. While

repeatedly playing a game may make it more likely that at some point the "Terms of Use" hyperlink will cross the user's field of vision, *Nguyen* specifically held that this is not enough for inquiry notice. *See* 763 F.3d at 1178-79. Furthermore, after moving beyond the initial download, a user likely becomes *less* alert to binding contract terms while casually using the product. *See Meyer*, 868 F.3d at 78. It would be a different story, perhaps, if the terms popped up each time the user fired up the game or when they registered their account, but that is not the story here. *See id*.

      Double Down also attempts to bring this case closer to *Register.com* and *Cairo* by arguing that Benson once used the "Need Help?" hyperlink, which is next to the "Terms of Use" hyperlink at the bottom of the Facebook gameplay window, and thus "likely received actual notice" of the website's terms. Sigrist Decl., Dkt. #45, at ¶¶ 21-22; Reply, Dkt. #53, at 5-6. However, Double Down presents no evidence that Benson actually used the in-game link to access customer service; she could have just as easily searched the Internet. Even if Double Down could somehow prove that Benson clicked the in-game link, this does not support actual notice. Instead, this merely addresses Double Down's scrolling problem, which does nothing to overcome *Nguyen*'s holding that even hyperlinks more prominent than Double Down's are insufficient on their own. *See* 763 F.3d at 1178-79. As previously discussed, the small-print notification below Double Down's link is not enough to overcome this barrier.

      Double Down's final argument is that the "Apple Media Terms and Conditions," which state that "each transaction is an electronic contract between you and Apple and/or you and the entity providing the content," somehow bound Simonson to Double Down's Terms. Reply, Dkt. #53, at 7. The case that Double Down cites in support of this proposition did not involve browsewrap and focused on a contract between a user and the owner of the app store (Google),

not a user and an app developer. *See Svenson v. Google Inc.*, No. 13-CV-04080-BLF, 2016 WL 8943301, at *13 (N.D. Cal. Dec. 21, 2016). In any case, the issue here is not whether a contract *of some nature* was created when Simonson downloaded the app, but rather whether Simonson agreed to be bound by Double Down's Term of Use. In light of the foregoing, the Court concludes she did not.

## CONCLUSION

For the reasons stated above, Double Down's Motion to Compel Arbitration (Dkt. #44) is **DENIED**.

IT IS SO ORDERED.

Dated this 13th day of November, 2018.

Ronald B. Leighton
United States District Judge