The Honorable Robert S. Lasnik

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

9

10 | ADRIENNE BENSON AND MARY
SIMONSON, individually and on behalf of all
11 | others similarly situated,

12 |                             Plaintiffs,

13 |        v.

14 | DOUBLE DOWN INTERACTIVE, LLC, a
Washington limited liability company, and
15 | INTERNATIONAL GAME TECHNOLOGY, a
Nevada Corporation,

16 |                             Defendants.

17
18
19
20
21
22
23
24
25
26
27
28

Case No. 2:18-cv-00525-RSL

**DEFENDANTS' MOTION TO
DISMISS UNDER FED. R. CIV
P. 12(B)(1) AND MOTION TO
ABSTAIN**

ORAL ARGUMENT REQUESTED

NOTE ON MOTION CALENDAR:
October 9, 2020

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION...................................................................................................1

II.    FACTUAL BACKGROUND .................................................................................2

    A.    Allegations in the First Amended Complaint.................................................2

    B.    The State Law Issues Presented Are Undecided by Any Washington Court...........2

    C.    The Commission Has Approved the Games in Question..........................................3

    D.    Procedural Status of the Lawsuit...................................................................5

III.   LEGAL STANDARDS..........................................................................................6

IV.    ARGUMENT .........................................................................................................7

    A.    Abstention Is Required Because the Interpretation and Application of Gambling Laws Are Reserved for the States. ............................................................8

    B.    Plaintiffs' Claims Rest on an Unsettled Interpretations of Washington's Gambling Laws. .......................................................................................10

        1.    No Washington state court has considered whether the types of games at issue in this case are gambling. ....................................................10

        2.    The interplay between the criminal and civil implications has not been considered by a Washington state court. ............................................13

    C.    Defendants Meet the Criteria for Abstention. ......................................................14

        1.    The Ninth Circuit's factors favor *Colorado River* abstention....................14

    D.    Abstention Is Appropriate When There Are Unresolved Issues of State Law under *Thibodaux*...................................................................................18

    E.    The Court Should Abstain Because Washington Has a Well-Established Regulatory Structure to Interpret and Enforce its Gambling Regulations. .............19

    F.    Abstention Is Also Necessary Under *Pullman* Because the Interpretation of Washington Law May Avoid Potential Constitutional Issues. .........................20

V.     CONCLUSION ....................................................................................................20

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Aaron v. Target Corp.*, 357 F.3d 768 (8th Cir. 2004) ........................................................17

4

*Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253 (9th

5     Cir. 1988) ..............................................................................................................15, 18

6
*Bullseye Distributing LLC v. State Gambling Commission*, 127 Wn. App. 231

7     (2005) ...................................................................................................................... 11-12

*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) ..................................................................*Passim*

8

*Canton v. Spokane Sch. Dist. No. 81*, 498 F.2d 840 (9th Cir. 1974)............................7, 20

9

*Chun v. New York*, 807 F. Supp. 288 (S.D.N.Y. 1992) .................................................8, 10

10

*Club Ass'n of W. Va, Inc. v. Wise*, 156 F. Supp. 2d 599 (S.D. W. Va. 2001), *aff'd*,

11     293 F.3d 723 (4th Cir. 2002)......................................................................................10

12
*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) ............*Passim*

13

*Diamond Game Enters. v. Howland*, 1999 WL 397743 (D. Or. Mar. 23, 1999)............................10

14

*Employers' Innovative Network, LLC v. Bridgeport Benefits, Inc.*, 2019 WL

15     539075 (S.D.W. Va. Feb. 11, 2019)..........................................................................15

16
*G2, Inc. v. Midwest Gaming, Inc.*, 485 F. Supp. 2d 757 (W.D. Tex. 2007)....................................10

17

*Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 399 F.3d 1276

18     (11th Cir. 2005) ..........................................................................................................8

19
*Internet Cmty. & Entm't Corp. v. Wash. State Gambling Comm'n*, 148 Wn. App.

20     795, 808 (2009) (citing *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004)), *rev'd on

      other grounds*, 169 Wn.2d 687 (2010) ........................................................................13

21
*Johnson v. Collins Entm't Co.*, 199 F.3d 710, 720 (4th Cir. 1999), *certified question

22     answered*, 948 So. 2d 599 (Fla. 2006)...........................................................8-9, 15, 19

23
*Kater v. Churchill Downs, Inc.*, 886 F.3d 784 (9th Cir. 2018) ...................................... 12, 16, 18-19

24
*Kater v. Churchill Downs Inc.*, No. 2:15-cv-00612-RBL  (W.D. Wash. July 24,

25     2020), Dkt. 218-1 § 3.4 .......................................................................................... 12-13

26
*Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959)................................1, 6, 18

*Meadow Valley Contractors, Inc. v. Johnson,* 89 F. Supp. 2d 1180 (D. Nev. 2000)......................17

27

*Medina v. Rudman*, 545 F.2d 244 (1st Cir. 1976)..........................................................8

28

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

*Metro Riverboat Assocs., Inc. v. Balley's La., Inc.*, 142 F. Supp. 2d 765 (E.D. La. 2001) ............................................................................................................. 10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) .......................... 15-17

*Murphy v. NCAA*, 138 S. Ct. 1461 (2018) .............................................................. 8

*Nakash v. Marciano*, 882 F.2d 1411 (9th Cir. 1989) ................................................ 17-18

*Polykoff v. Collins,* 816 F.2d 1326 (9th Cir. 1987) .................................................. 17

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) .............................................. 7, 10

*R.R. Street & Co. v. Transp. Ins. Co.*, 656 F.3d 966 (9th Cir. 2011) ................................. 16-17

*Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941) ............................. 1, 7, 10, 20

*Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001) ............................................ 6

*Seneca Ins. Co. v. Strange Land, Inc.*, 862 F.3d 835 (9th Cir. 2017) ............................... 7, 15-16

*State v. Rosenthal*, 93 Nev. 36 (1977) ................................................................ 8

*Thomas v. Bible*, 694 F. Supp. 750 (D. Nev. 1988), *aff'd*, 896 F.2d 555 (9th Cir. 1990) ............................................................................................................ 8

*Travelers Indem. Co. v. Madonna*, 914 F.2d 1364 (1990) .......................................... 15-17

*Wildgrass Oil & Gas Comm. v. Colorado*, 447 F. Supp. 3d 1051 (D. Colo. 2020), *appeal filed* (10th Cir. Apr. 17, 2020) ......................................................... 19

*Wilson v. Playtika Ltd.*, No. 3:18-cv-05277-RBL (W.D. Wash. Aug. 6, 2020), Dkt. 121-1 ........................................................................................................ 12

*Winshare Club of Canada v. Dep't of Legal Affairs*, 542 So. 2d 974 (Fla. 1989) .................. 8

**Statutes**

15 U.S.C. § 3001(a)(1) ................................................................................. 9

RCW 4.24.070 ......................................................................................... 2, 6

RCW 9.46.010 ............................................................................................ 14

RCW 9.46.0237 .......................................................................................... 2

RCW 9.46.240 ............................................................................................ 14

RCW 9.46.0285 ................................................................................... *Passim*

RCW 19.18.010, *et seq* ................................................................................ 6

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

RCW 19.86.010 *et seq.*................................................................................................2

**Other Authorities**

FED. R. CIV. P. 12(b)(1) ............................................................................................6

*Gambling in America*: *Final Report of the Commission on the Review of National Policy Toward Gambling* 1, 5 (1976)..............................................................8

H.R. REP. NO. 106-655 (2000) ................................................................................8

United States Constitution Tenth Amendment......................................................8, 15, 20

DEFS.' MOT. TO DISMISS AND ABSTAIN - iv
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

# I.    INTRODUCTION

Critical concepts of state sovereignty and federalism make this case the "exceptional circumstance" where this Court should abstain from exercising jurisdiction to permit the Washington state courts to address "difficult questions of state law bearing on policy problems of substantial public import" under *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814 (1976), and the related federal abstention principles articulated in *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959), *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500-01 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Double Down Interactive, LLC ("Double Down") and International Game Technology ("IGT") respectfully move that this Court to abstain and stay this matter pending resolution of unsettled state law by the Washington courts.

Gambling laws are an area where state law has long been preeminent.  Plaintiffs' claims rest on novel and untested interpretations of Washington's gambling laws that, when resolved, will be determinative of Defendants' ultimate liability.  No Washington court has determined whether the mere extension of time playing any game may serve as a "thing of value" under RCW 9.46.0285 and how the law may apply when players purchase virtual chips for purposes other than to extend gameplay.  These questions, and others about the interplay of civil liability under a criminal statute, transcend this case and impact the entire online gaming industry in Washington. The interpretation of these unsettled questions regarding Washington's gambling statutes should be left for Washington courts to decide.  Moreover, Washington has a coherent administrative structure set by statute.  The Washington State Gambling Commission ("Commission") has exclusive authority to enforce the state's gambling statutes.  This state regulatory system militates toward this Court abstaining from hearing this case to allow the state to interpret its own gambling laws, especially given that the Commission previously published guidance explicitly stating that DoubleDown Casino, the game at issue here, did not violate Washington law.  Thus, because it is inappropriate for this Court, or any federal court, to adjudicate these fundamental state law issues, this Court should abstain from interpreting Washington's gambling laws, yield that interpretation to the Washington state courts, and stay this action pending the Washington courts' resolution.

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

## II.     FACTUAL BACKGROUND

### A.     Allegations in the First Amended Complaint

Plaintiffs' First Amended Complaint does not allege any federal law questions.  *See generally* Dkt. 41.  Instead, Plaintiffs allege state law causes of action against Double Down and IGT for Recovery of Money Lost at Gambling under RCW 4.24.070; Violation of Washington Consumer Protection Act under RCW 19.86.010 *et seq.*; and Unjust Enrichment.  Dkt. 41 ¶¶ 45-75.  Each of the allegations is premised upon the theory that Plaintiffs' purchases of virtual chips in DoubleDown Casino are unlawful gambling under RCW 9.46.0237[1] and rests on their interpretation that virtual chips "are 'thing[s] of value' under RCW 9.46.0285[2] because they are credits that involve the "extension of entertainment and a privilege of playing a game without charge." Dkt. 41 at 14:16-18.  Plaintiffs also seek injunctive relief requiring Defendants to "cease the operation of their games." *Id.* ¶ 58.  Defendants deny these allegations.  Dkt. 74 at 20:1-2, 21:17.

Double Down and IGT did not choose this forum.  Plaintiffs commenced this action asserting state law claims only, invoking jurisdiction of the federal court under the Class Action Fairness Act.  Dkt. 41 ¶ 10.

### B.     The State Law Issues Presented Are Undecided by Any Washington Court

Double Down's video games include social games that entertain players with a variety of animation and virtual situations.  Dkt. 104 ¶ 2.  The games are free to download, free to play, and never result in monetary prizes.  *Id.*  Because players receive free virtual chips in a variety of ways, they need not purchase any virtual chips to play.  *Id.*  Players first receive free chips when they download the app and later obtain additional free chips.  *Id.*  In fact, contrary to the

---

[1] "'Gambling,' as used in this chapter, means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." RCW 9.46.0237.

[2] Under RCW 9.46.0285, "[t]hing of value" . . . "means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."

DEFS.' MOT. TO DISMISS AND ABSTAIN - 2
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

allegations of Plaintiffs that users must purchase virtual coins in order to play,[3] virtually no Double Down players purchase chips in order to continue to play. *Id*. A player cannot "cash out" their virtual chips. *Id*. Nor may players sell or transfer their accounts or any virtual chips in their account to another person. *Id*. Although the games can be played for free, Double Down's games, like many video games, allow players to buy more chips before they receive more free chips. *Id*.

The video game industry, including the development of casual or social games, represents a substantial portion of Washington's tech-driven economy, employing about 94,200 Washingtonians. *Id.* ¶¶ 4-9 & Exs. 1-4. Washington ranks third in the country in the total number of active video game developers, with nearly 300 such companies with offices in Washington, including major industry players and household names. *Id.* ¶ 4. Double Down likewise maintains its U.S. headquarters in Seattle, and currently employs almost 150 people in Washington. *Id.* ¶ 5.

### C.   The Commission Has Approved the Games in Question.

The Commission considered the subject of social gaming in connection with a public meeting on March 9, 2013, and subsequently posted its guidance in March 2014, that games such as DoubleDown Casino were not unlawful. In the March 9, 2013, public meeting, Paul Dasaro, Administrator of the Electronic Gambling Lab, and Rick Herrington, Program Manager in the Criminal Intelligence Unit, prepared and gave a staff presentation on "Social Gaming" at the Commission's public meeting. Social Gaming Presentation, May 9, 2013, Dkt. 107, Ex. 1. Their presentation to the Commission used DoubleDown Casino as an example. Dkt. 107 at 12. The presentation observed that "Social Gaming" was not gambling because the "prize" element of gambling was absent:

---

[3] Dkt. 41 ¶¶ 33, 35.

DEFS.' MOT. TO DISMISS AND ABSTAIN - 3
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

*Id.* at 17.

The Commission considered "casino-style games . . . characterized by the use of virtual game play credits," the exact business model now challenged by Plaintiffs. *Id*. at 21.  In fact, the Commission commented on DoubleDown Casino:

> One of the most popular poker games is a standard Texas Hold'em game called DoubleDown Casino.  Players are sitting at a virtual poker table playing with other real people who can be anywhere in the world.  They are playing with virtual chips that can either be purchased or just gained through entering the game.  This is a company that was purchased recently by IGT and is an IGT themed slot game. DoubleDown is based out of Seattle.  It is an online version of the same game that has been approved for Washington TLS, and is in many jurisdictions throughout the world.  Players are using virtual chips and not real chips, and these virtual chips cannot be redeemed for real cash.  With DoubleDown's ability to purchase virtual chips, players get 150,000 chips for $3, which they can purchase directly through their Facebook page.  Zynga has a different conversion, but is essentially the same concept.  Players can purchase more chips or more time to play with real money, which is how these companies make their money.

*Id.* at 21-22.

The conclusion of the project and presentation requested by the Commission was that the games were **not** gambling because there was no prize:

> **Program Manager Rick Herrington** explained that when he looks at any form of gambling, especially on the internet, he applies the basic rules of gambling: chance, consideration, or prize. In each of these games, there are two of the elements, but not the third, which is an actual prize.  Players do get virtual prizes and/or an endorphin rush; they can build their avatar and improve their avatar by purchasing other things of the same nature.  **It is not gambling in the current format according to Washington State law**.  At any time in the future, if the federal government or Washington State changes its laws, any one of these social platforms could be changed to a real gambling platform overnight.

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

*Id.* at 22 (emphasis added).

After this meeting, the Commission acted consistently with the presentation and its conclusion that the Double Down games were not gambling under Washington law. In March 2014, the Commission prepared and posted a brochure on its website to give "general guidance" to the public confirming that social gaming was not gambling, entitled "Online Social Gaming – When is it Legal? What to Consider."  Dkt. 107, Ex. 3.  The brochure states:



**No Prize = No Gambling = OK To Play**

*Buying virtual money:*
Many Social Gaming websites give free virtual money to begin play, with an option to buy more virtual money with "real" money to continue play. All play uses this virtual money.

Legal Social Gaming websites will not let players cash in their virtual winnings or points for "real" money or prizes.

Because there is no prize, these games are **not** gambling. However, if the virtual money can be sold or redeemed for "real" money or a prize, the game is illegal.

*Id.* at 49, Ex. 3.

DDI was aware of and relied upon the Commission's guidance and lack of enforcement at all pertinent times.  IGT owned Double Down Interactive LLC at the time of the Commission's May 9, 2013 meeting, and was similarly aware of and relied upon the Commission's guidance and lack of enforcement at all pertinent times.

**D.    Procedural Status of the Lawsuit**

This case is in its early stages.  In the two years since the original Complaint was filed, the parties have litigated only whether Plaintiffs agreed to arbitration.  After an appeal on the requirement to arbitrate, the case returned to this Court on February 20, 2020.  Dkt. 88.  The Court

DEFS.' MOT. TO DISMISS AND ABSTAIN - 5
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

has ruled on cross-motions for protective orders and a motion to compel regarding discovery issues, Dkt. 126, and denied Defendants' Motion to Certify Questions to the Washington Supreme Court, Dkt. 127, which Defendants have timely moved to reconsider, Dkt. 133.  Defendants have also moved to strike nationwide class allegations.  Dkt. 128.

Defendants have filed a declaratory judgment action in Thurston County Superior Court asking the court to issue a declaration that (1) the virtual chips purchased and used by Benson and Simonson in DoubleDown Casino are not "things of value" as defined by RCW 9.46.0285; (2) that DoubleDown Casino games played by Benson and Simonson are not illegal gambling games under Washington law; (3) that Benson and Simonson are not entitled to recover under RCW 4.24.070, the Washington Consumer Protection Act, RCW 19.18.010, *et seq*. or for unjust enrichment.  *See* Exhibit 1, Complaint for Declaratory Relief (without exhibits).

### III.    LEGAL STANDARDS

A motion to dismiss filed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure "allow[s] a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  In a Rule 12(b)(1) motion, the burden of proving that jurisdiction exists falls to the party asserting jurisdiction. *Ramming*, 281 F.3d at 161.

Multiple federal abstention doctrines support this Court in abstaining from exercising jurisdiction here.  Under the *Colorado River* doctrine, a court considers whether concurrent adjudication with a state court action is appropriate based on considerations of "wise judicial administration, giving regard to conservation of judicial resources, and comprehensive disposition of litigation." *Colorado River*, 424 U.S. at 817 (citation & internal quotation marks omitted). Abstention is likewise appropriate under *Thibodaux* where a case "present[s] difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result" in that particular case. *Id.* at 814 (citing *Thibodaux*, 360 U.S. 25).  The Ninth Circuit considers the following eight-factor test when considering *Colorado River* abstention:

(1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4)  the order in which the forums obtained jurisdiction; (5) whether federal law or

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.

*Seneca Ins. Co. v. Strange Land, Inc.*, 862 F.3d 835, 841-42 (9th Cir. 2017) (quoting *R.R. Street & Co. v. Transp. Ins. Co.*, 656 F.3d 966, 978-79 (9th Cir. 2011)).

Under *Burford*, abstention is appropriate where (1) the case presents a difficult issue of state law, (2) the case is in an area of important state policy, and (3) there is a unified state enforcement mechanism for the rights in question. *Burford*, 319 U.S. at 333-34.

Similarly, abstention is appropriate under *Pullman* where a three-pronged test, including considerations of sensitive social policy, constitutional issues, and uncertainty of state law is considered. *Canton v. Spokane Sch. Dist. No. 81*, 498 F.2d 840, 845 (9th Cir. 1974) (quoting *Pullman*, 312 U.S. at 498-99).

When abstention is warranted, in a case involving money damages, the appropriate remedy is for the court to stay the federal action pending the resolution of the state court issues by the state court. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 721 (1996) (federal courts must only stay actions for damages based on abstention).

## IV.    ARGUMENT

This case presents the "exceptional circumstances" required under a myriad of decisions explaining the fundamental concept that federal courts should abstain from exercising their jurisdiction under certain circumstances. "[T]he proposition that a court having jurisdiction must exercise it, is not universally true." *Id.* at 716 (quoting *Canada Malting Co. v. Patterson S.S.*, 285 U.S. 413, 422 (1932)).  The principles underlying the abstention doctrine reflect "our federal system whereby the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and for the smooth working of the federal judiciary." *Pullman*, 312 U.S. at 500-01 (internal quotation marks omitted).  Abstention here, where this Court's determination and interpretation of Washington's gambling laws intrudes on state sovereignty, is proper when considering "proper constitutional adjudication," "regard for federal-state relations," and "wise judicial administration." *Colorado*

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

*River*, 424 U.S. at 817.

**A.    Abstention Is Required Because the Interpretation and Application of Gambling Laws Are Reserved for the States.**

The Constitution reserves issues regarding state gambling laws for state self-determination under the Tenth Amendment.  *See Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018) (prohibition of state authorization of sports gambling schemes violates the anti-commandeering rule under the Tenth Amendment); *Thomas v. Bible*, 694 F. Supp. 750, 760 (D. Nev. 1988) (licensed gaming is reserved to the states under the Tenth Amendment), *aff'd*, 896 F.2d 555 (9th Cir. 1990)); *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 399 F.3d 1276, 1278 (11th Cir. 2005) (regulation of gambling lies at the "heart of the state's police power" (quoting *Johnson v. Collins Entm't Co.*, 199 F.3d 710, 720 (4th Cir. 1999))), *certified question answered*, 948 So. 2d 599 (Fla. 2006); *United States v. King*, 834 F.2d 109, 111 (6th Cir. 1987) (regulation of gambling has been left to the state legislatures); *Medina v. Rudman*, 545 F.2d 244, 251 (1st Cir. 1976) (enactment of gambling laws is proper exercise of the state's police power); *Chun v. New York*, 807 F. Supp. 288, 292 (S.D.N.Y. 1992) (scope of laws regulating gambling and lotteries is clearly matter of state concern); *Winshare Club of Canada v. Dep't of Legal Affairs*, 542 So. 2d 974, 975 (Fla. 1989) (gambling is "a matter of peculiarly local concern that traditionally has been left to the regulation of the states"); *State v. Rosenthal*, 93 Nev. 36, 44 (1977) ("We view gaming as a matter reserved to the states within the meaning of the Tenth Amendment to the United States Constitution.").

In addition, the United States Congress has recognized that "[s]ince the founding of our country, the Federal Government has left gambling regulation to the States. . . .  The Federal Government has largely deferred to the authority of States to determine the type and amount of gambling permitted."  *See* H.R. REP. NO. 106-655 (2000) (proposal for 2000 federal gambling regulations*); Gambling in America*: *Final Report of the Commission on the Review of National Policy Toward Gambling* 1, 5 (1976) ("[T]he States should have the primary responsibility for determining what forms of gambling may legally take place within their borders. The Federal Government should prevent interference by one State with the gambling policies of another, and

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

should act to protect identifiable national interests."); *see also* 15 U.S.C. § 3001(a)(1) ("[T]he States should have the primary responsibility for determining what forms of gambling may legally take place within their borders[.]").

Because of this, courts regularly abstain when gambling laws underpin merits issues.  In a case considering a near identical situation to Plaintiffs' claims against Defendants here, the Fourth Circuit, in *Johnson*, grappled with the same issues of comity indicative in interplay between the states' rights to determine their own gambling law and the federal court's interpretation of state gambling and consumer protection laws.  199 F.3d at 720.  In *Johnson*, the putative class alleged that they became addicted to video poker because defendants were offering cash payouts in excess of the maximum amount allegedly allowed under South Carolina law.  *Id.* at 717.  Plaintiffs further claimed that the offering of illegal cash prizes constituted both a "special inducement" to play video poker in violation of state gambling law and the South Carolina Unfair Trade Practices Act.  *Id.*

The Fourth Circuit found abstention was required and reversed the district court because the "court ventured into an area where state authority has long been preeminent.  The regulation of gambling enterprises lies at the heart of the state's police power."  *Id*. at 720.  Specifically, "the district court contravened *Burford* principles by attempting to answer disputed questions of state gaming law that so powerfully impact the welfare of South Carolina citizens."  *Id*.  The federal district court's attempt to interpret certain portions of South Carolina's statute prohibiting certain forms of gambling improperly "supplanted the legislative, administrative, and judicial processes of South Carolina and sought to arbitrate matters of state law and regulatory policy that are best left to resolution by state bodies."  *Id*. at 732-33.

The Fourth Circuit held that abstention was appropriate because (1) federal adjudication there would require a federal court to answer "disputed questions of state gaming law that ... powerfully impact the welfare of [state] citizens" and (2) the relief sought would "effectively establish[] parallel federal and state oversight of the [state] video poker industry."  *Id*. at 720, 724 (internal quotations omitted).  The exact same considerations exist here.  Plaintiffs' claims turn on the Ninth Circuit's interpretation, on a motion to dismiss, of Washington's gambling law that

DEFS.' MOT. TO DISMISS AND ABSTAIN - 9
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

defines a "thing of value" as including extended play.  Plaintiffs' entire suit rests on the Ninth

Circuit's novel interpretation of what constitutes a "thing of value."  But, no Washington court has

considered or approved this interpretation.  Without this Court abstaining, the federal court's

interpretation will remain and this Court will be asked to further interpret Washington's gambling

laws — all without the Washington courts ever interpreting their own gambling law on this issue.

Moreover, if this Court abstains and Washington courts agree with the Defendants' and the

Commission's interpretation of Washington's gambling law, Plaintiffs will have no claims and no

class.

Similarly, multiple other federal courts have abstained when state gambling laws are at

issue.  *See, e.g.*, *Chun*, 807 F. Supp. at 292 (abstaining under both *Burford* and *Pullman* where

New York's gambling laws were "clearly a matter of predominately state concern" and subject to

a "complex and comprehensive statutory scheme"); *Diamond Game Enters. v. Howland*, 1999 WL

397743, at *14 (D. Or. Mar. 23, 1999) (abstaining under *Pullman* when question as to whether

defendants' gaming dispensers fall within the Oregon law); *Club Ass'n of W. Va, Inc. v. Wise*, 156

F. Supp. 2d 599, 609 (S.D. W. Va. 2001) (abstention appropriate under *Pullman* when plaintiffs

sought a declaration that video lottery was unconstitutional under state law), *aff'd*, 293 F.3d 723

(4th Cir. 2002); *Metro Riverboat Assocs., Inc. v. Balley's La., Inc.*, 142 F. Supp. 2d 765, 775 (E.D.

La. 2001) (*Burford* abstention appropriate where case sat in state's gambling regulatory

framework and determinative issues in the federal court litigation would be decided in the state

court first); *G2, Inc. v. Midwest Gaming, Inc.*, 485 F. Supp. 2d 757, 765-66 (W.D. Tex. 2007)

(finding abstention under *Burford* where gaming is an "area of important state policy" and the

lottery commission provides a "unified State enforcement mechanism").

**B.**      **Plaintiffs' Claims Rest on an Unsettled Interpretations of Washington's Gambling Laws.**

**1.**      **No Washington state court has considered whether the types of games at issue in this case are gambling.**

Plaintiffs' claims under Washington's Recovery of Money Lost at Gambling statute

("RMLGA") turn on "difficult questions of state law bearing on policy problems of substantial

public import whose importance transcends the result in the case then at bar."  *Quackenbush*, 517

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

1    U.S. at 707 (quoting *Colorado River*, 424 U.S. at 814).  Washington courts have not determined

2    whether virtual tokens with no cash prize meet RCW 9.46.0285's definition of "thing of value",

3    and whether Double Down Casino's games are therefore "gambling" under Washington law.

4    Depending on the answer to that unsettled question of state law, how and whether the RMLGA

5    should be interpreted and enforced as to video games like the game at issue here remains

6    unresolved, and the answer implicates policy problems of substantial public import impacting all

7    video gaming industry participants offering games in Washington.

8          Plaintiffs allege that Double Down Casino games are illegal gambling games because

9    virtual chips are "things of value" under RCW 9.46.0285.  *See* Dkt. 41 ¶¶ 50, 55.  Under RCW

10   9.46.0285, a "thing of value":

11         means any money or property, any token, object or article exchangeable for money
           or property, or any form of credit or promise, directly or indirectly, contemplating

12         transfer of money or property or of any interest therein, or involving extension of a
           service, entertainment or a privilege of playing at a game or scheme without

13         charge.

14         Yet, RCW 9.46.0285 has been discussed only once by a Washington state court, fifteen

15   years ago, under a materially different set of facts. In *Bullseye Distributing LLC v. State Gambling*

16   *Commission*, 127 Wn. App. 231 (2005), the Court of Appeals decided whether the Commission

17   erred in determining that a slot-machine-like game which awarded cash prizes in a sports card

18   vending machine was a promotional contest of chance exempt from regulation by the

19   Commission.  The court affirmed an administrative law judge's determination that an electronic

20   vending machine designed to dispense collectible sports cards and emulate a casino slot machine

21   was a "gambling device" because at least one of the elements of gambling, including a cash prize,

22   were present.  *Id*. at 233-34.  Players paid cash to win points that could be redeemed for cash

23   and/or merchandise in the *Bullseye* game.  In *dicta*, the court noted that though the "play points"

24   lacked pecuniary value on their own, they fell within the definition of "thing of value" because

25   they extended the privilege of playing a game (which allowed a cash prize) without charge.  *Id*. at

26   242.  In the context of that case, the term "extension" was construed as offering the ability to play

27   at a game to win cash, and not a mere temporal "extension" of play time that could be applied to

28   any type of video game.  *Id*.

DEFS.' MOT. TO DISMISS AND ABSTAIN - 11
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

Unlike the game in *Bullseye*, DoubleDown Casino is a modern-era ubiquitous form of digital entertainment with no prize, as opposed to *Bullseye*'s physical vending machine, casino slot game awarding cash. *Bullseye* did not consider a game like DoubleDown Casino, which is (1) a virtual game, (2) using virtual coins, and (3) with no cash or merchandise prize. The *dicta* in *Bullseye* does not indicate how Washington views games played where there is no cash prize, such as the games at issue for Double Down. And, in fact, the application of this *dicta* by the Ninth Circuit in *Kater v. Churchill Downs, Inc.*, 886 F.3d 784, 787-88 (9th Cir. 2018), as the sole underpinning for its decision, fifteen years later, directly conflicts with the Commission's guidance that Double Down's game was not gambling. Moreover, *Kater*'s interpretation of a "thing of value," which was made on a motion to dismiss, is not a decision on the merits and is, therefore, an incomplete analysis of the RMLGA, including missing any discussion of the legislative intent behind the RMLGA or RCW 9.46.0285. These unresolved questions of state law are exactly the types of questions that should be answered by Washington state courts.

Importantly, also, because it was ruling on a motion to dismiss, the court in *Kater* assumed the allegations of the complaint were true – that a user must purchase more virtual chips in order to continue to play the games offered in the Big Fish Casino. *Id.* Yet the facts of this case transcend the limited facts assumed to be true by the court in *Kater*. Nearly all paying players of DoubleDown Casino buy chips when they already have enough chips to continue to play. Dkt. 104; Dkt. 117. They are not purchasing chips in order to have "the privilege of playing the game" under *Kater*, 886 F.3d at 787. Therefore, as actually purchased and used by players, virtual chips in DoubleDown Casino do not meet the statutory definition of a thing of value. RCW 9.46.0285. That *Kater* does not resolve the question of virtual coins sold and used for reasons other than continuing to play is acknowledged in the related litigation, where Plaintiff's counsel has conceded that illegal gambling does not occur if a user does not need to purchase virtual coins to extend gameplay on the explanation that freely obtained virtual coins are not "things of value" under Washington gambling law. *See Kater v. Churchill Downs Inc.*, No. 2:15-cv-00612-RBL (W.D. Wash. July 24, 2020), Dkt. 218-1 § 3.4 ("Big Fish Settlement Agreement"); Class Action Settlement Agreement, *Wilson v. Playtika Ltd.*, No. 3:18-cv-05277-RBL (W.D. Wash. Aug. 6,

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

2020), Dkt. 121-1 , § 3.4 ("Playtika Settlement Agreement").[4]

The answer to these unresolved questions under Washington law impacts all video gaming industry participants offering games in Washington.  The free-to-play business model involving micro transactions predominates in the industry today.  Dkt. 104 ¶ 6 (80% of all video game revenue).  In this prevailing model, players can play a game for free, and they can spend money for additional or enhanced fun by buying in-game items such as virtual chips.  *See id.* ¶¶ 2-6. Washington plays a major role in video game development.  "Washington ranks third in the country in the total number of active video game developers, with nearly 300 such companies with offices in Washington, including major industry players and household names." *Id.* ¶ 4.  The Washington video game industry generates $20 billion annually and directly employs 23,000 individuals in Washington.  *Id.* ¶ 7.  With a distinct local impact, video game developers have a great deal to lose if a federal court interpretation of century-old state law is held to turn chance-based video games that allow the purchase of virtual items where those items are not required to continue play, into illegal gambling.

### 2.	The interplay between the criminal and civil implications has not been considered by a Washington state court.

In addition to these unresolved issues, Washington's gambling law is a criminal statute that requires lenity in its interpretation when courts are determining both criminal and noncriminal applications. *Internet Cmty. & Entm't Corp. v. Wash. State Gambling Comm'n*, 148 Wn. App. 795, 808 (2009) (citing *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004)), *rev'd on other grounds*, 169 Wn.2d 687 (2010).  The lack of previous enforcement by the Commission and the affirmation

---

[4] In support of the Big Fish settlement, the parties have stipulated that because "players who run out of sufficient virtual chips to continue to play the game they are playing will be able to continue to play games within the Application they are playing without needing to purchase additional virtual chips or wait until they would have otherwise received free additional virtual chips in the ordinary course," the virtual chips used in the Applications will be "gameplay enhancements, not 'things of value' as defined by RCW 9.46.0285." Big Fish Settlement Agreement, § 2.2(c); § 3.4. In the Playtika Settlement Agreement, the parties stipulate that as a result of changes implemented by Playtika which "ensures that players who run out of sufficient virtual coins to continue to play slot games in the Application they are playing are able to continue to play slot games within the Application they are playing without needing to purchase additional virtual coins or to wait until they would have otherwise received free additional virtual coins in the ordinary course," the virtual coins in the Applications are "gameplay enhancements" and not "things of value." Playtika Settlement Agreement, § 2.2(c); § 3.4.

DEFS.' MOT. TO DISMISS AND ABSTAIN - 13
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

by the Commission that DoubleDown Casino was not unlawful gambling, which conflict with *Kater*'s new interpretation of Washington law in a civil case, support the application of lenity here to prevent an unfair schism between the state's interpretation of criminal law and civil liability. Washington state courts need to resolve this inconsistency, rather than additional federal court interpretations without any input from the state.

Another similar and entirely novel question of state law is presented as to whether the Washington Consumer Protection Act ("CPA") may apply where the CPA cause of action depends upon the alleged commission of a crime that is not recognized or treated as a crime by the law enforcement body charged exclusively with enforcement. The Commission has taken no action concerning the "social games" other than to provide guidance that social gaming without a cash prize is not gambling. Plaintiffs' CPA claim is that "a claimant may establish that the act or practice is injurious to the public interest because it . . . Violates a statute that contains a specific legislative declaration of public interest impact." Dkt. No. 41 ¶ 61. The declaration of public interest alleged violated by Defendants is found in RCW 9.46.010, which expresses a public policy which the Commission is required oversee and implement.

Lastly, also wrapped within the concerns regarding the application of a criminal statute is the Plaintiffs' own criminal culpability for their conduct since Washington law provides that people *placing* unlawful internet wagers are committing a crime. *See* RCW 9.46.240 ("[W]hoever knowingly transmits or receives gambling information by . . . the internet . . . or knowingly installs or maintains equipment for the transmission or receipt of gambling information shall be guilty of a class C felony . . . ."). Washington courts must address the criminal law impact, as a matter of policy, if Plaintiffs' theory of the case is true, including the extent to which Plaintiffs' culpability impacts the viability of Plaintiffs' or other putative class members' claims.

**C.   Defendants Meet the Criteria for Abstention.**

    **1.   The Ninth Circuit's factors favor *Colorado River* abstention.**

Courts in the Ninth Circuit evaluate the propriety of a stay under *Colorado River* pursuant to the following factors:

DEFS.' MOT. TO DISMISS AND ABSTAIN - 14
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

(1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.

*Seneca*, 862 F.3d at 841-42 (quoting *R.R. Street & Co.*, 656 F.3d at 978-79).  These factors are not a "mechanical checklist," as some may not have any applicability to this case, rather they are examined in "a pragmatic, flexible manner with a view to the realities of the case at hand."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 21 (1983).  On balance, six out of the eight factors favor abstention, while two are inapplicable or neutral.  Even weighing the factors, as required, in favor of the court exercising jurisdiction, the factors favor abstention.  *See id.* at 16.

Four factors weigh heavily in favor of abstention.  The third factor—the desire to avoid piecemeal litigation—weighs heavily in favor of abstention because it makes sense to first permit the states to resolve the interpretation of their gambling laws, as required by the Tenth Amendment, to avoid a potential contradictory result from the federal courts guessing at the state's interpretation.  "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results."  *Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1258 (9th Cir. 1988).  It is insufficient for there to be merely the possibility of conflicting results, rather there must be exceptional circumstances making piecemeal litigation particularly problematic.  *See Travelers Indem. Co. v. Madonna*, 914 F.2d 1364, 1369 (1990) (declining to abstain where ordinary contract and tort issues did not constitute exceptional circumstances risking inconsistent judgments); *Employers' Innovative Network, LLC v. Bridgeport Benefits, Inc.*, 2019 WL 539075, at *7 (S.D.W. Va. Feb. 11, 2019) (declining to abstain in a "rather mundane contract dispute" by distinguishing "*Johnson*, which implicated a controversial gambling statute").  In *Seneca*, the Ninth Circuit found this factor was not met when the case, though complex, involved tort and insurance issues and did not identify "any special concern counseling in favor of federal abstention, such as a 'clear federal

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

policy' of avoiding 'piecemeal adjudication of water rights'" justifying abstention in *Colorado River*. *Seneca*, 862 F.3d at 843 (citation omitted).  As discussed above, this case is the exceptional circumstance where the constitution and federal policy provide that gambling within a state is an area left to state law and state regulation.

The risk of inconsistent decisions here is real — if this Court and the state courts or agencies interpret Washington gambling law differently, the ramifications for Double Down's ultimate alleged liability and the ongoing viability of DoubleDown Casino, could be subject to conflicting decisions.  Everything about this case yearns for a single adjudication and interpretation of the Washington gambling code and civil statutes by a Washington court to avoid conflicting results.  This factor is decisively in favor of abstention.

Similarly, the fifth factor weighs equally in favor of abstention because it is the state law that provides the rule of decision on the merits of gambling law.  That law should be interpreted by Washington state court, not by the Ninth Circuit's interpretation on a pleadings motion in *Kater*.  The "presence of federal-law issues must always be a major consideration weighing *against* surrender" of jurisdiction, but "the presence of state-law issues may weigh in favor of that surrender" only "in some rare circumstances."  *Moses H. Cone*, 460 U.S. at 26 (emphasis added).  It is not enough that state law provides the rule of decision, but it must present questions that are complex and difficult, and better resolved by the state court.  *See R.R. St.*, 656 F.3d at 980-81 (concluding that the source of law factor is "neutral" where the complexity of the action "stems from the number of policies and insurers, not from the type of [state] law involved in the action").  This case is distinguishable because it does not present "routine issues of state law — misrepresentation, breach of fiduciary duty, and breach of contract," rather it implicates unique and undecided issue of gambling law reserved for the state's determination.  *See Madonna*, 914 F.2d at 1370; *c.f. Seneca*, 862 F.3d at 841-42 (complex state tort and insurance issues do not present the "exceptional circumstances" necessary to support abstention).

The sixth factor — whether state court proceedings protect the rights of federal litigants (the "adequacy" factor) — and the eighth factor — whether the determination of issues will resolve the merits in the federal suit, or significantly narrow the issues (the "parallelism" factor)

DEFS.' MOT. TO DISMISS AND ABSTAIN - 16
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

— also weigh in favor of abstention.  *See R.R. St.*, 656 F.3d at 981-82.  The adequacy factor looks at whether state proceedings might not be adequate to protect federal rights.  *Madonna*, 914 F.2d at 1370 ("This factor involves the *state* court's adequacy to protect *federal* rights, not the federal court's adequacy to protect state rights.") (citing *Moses H. Cone*, 460 U.S. at 26).  Here, there are no federal questions at issue, thus the issue favors abstention.  The eighth factor, or the parallelism factor, considers whether the state court will "be an adequate vehicle for complete and prompt resolution of the issues between the parties."  *Cone Mem'l Hosp.*, 460 U.S. at 28.  "[E]xact parallelism . . . is not required"; only a substantial similarity of claims is necessary before abstention is available. *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989).  Here, Plaintiffs' claims hinge on the interpretation of the Washington gambling code and the determination of how to interpret Washington's gambling laws by the state court will resolve the underlying merits issues in the federal suit, and either dispose of the federal suit entirely, or significantly narrow the issues.  Parallelism weighs significantly in favor of abstention.

The fourth factor — the order in which the forums obtained jurisdiction — favors abstention, since no merits rulings have occurred in this case.  The inquiry into the order that suits are brought is not about a date in time, but rather whether the state court action was brought "before any proceedings of substance on the merits have taken place in the federal court." *Polykoff v. Collins,* 816 F.2d 1326, 1332 (9th Cir. 1987) (citation & internal quotation marks omitted); *Meadow Valley Contractors, Inc. v. Johnson,* 89 F. Supp. 2d 1180, 1184 (D. Nev. 2000) (propriety of abstention is determined "not by a comparison of the starting dates of the federal and state proceedings, but rather whether state proceedings have been initiated before the performance of any proceedings of substance on the merits in the federal action") (citation & internal quotation marks omitted); *see also Aaron v. Target Corp.*, 357 F.3d 768, 775 (8th Cir. 2004) ("There is no fixed requirement in the law that a state judicial proceeding must have been initiated before the federal case was filed for abstention to be appropriate[.]").  Defendants filed the state court action before this Court addressed any merits issues.

The seventh factor — the desire to avoid forum shopping — also favors abstention.  When evaluating forum shopping, courts inquire as to whether either party sought more favorable rules

DEFS.' MOT. TO DISMISS AND ABSTAIN - 17
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

1   in its choice of forum or after facing setbacks in the originally filed proceeding.  *See Nakash*, 882

2   F.2d at 1417 (finding forum shopping where, after three-and-a-half years of litigation in a case that

3   was progressing to its detriment, one party sought a "new forum for [its] claims"); *Am. Int'l*

4   *Underwriters*, 843 F.2d at 1259 (finding forum shopping where, after two-and-a-half years, a party

5   "abandon[ed] its state court case solely because it believe[d] that the Federal Rules of Evidence

6   [we]re more favorable to it than the state evidentiary rules").  Here, where there are no merits

7   decisions, no forum shopping has occurred.

8        The remaining two factors are either inapplicable or neutral.  The first factor is

9   inapplicable because no property is at stake.  The second factor is neutral because neither the

10   federal nor state forums are any more or less convenient than one another for the litigants, all of

11   whom are Washington residents or limited liability companies, other than IGT who submits to the

12   state court's jurisdiction by bringing an action to have those courts interpret Washington's

13   gambling laws.

14
15       **D.**    **Abstention Is Appropriate When There Are Unresolved Issues of State Law under *Thibodaux*.**

16        In a similar situation of unresolved state law, in *Thibodaux*, the United States Supreme

17   Court agreed that the federal courts should abstain from deciding issues of state law.  There, the

18   issue was the scope of eminent domain power of municipalities under federal law and the federal

19   court abstained because the issue went to the heart of state sovereignty and transcended the

20   importance of the case itself.  *See Colorado River*, 424 U.S. at 814 (discussing *Thibodaux*).  The

21   federal court recognized that its decision could affect a city's ability to exercise power of eminent

22   domain under Louisiana law.  *Id.*  Similarly here, the interpretation of the Washington gambling

23   code has not been resolved by Washington courts.  And, in fact, the only guidance from

24   Washington prior to *Kater* – the Commission's public approval of Double Down's games -

25   directly conflicts with the interpretation in *Kater*.  As *Thibodaux* explained, since the state statute

26   at issue had never been interpreted by state courts, the district court properly abstained from ruling

27   on the issue before it, staying proceedings pending the institution of a declaratory judgment action

28   and subsequent decision by the Supreme Court of Louisiana.  *Thibodaux*, 360 U.S. at 30.  The

DEFS.' MOT. TO DISMISS AND ABSTAIN - 18
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

legal issues presented in this case under the gambling code are not certain or settled as a result of any court decision in Washington, such that abstention is required here.

### E.    The Court Should Abstain Because Washington Has a Well-Established Regulatory Structure to Interpret and Enforce its Gambling Regulations.

Separately, abstention is proper because Washington has a well-established regulatory structure to interpret and enforce its gambling regulations.  In *Burford*, the United States Supreme Court held that abstention is proper when the state has specially designed regulatory scheme. There, Sun Oil challenged the Texas Railroad Commission's order granting Burford a permit to drill oil wells.  319 U.S. at 317.  Like Washington's Commission, Texas had a regulatory regime for oil and gas industries overseen by the Texas Railroad Commission.  *Id*. at 320-27.  Citing the significance of the oil and gas industries to Texas' economy, the *Burford* Court found Texas had a special interest in a unified gas and oil policy, such that parallel federal court jurisdiction would interfere with the states' specially designed regulatory scheme.  *Id*. at 332-34.

Similarly, in *Wildgrass Oil & Gas Comm. v. Colorado*, 447 F. Supp. 3d 1051 (D. Colo. 2020), *appeal filed* (10th Cir. Apr. 17, 2020), a plaintiff attempted to prevent hydraulic fracturing in a residential neighborhood.  Even though the court found the case to be a justiciable controversy, the court abstained under *Burford* because the state regulatory structure for drilling reflected the vital interest of the general public.  *See id.* at 1065.  In support, the court relied extensively on *Johnson*, analogized state drilling regulations, state land use policy, and state gambling law, and observed that "regulation of gambling [is] a 'paramount' state policy concern." *Id.* (citation omitted).

Similarly here, Washington has a regulatory body, the Commission, that enforces the state's gambling laws. Prior to *Kater*, the Commission issued publicly available advice that Double Down's game was not gambling.  The Commission was undoubtedly aware of RCW 9.46.0285 at all times.  To now subject Double Down to parallel and inconsistent federal court jurisdiction conflicts with the state's authority to decide the application and scope of its gambling laws.  It also compromises legitimate reliance by Double Down and other social gaming industry participants upon the Commission's guidance.  For the same reasons the *Burford* Court abstained,

DEFS.' MOT. TO DISMISS AND ABSTAIN - 19
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

1    this Court should too.

2
       **F.      Abstention Is Also Necessary Under *Pullman* Because the Interpretation of
3              Washington Law May Avoid Potential Constitutional Issues.**

4        In determining whether to abstain under *Pullman*, the Ninth Circuit considers whether:

5        (1)  The complaint 'touches a sensitive area of social policy upon which the federal
6             courts ought not enter unless no alternative to its adjudication is open.'

        (2)  'Such constitutional adjudication plainly can be avoided in a definitive ruling
7             on the state issue would terminate the controversy.'

8        (3)  The possibly determinative issue of state law is doubtful.

9    *Canton*, 498 F.2d at 845 (quoting *Pullman*, 312 U.S. at 498-99).  Each of these three factors

10   supports abstention.  First, as discussed above, strong policy and constitutional considerations

11   leave the laws regarding gambling to the states.  *See supra* §IV. Next, a state court ruling

12   interpreting Washington's gambling laws could moot potential constitutional issues under the

13   Tenth Amendment regarding whether Washington's laws can be applied extraterritorially, as

14   Plaintiffs allege.  Finally, the interpretation and application of the Washington gambling code and

15   the RMLGA to virtual games with no cash prize is unsettled law that should be determined by the

16   Washington state courts.  Thus, abstention under *Pullman* is appropriate.

17                              **V.      CONCLUSION**

18       For the foregoing reasons, the Court should stay this action pending the resolution of

19   Washington gambling laws by the Washington courts.

20       DATED this 10th day of September, 2020.

21                                              **DUANE MORRIS LLP**
                                              Attorneys for International Game Technology
22

23                                              By: *s/William Gantz*
                                                  William Gantz, Admitted *Pro Hac Vice*
24                                               **Duane Morris LLP**
                                                  100 High Street, Suite 2400
25                                               Boston, MA 02110-1724
                                                  Telephone:     857.488.4200
26                                               Facsimile:      857.488.4201
                                                  Email: bgantz@duanemorris.com
27

28                                               Dana B. Klinges, *Pro Hac Vice*
                                                  **Duane Morris LLP**

DEFS.' MOT. TO DISMISS AND ABSTAIN - 20
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

30 South 17th Street
Philadelphia, PA 19103-4196
Telephone:      215.979.1000
Facsimile:      215.979.1020
Email: dklinges@duanemorris.com

Lauren M. Case, WSBA No. 49558
**Duane Morris LLP**
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Telephone:      415.957.3000
Facsimile:      415.957.3001
Email: lmcase@duanemorris.com

Adam T. Pankratz, WSBA No. 50951
**OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.**
1201 Third Avenue, Suite 5150
Seattle, WA 98101
Telephone: 206-693-7057
E-mail: adam.pankratz@ogletree.com

**DAVIS WRIGHT TREMAINE LLP**
Attorneys for Double Down Interactive, LLC

By _____
Jaime Drozd Allen, WSBA #35742
Stuart R. Dunwoody, WSBA #13948
Benjamin J. Robbins, WSBA #53376
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: 206-757-8039
Fax: 206-757-7039
E-mail: jaimeallen@dwt.com
E-mail: stuartdunwoody@dwt.com
E-Mail: benrobbins@dwt.com

DEFS.' MOT. TO DISMISS AND ABSTAIN - 21
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

DATED this 10th day of September, 2020.

s/ Lauren M. Case
Lauren M. Case, WSBA No. 49558

DEFS.' MOT. TO DISMISS AND ABSTAIN - 22
Case No. 2:18-cv-00525-RSL

Duane Morris LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

# EXHIBIT 1

1
2
3
4
5
6
7       **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
        **IN AND FOR THE COUNTY OF THURSTON**
8
9
10      DOUBLE DOWN INTERACTIVE, LLC, a              No. _____
        Washington limited liability company, and
        INTERNATIONAL GAME TECHNOLOGY, a
11      Nevada corporation,                          **COMPLAINT FOR**
                                                     **DECLARATORY RELIEF**
12                           Plaintiffs,
13      v.
14      ADRIENNE BENSON, an individual, and MARY
        SIMONSON, an individual,
15
                             Defendants.
16
17
18          Plaintiffs Double Down Interactive, LLC ("Double Down") and International Game

19      Technology ("IGT") (together "Plaintiffs"), bring this complaint against Defendants Adrienne

20      Benson ("Benson") and Mary Simonson ("Simonson"), and allege as follows:

21                          **I.     NATURE OF THE ACTION**

22          1.     This is a civil action for declaratory relief concerning whether Plaintiffs have

23      violated Washington's gambling laws by having allegedly operated unlawful gambling games by

24      selling virtual chips which may be used only on games within the DoubleDown Casino "app" or

25      Facebook platform.

26          2.     DoubleDown Casino's video games include online social games that entertain

27      players with a variety of animation and virtual casino situations.  The games are free to

28      download, free to play, and never result in monetary prizes.  Because players receive free virtual

COMPLAINT FOR DECLARATORY RELIEF                    Duane Morris LLP
PAGE 1                                      One Market Plaza, Suite 2200, San Francisco, CA 94105
                                           Telephone: +1 415 957 3000, Fax: +1 415 957 3001

chips in a variety of ways, they need not purchase any virtual chips to play.  Players first receive free chips when they download the app and later obtain additional free chips.  Virtually no Double Down players purchase chips in order to continue to play.  In DoubleDown Casino, via either the app or through Facebook, players can obtain additional free virtual chips every day or more often.  Players may also receive additional free chips by participating in free promotional offers. Double Down's games never award monetary winnings or real-world prizes.  A player cannot "cash out" their virtual chips.

3.     Although the games can be played for free, Double Down's games, like many video games, allow players to buy more chips before they receive more free chips.  But the player purchases knowing they will receive more free virtual chips that cannot be used outside the game, have no value in the game, and cannot be converted to money or anything else of value.

4.     The video game industry, including the development of casual or social games, represents a substantial portion of Washington State's tech-driven economy, employing about 94,200 Washingtonians.  Washington ranks third in the country in the total number of active video game developers, with nearly 300 such companies with offices in Washington, including major industry players and household names.  Double Down likewise maintains its U.S. headquarters in Seattle, and currently employs almost 150 people in Washington.

5.     Defendants Benson and Simonson have played Double Down's games and have advanced claims that their purchase and use of virtual chips in DoubleDown Casino was unlawful gambling under Washington law.

6.     Plaintiffs seek a declaration that the sale of virtual chips to Defendants Benson and Simonson to be used only in games played by Benson and Simonson within the DoubleDown Casino is not unlawful gambling under Washington law and that Benson and Simonson may not recover any amounts based upon their allegations that the games they played were unlawful in Washington.

7.     Pursuant to RCW 7.24, Plaintiffs are entitled to a declaratory judgment as to the rights, duties, and obligations of the parties under applicable Washington law.

Duane Morris LLP
One Market Plaza, Suite 2200, San Francisco, CA 94105
Telephone: +1 415 957 3000, Fax: +1 415 957 3001

8.     The parties to this case are already parties in a separate federal putative class action in which Benson and Simonson, as named plaintiffs, have asserted state law claims alleging causes of action under the Recovery of Money Lost at Gambling Act, the Consumer Protection Act, as well as for unjust enrichment.  A true and correct copy of the Amended Complaint filed in *Benson, et al. v. Double Down Interactive, LLC, et al*., Case No. 2:18-cv-00525 (the "Benson Case") is attached hereto as Exhibit "A."

9.     The Benson Case remains in preliminary stages and there have been no decisions on the merits.

10.     No Washington state court has considered whether the video games offered by Plaintiffs that offer no cash or merchandise prize is unlawful gambling under Washington law. Plaintiffs bring this suit for the sole purpose to permit the Washington state courts to make this fundamental state law determination.

11.     The State of Washington must be allowed to decide the novel issue of what is and what is not gambling within the State of Washington for itself.  For this reason, Double Down and IGT have filed a Motion to Dismiss the Benson Case based upon the doctrine of abstention and for a stay of proceedings pending resolution of this state law issue by Washington state courts.  A true and correct copy of the Motion for Abstention as filed in the Benson Case is attached hereto as Exhibit "B."

12.     This action is necessary and proper in order that Plaintiffs may seek a declaration from this court as to whether or not DoubleDown Casino violates Washington's gambling laws.

## II.     THE PARTIES

13.     Plaintiff Double Down is a limited liability company organized under the laws of the State of Washington with a principal place of business in Seattle, Washington.

14.     Plaintiff IGT is a corporation organized under the laws of the State of Nevada with its principal place of business at 6355 South Buffalo Drive, Las Vegas, Nevada, 89113. Double Down Interactive, LLC is a former subsidiary of IGT.

15.     Defendant Adrienne Benson is a natural person and a citizen of Spokane County in the state of Washington.

Duane Morris LLP
One Market Plaza, Suite 2200, San Francisco, CA 94105
Telephone: +1 415 957 3000, Fax: +1 415 957 3001

16.     Defendant Mary Simonson is a natural person and a citizen of Thurston County in of the state of Washington.

### III.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to RCW 2.08.010 and RCW 7.24.010, and because the events giving rise to this litigation took place within the state of Washington.

18.     The Court has personal jurisdiction over Defendants Adrienne Benson and Mary Simonson because, based upon information and belief, both reside in Washington.

19.     Venue is proper in Thurston County Superior Court pursuant to RCW 4.12.025 because, based upon information and belief, either one or both Defendants reside in Thurston County.

### IV.     GENERAL ALLEGATIONS

### Washington's Video Game Industry

20.     The video game industry, including the development of casual or social games – like the DoubleDown Casino games – represents a substantial portion of Washington State's tech-driven economy.

21.     The unsettled questions here raise important public policy issues for Washington because they have implications far beyond casino-themed video games. The imposition of civil liability amounting to a full refund of customer purchases and potential criminal penalties could substantially disrupt and dismantle the video game producing industry in Washington and impact thousands of Washingtonians' jobs.  This is especially true where the laws of other states do not regard the same games to be gambling.  *See Mason v. Mach. Zone, Inc.*, 140 F. Supp. 3d 457 (D. Md. 2015) (rejecting claims that free-to-play games constitute gambling) *aff'd*, 851 F.3d 315 (4th Cir. 2017); *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731 (N.D. Ill. 2016) (same); *Soto v. Sky Union, LLC*, 159 F. Supp. 3d 871 (N.D. Ill. 2016) (same).

22.     The development and sale of video games generate billions of dollars in revenue annually in Washington State.  Developers include start-up companies, mid-size businesses, and members of the Fortune 100.  There is no meaningful way to distinguish free-to-play casino-

themed video games offering micro transactions from other free-to-play video games offering micro transactions.  A "contest of chance" for purposes of the Washington gambling code (RCW 9.46.0237) is further defined broadly under RCW 9.46.0225 to include any game where "outcome depends in a material degree upon an *element of chance*, notwithstanding that *skill of the contestants may also be a factor.*"  *Id.* (emphasis added).

23.     Washington first enacted its Recovery of Money Lost at Gambling statute ("RMLGA") in 1879 and the relevant "thing of value" language was enacted in 1987.  If Washington's statute is construed to make Washington the *first state* to effectively ban the sale of virtual items purchased in all such video games whose outcome depends in a material degree upon an *element of chance*, even though many Washington State companies employ thousands of people in Washington, that multi-billion-dollar decision should be left to the Washington state courts.

24.     Congress mandates "the States," and *not* the federal government (including its judicial branch), "should have the primary responsibility for determining what forms of gambling may legally take place within their borders."  15 U.S.C. 3001(a)(1).

25.     Federal courts have recognized repeatedly that the power to regulate gambling is reserved to the states under the Tenth Amendment.  *See Murphy v. NCAA*, 584 US 138 S. Ct. 1461, 1478 (2018) (prohibition of state authorization of sports gambling schemes violates the anti-commandeering rule under the Tenth Amendment); *Thomas v. Bible*, 694 F. Supp. 750, (D. Nev. 1988) (licensed gaming is reserved to the states within the meaning of the Tenth Amendment) *aff'd* 896 F.2d 555 (9th Cir. 1990); *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 399 F.3d 1276, 1278 (11th Cir. 2005) (regulation of gambling lies at the "heart of the state's police power" (quoting *Johnson v. Collins Entm't Co.*, 199 F.3d 710, 720 (4th Cir.1999))), *certified question answered*, 948 So. 2d 599 (Fla. 2006); *United States v. King*, 834 F.2d 109, 111 (6th Cir. 1987) (regulation of gambling has been left to the state legislatures); *Medina v. Rudman*, 545 F.2d 244, 251 (1st Cir.1976) (enactment of gambling laws is proper exercise of the state's police power); *Chun v. New York*, 807 F. Supp. 288, 292 (S.D.N.Y. 1992) (scope of laws regulating gambling and lotteries is clearly matter of state concern); *Winshare*

*Club of Canada v. Dep't of Legal Affairs*, 542 So. 2d 974, 975 (Fla. 1989) (gambling is "a matter of peculiarly local concern that traditionally has been left to the regulation of the states"); *State v. Rosenthal*, 93 Nev. 36, 44 (1977) ("We view gaming as a matter reserved to the states within the meaning of the Tenth Amendment to the United States Constitution.").

26.     Washington has a complete, careful, and complex statutory and regulatory scheme for gambling, with a rulemaking body, the Washington State Gambling Commission (the "Commission"), that has the authority and the duty to interpret, enforce, and adjudicate the state's gambling laws. To effectuate its intent, the legislature created the Commission.  RCW 9.46.040.  The Commission has wide powers, including the right "[t]o regulate and establish the type and scope of and manner of conducting the gambling activities authorized by this chapter," RCW 9.46.070(11), as well as "[t]o perform all other matters" to enforce the state's gambling laws, RCW 9.46.070(22).  Those powers include the power to both prosecute criminal violations and pursue other, non-criminal remedies.  *See, e.g.*, RCW 9.46.210(3) (power to enforce penal gambling laws); RCW 9.46.075 (power to deny or suspend licenses).

27.     The Commission considered the subject of social gaming in connection with a public meeting on March 9, 2013 and subsequently posted its guidance in March 2014 that sites such as DoubleDown Casino were not unlawful.  It has taken no enforcement action at any time as to DoubleDown Casino or any other so-called "social gaming" web business.

28.     In a public meeting on March 9, 2013, Paul Dasaro, Administrator of the Electronic Gambling Lab, and Rick Herrington, Program Manager in the Criminal Intelligence Unit, prepared and gave a staff presentation on "Social Gaming" and the Commission's public meeting.  A true and correct copy of the May 9, 2013 Social Gaming Presentation is attached hereto as Exhibit "C."  Their presentation to the Commission expressly used DoubleDown Casino as an example.  (Exhibit C, p. 12.)

29.     The presentation observed that "Social Gaming" was not gambling because the "prize" element of gambling was absent:

Duane Morris LLP
One Market Plaza, Suite 2200, San Francisco, CA 94105
Telephone: +1 415 957 3000, Fax: +1 415 957 3001

(Exhibit C, p. 17.)

30.     The minutes of the Commission's meeting reflect the consideration of the

business model now challenged by Defendants:

> The casino-style games in social gaming are characterized by the
> use of virtual game play credits that players can earn or they can
> purchase credits to play the game with real money, but the credits
> cannot be redeemed for real money. The social gaming media makes
> most of its money from players that are offered the option of
> purchasing items within the game.

(Exhibit C, p. 21.)

31.     The minutes further reflect consideration of how DoubleDown Casino's virtual

chips cannot be redeemed for real value, and importantly that "these" companies make their

money when people purchase more chips or more time to play with real money:

> One of the most popular poker games is a standard Texas Hold'em
> game called DoubleDown Casino. Players are sitting at a virtual
> poker table playing with other real people who can be anywhere in
> the world. They are playing with virtual chips that can either be
> purchased or just gained through entering the game. This is a
> company that was purchased recently by IGT and is an IGT themed
> slot game.  DoubleDown is based out of Seattle. It is an online
> version of the same game that has been approved for Washington
> TLS, and is in many jurisdictions throughout the world. Players are
> using virtual chips and not real chips, and these virtual chips cannot
> be redeemed for real cash. With DoubleDown's ability to purchase
> virtual chips, players get 150,000 chips for $3, which they can
> purchase directly through their Facebook page. Zynga has a
> different conversion, but is essentially the same concept. Players can
> purchase more chips or more time to play with real money, which is
> how these companies make their money.

(Exhibit C, pp. 21-22.)

Duane Morris LLP
One Market Plaza, Suite 2200, San Francisco, CA 94105
Telephone: +1 415 957 3000, Fax: +1 415 957 3001

32.     The conclusion of the presentation was that social games as described was not gambling:

> **Program Manager Rick Herrington** explained that when he looks at any form of gambling, especially on the internet, he applies the basic rules of gambling: chance, consideration, or prize. In each of these games, there are two of the elements, but not the third, which is an actual prize. Players do get virtual prizes and/or an endorphin rush; they can build their avatar and improve their avatar by purchasing other things of the same nature. It is not gambling in the current format according to Washington State law. At any time in the future, if the federal government or Washington State changes its laws, any one of these social platforms could be changed to a real gambling platform overnight.

(Exhibit C, p. 22)

33.     After this meeting, in March 2014, the Commission prepared and posted a brochure on its website to give "general guidance" concerning whether social gaming was gambling, entitled "Online Social Gaming – When is it Legal? What to Consider."  A true and correct copy of brochure entitled "Online Social Gaming – When is it Legal? What to Consider." is attached hereto as Exhibit "D."  The brochure states:



34.     Double Down was aware of and relied upon the Commissions' guidance and lack of enforcement at all pertinent times.

35.     IGT owned Double Down Interactive LLC at the time of the Commission's May 9, 2013 meeting, and was similarly aware of and relied upon the Commissions' guidance and lack of enforcement at all pertinent times.

Duane Morris LLP
One Market Plaza, Suite 2200, San Francisco, CA 94105
Telephone: +1 415 957 3000, Fax: +1 415 957 3001

36.     Subsequently, in *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 789 (9th Cir. 2018), the Ninth Circuit ruled that a complaint stated a cause of action under Washington's Recovery of Money Lost at Gambling Act and should not have been dismissed.  The Ninth Circuit ruled that the plaintiff's allegation that it was necessary to purchase virtual chips in order to continue to play games on Big Fish Casino satisfied the definition of "thing of value" under RCW 9.46.0285, such that Plaintiff stated a cause of action under RCW 9.46.0237.  *Id.  Kater* was not a merits ruling.  The reversal of a grant of a motion to dismiss is only a ruling that a complaint alleges a cause of action, and is not a decision on the merits.  Moreover, *Kater* is distinguishable from this case because the vast majority of Double Down players, including Benson and Simonson, do not purchase virtual chips in order to continue playing virtual games but to enhance their experience and play games that they wish to play.

37.     Nevertheless, immediately after the *Kater* decision, Benson filed the Benson Case against Double Down and IGT.  Simonson later joined Benson as a plaintiff when they filed an amended complaint.

38.     After the Ninth Circuit's ruling in *Kater*, Big Fish brought a petition before the Commission.  The Commission declined to rule on the legality of Big Fish's social casino games, and instead, improperly, yielded to the federal court case.  It would be futile for Double Down and IGT to bring a petition before the Commission, since the Commission already stated that it would not decide the issue.

39.     Double Down and IGT bring this action because Benson's and Simonson's attempt to use *Kater* to supply a federally issued definition of gambling subjects Double Down not only to parallel oversight but to contradictory oversight.  *See Johnson v. Collins Entm't Co.*, 199 F.3d 710, 719-20 (4th Cir. 1999) (federal district court's attempt to interpret certain portions of state statute prohibiting certain forms of gambling "supplanted the legislative, administrative, and judicial processes of South Carolina and sought to arbitrate matters of state law and regulatory policy that are best left to resolution by state bodies."); *see also Metro Riverboat Assocs., Inc. v. Bally's La., Inc.*, 142 F. Supp. 2d 765, 775-76 (E.D. La. 2001) (abstaining from

deciding RICO claim because it implicated important issues of Louisiana's gaming regulatory scheme).

### The Benson Case

40.     Adrienne Benson and Mary Simonson, individually and on behalf of a class, filed the Benson Case against Double Down and IGT in the District Court for the Western District of Washington on April 9, 2018.

41.     The First Amended Complaint, the operative pleading, filed on July 23, 2018, alleges causes of action for (1) Recovery of Money Lost at Gambling under RCW 4.24.070; (2) violations of the Washington Consumer Protection Act, RCW 19.18.010, *et seq*.; and (3) unjust enrichment.

42.     Ms. Benson and Ms. Simonson seek, in part, injunctive relief requiring Double Down and IGT to "cease the operation of their games." (Exhibit A, at ¶ 58.)

43.     The allegations are based on Ms. Benson and Ms. Simonson playing DoubleDown Casino games.

44.     Ms. Benson alleges that she has been playing DoubleDown Casino on Facebook since 2013, and after losing the balance of her initial allocation of free chips, she purchased chips. Benson alleges she continued playing games within the DoubleDown Casino, and that since 2016, she has lost over $1,000. (Exhibit A, at ¶¶ 33-34.)

45.     Ms. Simonson alleges that she has been playing DoubleDown Casino on her mobile phone since 2017, and after losing the balance of her initial allocation of free chips, she purchased chips. Simonson alleges that she continued playing games within the DoubleDown Casino, and that since December 2017, she has lost over $200. (Exhibit A, at ¶¶ 35-36.)

46.     For example, the Benson case alleges that the purchase of virtual chips in DoubleDown Casino is unlawful gambling under RCW § 9.46.0237. (See, e.g., Exhibit A, at ¶ 50.)

Duane Morris LLP
One Market Plaza, Suite 2200, San Francisco, CA 94105
Telephone: +1 415 957 3000, Fax: +1 415 957 3001

**FIRST CAUSE OF ACTION**
**No Right to Recover Money Lost at Gambling Under RCW 4.24.070**

47.     An actual justiciable controversy exists between Plaintiffs and Defendants with respect to Defendants' claims they are entitled to recover money lost at gambling, pursuant to Washington's "Recovery of Money Lost at Gambling" statute, RCW 4.24.070.

48.     RCW 4.24.070 provides that "All persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

49.     "Gambling" is defined as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome."  RCW 9.46.0237.

50.     "Thing of value" is defined as "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."  RCW 9.46.0285.

51.     Benson and Simonson are not entitled to any recovery under RCW 4.24.070 with respect to the DoubleDown Casino games because the games in DoubleDown Casino do not constitute "illegal gambling games" and Benson and Simonson have not lost any "thing of value" under Washington law.

52.     RCW 9.46.0285 provides in full:

> "Thing of value," as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form of **credit or promise**, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving **extension** of a **service**, **entertainment** or a **privilege of playing at a game or scheme** without charge.

RCW 9.46.0285 (with emphasis).

Duane Morris LLP
One Market Plaza, Suite 2200, San Francisco, CA 94105
Telephone: +1 415 957 3000, Fax: +1 415 957 3001

53.     Synonyms for the verb to "extend" include many terms and ideas, including both to "lengthen" and to "offer." https://synonyms.reverso.net/synonym/en/extend.  Benson and Simonson's attempted usage in the context of RCW 9.46.0285 is wrong.

54.     The term "extension" relates to "service," to "entertainment" and to "a privilege," all of which are objects in the same sentence.  As a basic rule of statutory construction, the term "extension" cannot mean different things in the same sentence.  One would not say they lengthened a service, lengthened entertainment or lengthened a privilege "without charge."  One would say they offered a service, offered entertainment or offered a privilege "without charge."

55.     In addition, under RCW 9.46.0285 the "thing of value" won must be a "form of credit or promise."  This term fits grammatically with the idea of a winning a credit or promise to provide a service, entertainment or a privilege without charge.  The term does not fit grammatically with the idea of a winning a credit or promise to lengthen a service, entertainment or a privilege without charge.  Plaintiffs' shorthand reference to the liability question as extending the time of "gameplay" before more chips must be purchased is a misguided crutch that ignores how the term "extension" is used in RCW 9.46.0285.

56.     The purpose of Washington's gambling code can be found in RCW 9.46.010, which states that the purpose of Washington's gambling law is to "keep the ***criminal element*** out of gambling," recognizing the "close relationship between professional gambling and ***organized crime***," while ***not restricting*** "***social pastimes***," which are "***more for amusement rather than for profit***."  RCW 9.46.010 (emphasis added).

57.     Benson and Simonson bought virtual chips without any expectation of "profit," as they were aware at all times that the Double Down games award no cash or prize and that the virtual chips, once purchased, could not be transferred or used for any purpose other than to play games.  Paying to play video games, where no cash or merchandize prize can be won, are current-day social pastimes engaged in for amusement and entertainment and are outside the ambit of the legislature's intent behind the gambling code.

58.     Benson and Simonson purchased virtual chips when it was unnecessary to do so in order to continue playing because they still had enough chips to use continue to play DoubleDown Casino.

59.     An actual and justiciable controversy exists between Plaintiffs and Defendants concerning whether DoubleDown Casino games are illegal gambling games; whether chips are "things of value", entitling Defendants to recovery lost money under RCW 4.24.070; and whether Benson and Simonson's specific play constituted violations of Washington's gambling laws.

60.     For the reasons alleged above, Plaintiffs seek a judicial determination and order from the Court declaring that Defendants are not entitled to recover under RCW 4.24.070, as DoubleDown Casino games are not illegal gambling games; that the virtual chips purchased and used by Benson and Simonson are not "things of value" under Washington law; and that Benson and Simonson's play did not constitute violations of Washington's gambling laws.

## SECOND CAUSE OF ACTION
**No Violation of Washington's Consumer Protection Act, RCW 19.86.010, *et seq.***

61.     Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-59 of this Complaint, as though fully set forth herein.

62.     Benson and Simonson allege a right to recover under Washington's Consumer Protection Act, RCW 19.86.010, *et seq*. ("CPA") as a result of the alleged gambling.  Benson and Simonson's alleged allegations under the CPA result from their allegations that their play of DoubleDown Casino constituted "gambling."  The same state law issues regarding gambling as described above and in the First Cause of Action are determinative of their allegations of CPA violations.  Benson and Simonson allege, under RCW 19.86.093, that "a claimant may establish that the act or practice is injurious to the public interest because it ". . . Violates a statute that contains a specific legislative declaration of public interest impact."  (Exhibit A ¶ 62; *see* RCW 19.86.093.)  Benson and Simonson claim the "public interest" violated by Plaintiffs is established by RCW 9.46.010, which expresses a "public policy" of Washington recognizing the close relationship between professional gambling and organized crime, and seeking to restrain all

Duane Morris LLP
One Market Plaza, Suite 2200, San Francisco, CA 94105
Telephone: +1 415 957 3000, Fax: +1 415 957 3001

1    persons from seeking profit from professional gambling activities in this state and all persons

2    from  patronizing professional gambling activities.  *Id.*

3         63.    An actual justiciable controversy exists between the parties with respect to

4    whether Double Down and IGT have violated the CPA, which prohibits any person from using

5    "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any

6    trade of commerce . . . ."  RCW 19.86.020.

7         64.    Double Down and IGT have not violated any Washington statute, including but

8    not limited to Washington's Gambling Act, RCW 9.46.010, *et seq*. ("Gambling Act"), the

9    legislative declaration of which provides:

10            The public policy of the state of Washington on gambling is to keep
             the criminal element out of gambling and to promote the social
11            welfare of the people by limiting the nature and scope of gambling
             activities and by strict regulation and control.

12            It is hereby declared to be the policy of the legislature, recognizing
13            the close relationship between professional gambling and organized
             crime, to restrain all persons from seeking profit from professional
14            gambling activities in this state; to restrain all persons from
             patronizing such professional gambling activities; to safeguard the
15            public against the evils induced by common gamblers and common
             gambling houses engaged in professional gambling; and at the same
16            time, both to preserve the freedom of the press and to avoid
             restricting participation by individuals in activities and social
17            pastimes, which activities and social pastimes are more for
             amusement rather than for profit, do not maliciously affect the
18            public, and do not breach the peace.

19        65.    Accordingly, an actual and justiciable controversy exists between Plaintiffs and

20   Defendants concerning whether Double Down and IGT have violated the CPA, and the

21   Gambling Act.

22        66.    For the reasons alleged above, Plaintiffs seek a judicial determination and order

23   from the Court declaring that Double Down and IGT have not violated the CPA or the Gambling

24   Act.

25

26

27

28

Duane Morris LLP
One Market Plaza, Suite 2200, San Francisco, CA 94105
Telephone: +1 415 957 3000, Fax: +1 415 957 3001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### THIRD CAUSE OF ACTION
**No Unjust Enrichment**

67.     Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-65 of this Complaint, as though fully set forth herein.

68.     An actual justiciable controversy exists between the parties with respect to whether Plaintiffs have been unjustly enriched in connection with Defendants' playing DoubleDown Casino games.

69.     Benson and Simonson's unjust enrichment claim is based on the allegation that DoubleDown Casino constitutes illegal gambling.  (Exhibit A, at ¶¶ 72-75.)  The same state law issues regarding gambling as described above and in the First Cause of Action are determinative of their allegations of unjust enrichment.

70.     Double Down and IGT have not been unjustly enriched, as the DoubleDown Casino is not an unlawful gambling game.

71.     Defendants contend that Double Down and IGT "should not be permitted to retain the money obtained from [Defendants] and the members of the Class, which [Double Down and IGT] have unjustly obtained as a result of their unlawful operation of unlawful online gambling games."  (Exhibit A, at ¶ 74.)

72.     Accordingly, an actual and justiciable controversy exists between Plaintiffs and Defendants concerning whether Double Down and IGT have been unjustly enriched in connection with Defendants' playing DoubleDown Casino games.

73.     For the reasons alleged above, Plaintiffs seek a judicial determination and order from the Court declaring that DoubleDown Casino is not an unlawful gambling game and that Double Down and IGT have not been unjustly enriched.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     For a declaration that Benson and Simonson are not entitled to recover under RCW 4.24.070;

Duane Morris LLP
One Market Plaza, Suite 2200, San Francisco, CA 94105
Telephone: +1 415 957 3000, Fax: +1 415 957 3001

2.      For a declaration that the virtual chips purchase and used by Benson and Simonson in DoubleDown Casino games are not "things of value" as defined by RCW 9.46.0285;

3.      For a declaration that DoubleDown Casino games played by Benson and Simonson are not illegal gambling games under Washington law;

4.      For a declaration that Benson and Simonson's play did not constitute violations of Washington's gambling laws;

5.      For a declaration that Plaintiffs have not violated the CPA;

6.      For a declaration that Plaintiffs have not been unjustly enriched;

7.      For entry of judgment in favor of Plaintiffs for the amount of all costs incurred in this action; and

8.      For such other and further relief this Court deems just.

DATED this 10th day of September, 2020.

**DUANE MORRIS LLP**

Attorneys for International Game Technology

By: _s/Lauren M. Case_
    Lauren M. Case, WSBA No. 49558
    Spear Tower
    One Market Plaza, Suite 2200
    San Francisco, CA 94105-1127
    Telephone:    415.957.3000
    Facsimile:    415.957.3001
    Email: lmcase@duanemorris.com

By: _s/Adam T. Pankratz_
    Adam T. Pankratz, WSBA No. 50951
    **OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
    1201 Third Avenue, Suite 5150
    Seattle, WA 98101
    Telephone: 206-693-7057
    E-mail: adam.pankratz@ogletree.com

**DAVIS WRIGHT TREMAINE LLP**
Attorneys for Double Down Interactive, LLC

By *s/Jaime Drozd Allen*
Jaime Drozd Allen, WSBA #35742
Stuart R. Dunwoody, WSBA #13948
Cyrus E. Ansari, WSBA #52966
Benjamin J. Robbins, WSBA #
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: 206-757-8039
Fax: 206-757-7039
E-mail: jaimeallen@dwt.com
E-mail: stuartdunwoody@dwt.com
E-mail: cyrusansari@dwt.com
E-Mail: benrobbins@dwt.com

## ATTESTATION PER GENERAL RULE 30

The e-filing attorney hereby attests that concurrence in the filing of the document has been obtained from each of the other signatories indicated by a conformed signature (s/) within this efiled document.

Dated:  September 10, 2020          By *s/ Lauren M. Case*
                                           Lauren M. Case

Attorneys for International Game Technology