The Honorable Robert S. Lasnik

1
2
3
4
5
6

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

7

8   ADRIENNE BENSON and MARY
    SIMONSON, individually and on behalf of all
9   others similarly situated,
10
                          *Plaintiffs*,
11
12          *v.*
13   DOUBLE DOWN INTERACTIVE, LLC, a
     Washington limited liability company, and
14   INTERNATIONAL GAME TECHNOLOGY,
     a Nevada corporation.
15
16
                          *Defendants*.
17

Case No. 2:18-cv-00525-RSL


**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE
NATIONWIDE CLASS ALLEGATIONS**

**FILED UNDER SEAL**

**Noting Date:** October 2, 2020

18
19
20
21
22
23
24
25
26
27

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

ARGUMENT ............................................................................................................ 5

   I.  WASHINGTON LAW APPLIES TO THE CLAIMS OF ALL
      PROPOSED CLASS MEMEBERS. ........................................................... 6

      A. As applied to this case, the differences between Washington's
         gambling laws and the gambling laws of other states present
         only false conflicts. ............................................................................ 7

      B. In any event, a Second Restatement analysis selects Washington Law. .......... 9

         1.  Section 6(1): Washington law applies to the Washington
             statutory claims of all class members. ................................. 9

         2.  Section 6(2): Washington has the most significant
             relationship to all class members' claims. ...................... 12

            a.  Factors (a) and (c): The needs of the interstate
                system and the basic policies underlying
                gambling law. ........................................................... 14

            b.  Factors (b) and (c): The relevant policies of
                interested states and their relative interests. ...................... 16

            c.  Factors (d) and (f): The protection of justified
                expectations and the predictability of result. ...................... 18

            d.  Factor (g): Ease of determination and
                application. ................................................................. 19

   II.  APPLICATIONS OF WASHINGTON LAW TO THE CLAIMS
      OF ALL PROPOSED CLASS MEMBERS IS CONSTITUTIONAL. ........................ 20

   III. DEFENDANTS' PREDOMINANCE AND SUPERIORITY
       ARGUMENTS ARE PREMATURE, AND WILL BE ADDRESSED
       AT CLASS CERTIFICATION. .................................................................. 22

CONCLUSION ...................................................................................................... 22

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

## <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court Cases:**

*Allstate Ins. Co. v. Hague*,
   449 U.S. 302 (1981) ...................................................................................... 20, 21

*Camreta v. Greene*,
   563 U.S. 692 (2011) ............................................................................................. 11

*Healy v. Beer Instit.*,
   491 U.S. 324 (1989) ............................................................................................. 22

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   138 S. Ct. 1461 (2018) ........................................................................................ 15

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ............................................................................................. 20

**United States Circuit Court of Appeals Cases**

*AT&T Mobility LLC v. AU Optronics Corp.*,
   707 F.3d 1106 (9th Cir. 2013) ........................................................................ 20, 21

*Benson v. Double Down Interactive, LLC*,
   798 Fed. App'x 117 (9th Cir. Jan. 29, 2020) ........................................................ 1

*California v. Iipay Nation of Santa Ysabel*,
   898 F.3d 960 (9th Cir. 2018) ............................................................................... 15

*Chinatown Neighborhood Ass'n v. Harris*,
   794 F.3d 1136 (9th Cir. 2015) ............................................................................. 22

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F.3d 539 (9th Cir. 2019) ............................................................................. 5, 6

*Johnson v. Collins Entm't Co.*,
   199 F.3d 710 (4th Cir. 1999) ............................................................................... 16

*Kater v. Churchill Downs Inc.*,
   886 F.3d 784 (9th Cir. 2018) ......................................................................... 2, 5, 7

*Mazza v. American Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................... 13

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-iii

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

*Rocky Mountain Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) ........................................................................21

*Sam Francis Found. v. Christies, Inc.*,
    784 F.3d 1320 (9th Cir. 2015) ........................................................................22

*Storie v. Randy's Auto Sales, LLC*,
    589 F.3d 873 (7th Cir. 2009) ...........................................................................9

*Tomlin v. Boeing Co.*,
    650 F.2d 1065 (9th Cir. 1981) ................................................................6, 8, 19

**United States District Court Cases:**

*MKB Constructors v. Am. Zurich Ins. Co.*,
    49 F. Supp. 3d 814 (W.D. Wash. 2014) ..........................................................12

*N. Am. Meat Inst. v. Becerra*,
    420 F. Supp. 3d 1014 (C.D. Cal. 2019) ...........................................................21

*Rahmani v. Resorts Int'l Hotel, Inc.*,
    20 F. Supp. 2d 932 (E.D. Va. 1998) ................................................................12

*Sampson v. Knight Transportation, Inc.*,
    No. 17-cv-00288-JCC, 2018 WL 2984825 (W.D. Wash. June 14, 2018).........12

*Thornell v. Seattle Serv. Bureau, Inc.*,
    No. 14-cv-1601-MJP, 2016 WL 3227954 (W.D. Wash. June 13, 2016) ..........11

**State Supreme Court Cases:**

*Burnside v. Simpson Paper Co.*,
    864 P.2d 937 (Wash. 1994) ...........................................................................6, 9

*Erwin v. Cotter Health Centers*,
    167 P.3d 1112, 1123 (Wash. 2007) .................................................................19

*FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*,
    331 P.3d 29 (Wash. 2014) .................................................................................6

*Johnson v. Spider Staging Corp.*,
    555 P.2d 997 (Wash. 1976) ....................................................................7, 8, 19

*Rousso v. State*,
    239 P.3d 1084 (Wash. 2010) ...................................................................2, 8, 22

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

*Thornell v. Seattle Serv. Bureau, Inc.*,
  363 P.3d 587 (Wash. 2015) ............................................................................... 10

*Zenaida-Garcia v. Recovery Sys. Tech., Inc.*,
  115 P.3d 1017 (Wash. 2005) ................................................................... 8, 9, 19

**State Circuit Court of Appeals Cases:**

*In re Marriage of Abel*,
  886 P.2d 1139 (Wash. Ct. App. 1995) ............................................................ 11

*Rousso v. State*,
  204 P.3d 243 (Wash. Ct. App. 2009) .............................................................. 16

**State Circuit Court Cases:**

*People ex rel. Vecco v. World Interactive Gaming Corp.*,
  714 N.Y.S.2d 844 (N.Y. Sup. Ct. 1999)......................................................... 12

**Miscellaneous Authority:**

31 U.S.C. § 5361 ...................................................................................................... 14

B. Currie, *Selected Essays on the Conflict of Laws* (1963) ..................................... 6

Brier Dudley, *Seattle Companies Bet Big on Legal Online Gambling*,
  THE SEATTLE TIMES (Nov. 11, 2012), *available at* https://bit.ly/2Zyditf .......................... 4

*Conflict of Laws, Black's Law Dictionary* (11th ed. 2019)................................... 6, 7

DoubleDown Interactive Co., Ltd., Form F-1/A (June 30, 2020),
  *available at* https://bit.ly/3kcmcV8 ..................................................... 1, 3, 4

DoubleDown, *Terms of Use* (June 2019),
  *available at* https://bit.ly/2FD6tzh....................................................................... 1

DoubleDown, *Terms of Use* (Apr. 2020),
  *available at* https://www.doubledowninteractive.com/terms/.............................. 1

Graham C. Lilly & Molly Bishop Shadel, *When Privilege Fails: Interstate Litigation
  and the Erosion of Privilege Law*, 66 Ark. L. Rev. 613 (2013) ......................... 13

*Hearing on HB 2720 before the H. Civil Rights & Judiciary Committee*,
  66th Leg., Reg. Sess. (Wash. 2020), *available at* https://bit.ly/2FpuYAo ......................... 1

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Job Listing, DoubleDown Interactive, *User Acquisition Manager*,
    https://bit.ly/3bTo3ey (last visited Sept. 14, 2020) ...........................................................3

Joe Sigrist, *The Power of Authentic Slots*, DoubleDown Interactive (Aug. 22, 2017),
    *available at* https://bit.ly/35FWzbr ...........................................................4

John Rosengren, *How Casinos Enable Gaming Addicts,*
    THE ATLANTIC (Dec. 2016), *available at* https://bit.ly/3itqvLo. ...........................................................2

Lea Brilmayer, *Hard Cases, Single Factor Theories, and A Second Look at the
    Restatement 2d of Conflicts*, 2015 U. Ill. L. Rev. 1969 (2015) ...........................................................7

Letter from Professor Natasha Dow Schüll to Brian Considine (Aug. 1, 2018),
    *available at* https://bit.ly/3keaARp ...........................................................5

Ninth Cir. R. 36-3 ...........................................................11

RCW 4.24.070 ...........................................................2, 6, 10, 11

RCW 9.46.010 ...........................................................7, 16

RCW 19.86 ...........................................................7

Restatement (Second) of Conflict of Laws § 6 (1971)...........................................................*passim*

Restatement (Second) of Conflict of Laws § 145 (1971)...........................................................12

Restatement (Second) of Conflict of Laws § 188 (1971)...........................................................12

Spectrum Gaming Group, *Economic Market Study: Casinos Cardrooms and
    Other Forms of Gambling in Washington State* (Sept. 28, 2016),
    *available at* https://bit.ly/2E0nK5e ...........................................................1

Transcript of July 2018 Washington State Gambling Commission,
    *available at* https://bit.ly/3bZ82Un ...........................................................1

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-vi

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

# INTRODUCTION

Since its launch in 2010, everything about DoubleDown Casino has been centered in Washington. DoubleDown's 49,375 square foot headquarters in Seattle, for example, houses all of DoubleDown's 149 domestic employees—including all 70 employees responsible for the "development, testing and delivery" of DoubleDown Casino and all of DoubleDown's domestic customer service employees.[1] When the Washington Legislature and the Washington State Gambling Commission recently considered whether to change Washington's gambling laws, DoubleDown Casino representatives—including DoubleDown's General Manager—offered testimony demonstrating DoubleDown's understanding that Washington law governs all its conduct and transactions.[2] Until earlier this year, DoubleDown's Terms of Use contained, and Defendants repeatedly tried to enforce, a choice-of-law clause purporting to bind DoubleDown players to Washington law.[3] And when DoubleDown was required to file an answer in this case, it admitted that it conducts business in Washington State but denied that it conducts business "throughout . . . the United States."[4]

DoubleDown Casino is also perhaps the most lucrative casino in Washington. In 2019, DoubleDown Casino raked in more than $263 million—"substantially all" of DoubleDown's $273 million total annual haul.[5] To put that in perspective, slot machine revenues generated by all 28 of Washington's Class II/III casinos—combined—were around $2.25 billion.[6] In other

---

[1]     *See* DoubleDown Interactive Co., Ltd., Form F-1/A at 90, (June 30, 2020), *available at* https://bit.ly/3kcmcV8 ("DoubleDown Form F-1/A").

[2]     *See Hearing on HB 2720 before the H. Civil Rights & Judiciary Committee*, 66th Leg., Reg. Sess. (Wash. 2020), *available at* https://bit.ly/2FpuYAo; Transcript of July 2018 Washington State Gambling Commission at 115-17, *available at* https://bit.ly/3bZ82Un.

[3]     *See, e.g.*, Dkt. 39 at 18, 30, 39; *but see Benson v. Double Down Interactive, LLC*, 798 Fed. App'x 117 (9th Cir. Jan. 29, 2020) (holding DoubleDown's Terms unenforceable). In April 2020, DoubleDown's Terms replaced the Washington choice of law clause with a Delaware choice of law clause. *Compare* DoubleDown, *Terms of Use* (June 2019), *available at* https://bit.ly/2FD6tzh (Washington) *with* DoubleDown, *Terms of Use* (Apr. 2020), *available at* https://www.doubledowninteractive.com/terms/ (Delaware).

[4]     Dkt. 76 at 3.

[5]     *Id.*

[6]     *See* Spectrum Gaming Group, *Economic Market Study: Casinos Cardrooms and Other Forms of Gambling in Washington State*, at iii, (Sept. 28, 2016), *available at* https://bit.ly/2E0nK5e, estimating approximately $3.2 billion in 2019 gross gaming receipts. (As a technical aside, Washington Class II/III offer "TLS terminals," not true slot machines, though from a player's perspective there is "no distinguishable difference between slot machines and TLS terminals." *Id.*). Slot machine revenues typically account for approximately 70 percent of casino revenues. *See*

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1   words, for every $100 gambled away at a Washington-based slot machine last year, more than

2   $11 was collected, in Washington, by Defendants.

3        Here's the big problem for Defendants: Washington does not allow in-state businesses to

4   offer internet-based gambling, and consequently DoubleDown Casino is an illegal gambling

5   enterprise. *See Kater v. Churchill Downs Inc.*, 886 F.3d 784, 789 (9th Cir. 2018) (social casinos

6   constitute gambling under Washington law); *Rousso v. State*, 239 P.3d 1084, 1095 (2010)

7   (Washington legislature "balanced public policy concerns and determined the interests of

8   Washington are best served by banning Internet gambling.").

9        An important arrow in Washington's quiver for preventing the operation of illegal

10  casinos within its borders is an Act requiring illegal casinos to return their ill-gotten gains to the

11  players they extracted them from. *See* RCW 4.24.070. And on behalf of a proposed nationwide

12  class of DoubleDown Casino players, Plaintiffs Adrienne Benson and Mary Simonson filed this

13  lawsuit seeking a judgment forcing Defendants to do just that.

14       More than two years later, Defendants filed a motion to strike Plaintiffs' nationwide class

15  allegations. *See* Dkt. 128 ("Motion"). Having apparently soured on Washington law, Defendants

16  now argue that DoubleDown Casino transactions are subject to the gambling laws of all fifty

17  states, and that which state's law applies to any particular transaction turns on the state the

18  *player*, not the casino, is located in at the time of the transaction. In other words, Defendants'

19  position is that DoubleDown Casino is immune from any liability under Washington law as long

20  it doesn't allow folks in Washington to gamble at its internet slot machines.

21       As a threshold problem, that position doesn't pass the smell test. Of the ████████

22  DoubleDown Casino raked in last year, more than ████████ came from players located

23  outside of Washington.[7] If Defendants are correct, Washington is powerless to regulate

24  DoubleDown's receipt of that ████████ (*i.e.*, ████████████████████████),

25

26  ────────────────────────────────────
    John Rosengren, *How Casinos Enable Gaming Addicts,* THE ATLANTIC (Dec. 2016), *available at*
    https://bit.ly/3itqvLo.

27  [7]    *See* Declaration of Todd Logan ("Logan Decl.") ¶¶ 2-4.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1 and Defendants can continue to operate their Seattle-based internet casino with impunity

2 provided they don't cater to Washingtonians.

3      Unsurprisingly, a routine choice of law analysis confirms that Defendants' facially

4 dubious position is, in fact, wrong. Washington choice-of-law rules—which require the Court to

5 assess false conflicts, identify the intended geographic scope of Washington's statutes, and

6 engage in the Second Restatement's most-significant-relationship test—establish that

7 Washington law governs the operation of DoubleDown Casino, even when patronized by out-of-

8 state gamblers. And contrary to Defendants' assertion, there are no due process or dormant

9 commerce clause problems with applying Washington law to claims made by out-of-state users

10 of DoubleDown Casino.

11      Because Washington choice-of-law rules select Washington law to be applied to the

12 claims of all proposed class members, and because Washington law can be so applied

13 constitutionally, Defendants' motion to strike nationwide class allegations should be denied.

14 **BACKGROUND**

15      DoubleDown Interactive, LLC, has been headquartered in and operated out of Seattle

16 since 2009. *See* Dkt. 45 ¶ 2. It owns and operates several virtual casinos available through

17 mobile apps and Facebook, including the flagship "DoubleDown Casino" that is responsible for

18 substantially all of DoubleDown's revenues. *See* Dkt. 76 ¶¶ 1-2; DoubleDown Form F-1/A at 87,

19 *available at* https://bit.ly/3kcmcV8. To support the operation of its virtual casinos, DoubleDown

20 employs "approximately 150 Software Engineers, Game Designers, Artists, Producers,

21 Marketers, Analytical Experts, and more" in its International District headquarters. *See* Job

22 Listing, DoubleDown Interactive, *User Acquisition Manager*, https://bit.ly/3bTo3ey (last visited

23 Sept. 14, 2020). Joe Sigrist, DoubleDown's Senior Vice President and General Manager, has

24 testified that he "serve[s] in this role in DoubleDown's offices in Seattle," and that his

25 responsibilities include "oversight of DoubleDown's game development." Dkt. 104 ¶ 1.

26

27

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-3

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

In 2012, International Game Technology ("IGT"), one of the world's leading manufacturers and distributers of slot machines, acquired DoubleDown. Dkt. 45 ¶ 3. The corporate combination allowed DoubleDown to offer its players IGT's library of "authentic slots," including Vegas hit "Wheel of Fortune Slots." Joe Sigrist, *The Power of Authentic Slots*, DoubleDown Interactive (Aug. 22, 2017), *available at* https://bit.ly/35FWzbr. As Mr. Sigrist has explained, DoubleDown's ability to offer IGT's library of authentic slots "fuel[ed] DoubleDown Interactive's social casino success." *Id.* From the outset, "IGT [was] giving DoubleDown everything it need[ed] to keep growing the operation in Seattle." Brier Dudley, *Seattle Companies Bet Big on Legal Online Gambling*, THE SEATTLE TIMES (Nov. 11, 2012), *available at* https://bit.ly/2Zyditf. The partnership was a smash hit. By 2016, DoubleDown was generating some $280 million in revenue. Dkt. 76 ¶ 25.[8] And to this day, IGT rakes in millions of dollars per year by licensing its library of "authentic slot" content to DoubleDown. *See* DoubleDown Form F-1/A at 84, *available at* https://bit.ly/3kcmcV8 (showing IGT's ongoing licensing royalties, describing IGT as DoubleDown's "partner," and explaining that DoubleDown "leverage[s] IGT's expansive selection of land-based casino content, which [DoubleDown] continue[s] to utilize through an exclusive licensing agreement, to release proven slot titles that enrich the authentic playing experience of [DoubleDown] games.").

Though ostensibly free to play, DoubleDown Casino's hundreds of millions of dollars in annual revenues come from somewhere. The dark reality is that these outsized revenues come on the backs of a relatively small number of players, largely problem gamblers, who get addicted to DoubleDown Casino and then spend tens of thousands or even hundreds of thousands of dollars that they cannot afford. *See, e.g.*, Declaration of Stephanie Hawkins (estimating that she's lost between $15,000 and $25,000 at the DoubleDown Casino—money that takes food off her table and negatively impacts her marriage—in "a horrible cycle that [she] couldn't break"); Declaration of Regina Howard (estimating that she's lost $45,000 at the DoubleDown Casino

---

[8] IGT subsequently sold DoubleDown in 2017 for $825 million. *See* Dkt. 41 ¶ 24.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

playing 3-4 hours per day, negatively impacting her marriage); Declaration of Patrick James

Bailey (estimating that he's lost between $300,000 and $400,000 at the DoubleDown Casino,

and despairing that "[i]t's nothing for me to spend 6-8 hours a day playing on the damn phone

and I do it almost every day…. I am pathetic").[9] As professor Natasha Dow Schüll explained in a

Letter to the Washington State Gambling Commission, "Especially for players vulnerable to

compulsive play, [virtual casinos like DoubleDown Casino] offer an identical experience [to

traditional gambling machines]—and an identical set of associated dangers."). *See* Letter from

Professor Natasha Dow Schüll to Brian Considine (Aug. 1, 2018), https://bit.ly/3keaARp.

Despite operating a fantastically lucrative internet casino out of Washington, employing

scores of engineers, designers, and marketers in Washington, and featuring a Washington choice

of law clause in DoubleDown's (ultimately unenforceable) Terms of Use, Defendants "purport[]

to be shocked—shocked!"—to find that Washington law governs their conduct. *Kater*, 886 F.3d

at 784. They argue that Washington law could not possibly regulate DoubleDown Casino's

internet sales of casino chips to out-of-state players, and as a result have moved to strike

Plaintiffs' nationwide class allegations.

## ARGUMENT

Defendants argue that a nationwide class cannot be certified because the law of each

proposed class member's home state must be applied to their claim. But "[s]ubject to

constitutional limitations and the forum state's choice-of-law rules, a court adjudicating a

multistate class action is free to apply the substantive law of a single state to the entire class." *In

re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561 (9th Cir. 2019). Here, Washington

choice-of-law principles militate in favor of Washington law governing the claims of all

proposed class members, and that conclusion presents no constitutional problems. Because

Washington law can and should be applied to the claims of the entire proposed class,

Defendants' motion to strike nationwide class allegations should be denied.

---

[9]      These declarations will be filed contemporaneously with this brief in successive docket entries.

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

## I.   WASHINGTON LAW APPLIES TO THE CLAIMS OF ALL PROPOSED CLASS MEMBERS.

Washington uses the Second Restatement's "most significant relationship" approach to resolve choice of law questions. *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 331 P.3d 29, 36 (Wash. 2014) (citing Restatement (Second) of Conflict of Laws (1971)).[10] Before engaging in a Second Restatement analysis, however, the proponent of foreign law—here, Defendants—must first establish that an *actual* conflict, as opposed to merely a *false* conflict, exists between Washington law and the asserted foreign law. *See Burnside v. Simpson Paper Co.*, 864 P.2d 937, 942 (Wash. 1994) (citing B. Currie, *Selected Essays on the Conflict of Laws* 176 (1963)). And while Defendants' motion papers painstakingly establish that many states have differences in their gambling laws, *see* Dkt. 129 at 2-205, that fact is of no moment because the differences Defendants identify raise only false conflicts in this case.

A false conflict is presented when "although a case has a territorial connection to two or more states whose laws conflict with one another, there is no real conflict because one state has a dominant interest in having its law chosen to govern the case. *See Conflict of Laws, Black's Law Dictionary* (11th ed. 2019). For example, a foreign state has no interest in applying its own law to deny recovery *by* a resident of that state *from* a Washington defendant, in a Washington court, when Washington would allow recovery against that defendant. That is a false conflict, which is exactly the case here: Washington has a compelling interest in "deterring the wrongful conduct of [one of] its most prominent corporate citizen[s]," and no other state has any legitimate interest in simply "denying a recovery to [its] own residents." *Tomlin v. Boeing Co.*, 650 F.2d 1065, 1071 (9th Cir. 1981). Because Defendants' motion presents only false conflicts, the Court can and should deny the motion without reaching a Second Restatement analysis.

In any event, a Second Restatement analysis confirms that Washington law applies in this case. Washington's Gambling Loss Recovery Act, RCW 4.24.070, and Consumer Protection

---

[10]   When sitting in diversity, federal district courts apply the choice-of-law rules of the state in which they sit. *Hyundai*, 926 F.3d at 561.

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-6

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Act, RCW 19.86, provide a cause of action to foreign plaintiffs against Washington defendants (and those acting through them). Consequently, under § 6(1) of the Second Restatement, those statues apply to the statutory claims of all class members. Furthermore, under the fundamental principles set forth in § 6(2) of the Second Restatement, Washington has the most significant relationship to the claims of all putative class members.

Because the differences between Washington and foreign law present only false conflicts as to the claims asserted in this case, and because in any event a Second Restatement analysis selects Washington law, the proposed class has properly asserted Washington law claims here.

### A.   As applied to this case, the differences between Washington's gambling laws and the gambling laws of other states present only false conflicts.

"False conflicts are cases in which only one state has an interest in having its law applied[.]" Lea Brilmayer, *Hard Cases, Single Factor Theories, and A Second Look at the Restatement 2d of Conflicts*, 2015 U. Ill. L. Rev. 1969, 1977 (2015); *see also Conflict of Laws, Black's Law Dictionary* (11th ed. 2019). In false conflict cases, the law of the state with an actual interest in having its law applied is applied. *Johnson v. Spider Staging Corp.*, 555 P.2d 997, 1002 (Wash. 1976) ("When one of two states related to a case has a legitimate interest in the application of its law and the other state has no such interest, clearly the interested state's law should apply."). Here, that is Washington.

In this case, only Washington has an interest in applying its law to the claims of foreign plaintiffs seeking recovery of their gambling losses to DoubleDown Casino. Washington has decided both that the kind of gaming that occurs in the DoubleDown Casino is unlawful and that players are entitled to recover money lost gambling there. *See Kater*, 886 F.3d at 784. And while DoubleDown Casino is digital, DoubleDown's offices are very much tangible and are located in downtown Seattle. Washington—like all states—has a strong interest in regulating unscrupulous conduct occurring within its borders, and it has expressly "declared to be the policy of the legislature . . . to restrain all persons from seeking profit from professional gambling activities in this state," RCW 9.46.010. Applying Washington law here to allow *all* users—Washington and

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-7

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

foreign—to recover their gambling losses to Washington-based DoubleDown Casino advances the state's interest in preventing corporations in this state from profiting off professional gambling activities. *See Johnson*, 555 P.2d at 1002 ("Washington's deterrent policy of full compensation is clearly advanced by the application of its own law.").

In contrast, no foreign user's home state has any interest in having their gambling laws override Washington law's disgorgement of DoubleDown's winnings. As Defendants correctly note, different states can formulate different policies on gambling. *See* Mot. at 13-14. But to the extent that other states' laws would not deem DoubleDown Casino to be unlawful gambling or would not allow users to recover their losses, those states have no interest in having their laws applied in this case, in which their own residents seek recovery against a Washington casino. As the Ninth Circuit explained in *Tomlin*, a foreign state has no interest in having its own law applied simply to bar recovery by its own citizens who have asserted claims for recovery under Washington law, in a Washington court, against a Washington defendant. 650 F.2d at 1071 ("Although [foreign] states would have barred the action in their courts, they are not interested in denying a recovery to their own residents where it would not affect a resident defendant.") (applying Washington choice of law analysis); *accord Johnson*, 555 P.2d at 1002 (finding that Kansas had no interest in having Kansas law, which would limit the damages of Kansas plaintiffs, apply to claims against a Washington defendant being sued in Washington).

Other states are certainly free to welcome companies like DoubleDown and IGT to set up headquarters within their own borders to develop virtual casinos and offer online gambling from those headquarters. *See Rousso*, 239 P.3d at 1090 ("[Washington law] does not prevent or hinder Internet gambling businesses from operating throughout the rest of the world."). But where Washington has determined that such activity is undesirable in Washington, and where Washington has authorized gamblers to recover their losses from Washington-based companies as a means of deterring illegal casinos by making them unprofitable, other states have no interest in interfering with Washington's statutory scheme. *See Zenaida-Garcia v. Recovery Sys. Tech.*,

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-8

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

*Inc.*, 115 P.3d 1017, 1022-23 (Wash. 2005) ("Washington has strong policy interests in deterring the design, manufacture and sale of unsafe products within its borders. In contrast, Oregon has no strong interest in application of its statute of repose to protect a Washington corporation.").

Simply put, Washington has a strong interest in having its law applied to allow full recovery by foreign plaintiffs to deter conduct by a Washington defendant that Washington deems undesirable. Foreign states, on the other hand—whatever their views on virtual casinos generally—have no interest in preventing their own citizens from recovering against a Washington defendant or otherwise interfering with Washington's chosen regulatory scheme. Consequently, "this is a 'false' conflicts case, rendering . . . application of the presumptive local law—Washington law—proper." *Burnside*, 864 P.2d at 941.

### B.      In any event, a Second Restatement analysis selects Washington law.

Because this case presents only false conflicts, no further choice-of-law analysis is needed. But even if the Court chooses to engage in a Second Restatement analysis, the clear conclusion is that Washington law applies to the claims asserted by the proposed class.

#### 1.      Section 6(1): Washington law applies to the Washington statutory claims of all class members.

As an initial matter, § 6(1) of the Second Restatement states that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Second Restatement § 6(1) (1971). As comments to that section explain, however, "[a] court will rarely find that a question of choice of law is explicitly covered by statute." *Id*. § 6 cmt. b. Instead, courts "will constantly be faced with the question whether the issue before it falls within the intended range of application of a particular statute." *Id*. Where the intended range of a local statute "can be ascertained and can constitutionally be given effect," the local statute should be applied. *Id*. In other words, "[i]f the legislature intended that the statute should be applied to the out-of-state facts involved, the court should so apply it unless constitutional considerations forbid." *Id*.; *see also Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 879 (7th Cir. 2009) ("Here, the choice-of-law analysis is straightforward. [A foreign plaintiff] brought the present

1  action in the Southern District of Indiana, alleging a violation of an Indiana statute. It is well

2  established that Indiana law applies to a claim under an Indiana statute. The only question is

3  whether the Indiana statute applies to the facts alleged in the complaint.") (internal quotation and

4  citation omitted).

5      Here, both the Loss Recovery Act and the Consumer Protection Act are intended to apply

6  to the interstate situation before this Court: non-Washington class members bringing claims

7  against a Washington company and its non-Washington owner acting in concert with that

8  Washington company. The Washington Supreme Court has expressly held that that the

9  Consumer Protection Act provides a cause of action for foreign plaintiffs to sue Washington

10  corporate defendants and non-Washington defendants acting through those corporations. *See*

11  *Thornell v. Seattle Serv. Bureau, Inc.*, 363 P.3d 587, 589 (Wash. 2015). That holding was

12  premised on, among other things, the statute's inclusion of both the broad phrase "any person"

13  and an explicit "liberal construction" provision. *Id*. at 590. The Loss Recovery Act contains

14  similar language suggesting that it, too, encompasses claims by foreign plaintiffs against

15  Washington corporations. *See* RCW 4.24.070 ("*All persons* losing money or anything of value at

16  or on *any* illegal gambling games shall have a cause of action. . . .") (emphasis added); RCW

17  9.46.10 (declaring that state gambling laws "shall be liberally construed"). Furthermore, in

18  addition to the statutory language, the *purpose* behind applying the Consumer Protection Act to

19  foreign plaintiffs' claims against Washington companies applies equally to such claims under the

20  Loss Recovery Act: "unscrupulous entities might escape liability under the [statute] if out-of-

21  state citizens could not bring [statutory] actions against Washington entities that direct unfair and

22  deceptive practices only to out-of-state residents." *Thornell*, 363 P.3d at 591.

23      Under § 6(1), then, the Loss Recovery Act and the Consumer Protection Act apply to the

24  statutory claims of all class members, without any further choice-of-law analysis. The

25  Washington legislature intended for those statutes to be used by out-of-state plaintiffs against

26  Washington defendants (and companies acting through them), and as the comments to § 6 make

27

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-10

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1    clear, "[i]f the legislature intended that [a] statute should be applied to the out-of-state facts

2    involved, the court should so apply it unless constitutional considerations forbid." Second

3    Restatement § 6 cmt. b; *see also id.* ("Provided that it is constitutional to do so, the court will

4    apply a local statute in the manner intended by the legislature even when the local law of another

5    state would be applicable under usual choice-of-law principles.").[11]

6            To be sure, this approach—applying local statutes to their intended range of interstate

7    facts under § 6(1) without further choice-of-law analysis—was potentially called into question

8    by another court in this district in a decision affirmed by the Ninth Circuit. *See Thornell v.*

9    *Seattle Serv. Bureau, Inc.*, No. 14-cv-1601-MJP, 2016 WL 3227954, at *2-3 (W.D. Wash. June

10   13, 2016) ("[A]n *allowance* for claims brought by foreign plaintiffs is not a directive to override

11   ordinary choice-of-law rules."), *aff'd*, 742 F. App'x 189 (9th Cir. 2018). Those decisions, of

12   course, are not binding on this Court. See *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011);

13   Ninth Cir. R. 36-3(a). And in any event, the district court's *Thornell* opinion determined only

14   that the application of the Consumer Protection Act to foreign plaintiffs was not *mandatory*, and

15   in doing so, expressly distinguished a different Washington statute on grounds equally applicable

16   to the Loss Recovery Act. *Compare Thornell*, 2016 WL 3227954, at *3 ("[N]othing in the actual

17   text of the [Consumer Protection Act] indicates that its application is mandatory, in contrast with

18   the use of the term 'shall' found to indicate mandatory application of the statute in *In re*

19   *Marriage of Abel*, [886 P.2d 1139 (Wash. Ct. App. 1995)].") *with* RCW 4.24.070 ("All persons

20   losing money or anything of value at or on any illegal gambling games *shall* have a cause of

21   action. . . .") (emphasis added). Thus, even crediting the district court's decision in

22   *Thornell*, § 6(1) requires at least that the Loss Recovery Act be applied to nationwide class

23   members' claims here. And, in any event, as explained below, continuing the choice-of-law

24   analysis undoubtedly points to Washington law for all claims of all class members, further

25   distinguishing this case from *Thornell*.

26   _____

27   [11]      As explained in Part II below, allowing foreign class members to bring claims against DoubleDown and
     IGT under the Loss Recovery Act and the Consumer Protection Act is constitutional.

### 2. Section 6(2): Washington has the most significant relationship to all class members' claims.

To the extent that any choice-of-law issues remain after the Court identifies false conflicts and applies § 6(1) of the Second Restatement, § 6(2) resolves them. Section 6(2), which lists "the factors relevant to the choice of the applicable rule of law," is the centerpiece of the Second Restatement. Defendants argue that § 188 (relating to contract issues) applies here. Mot. at 17-18. Arguably, § 145 (relating to tort issues) is more appropriate. *See, e.g.*, *MKB Constructors v. Am. Zurich Ins. Co.*, 49 F. Supp. 3d 814, 832 (W.D. Wash. 2014); *Sampson v. Knight Transportation, Inc.*, No. 17-cv-00288-JCC, 2018 WL 2984825, at *3 n.4 (W.D. Wash. June 14, 2018). Either way, however, all either of those sections do is help figure out which states are possibly in contention for a § 6(2) analysis. *See* Second Restatement § 145(2) ("Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include . . . ."); *id.* § 188(2) (same).

Here, given the Parties' competing positions—*i.e.*, Plaintiffs' contention that Washington law applies classwide, and Defendants' contention that the laws of all fifty states apply—the only states potentially relevant to any particular class member's claims are (1) the class member's home state, or (2) Washington. Trying to pin down where exactly, say, the "place of contracting" or the "place of performance" was (or any other place referenced in §§ 145 and 188) is unnecessary, because doing so isn't going to point to a state other than Washington or the class member's home state.[12] As Defendants correctly note, the approach is not to "count contacts." Mot. at 18. It is consequently irrelevant how many times § 145 or § 188 points to a particular state; it's only relevant *which* states are pointed to. Ultimately, whether the claims here are

---

[12] Even assuming it were necessary to determine the "place of contracting" here, Defendants' assertion that "[t]he place of contracting for purposes of this case is where players are located when they make their alleged 'wager' in a game," Mot. at 18, is not supported by their cases. To the contrary, the cases they cite stand just as easily for the proposition that the place of contracting is the state from which an internet casino is operating when it accepts a wager. See *People ex rel. Vecco v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 850-51 (N.Y. Sup. Ct. 1999) (New York gambling law applied to internet casino where "the individuals who gave the computer commands [that ran the virtual casino] operated from [defendant's] New York office"); *Rahmani v. Resorts Int'l Hotel, Inc.*, 20 F. Supp. 2d 932, 935 (E.D. Va. 1998) (New Jersey law applied because "[n]o mutually enforceable obligations were created until Rahmani placed a bet at a New Jersey gaming table") (emphasis added).

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1   characterized as contract or tort for choice-of-law purposes, the analysis boils down to which

2   state's laws—Washington or each class member's home state—is selected by application of the

3   § 6(2) factors. "Under the Second Restatement, all paths eventually lead to section 6 and its

4   criteria for selecting the state that has the most important relationship to the particular issue

5   before the court." Graham C. Lilly & Molly Bishop Shadel, *When Privilege Fails: Interstate*

6   *Litigation and the Erosion of Privilege Law*, 66 Ark. L. Rev. 613, 636 (2013).

7        The relevant § 6(2) factors distinguish this case from *Mazza v. American Honda Motor*

8   *Co.*, 666 F.3d 581 (9th Cir. 2012). In *Mazza*, the court held that California law could not apply to

9   a nationwide class of automobile purchasers alleging that Honda had misled them about a certain

10   safety feature. *Id.* at 594. In performing its choice of law analysis, the court applied California's

11   "governmental interest test," which applies the law of the state "whose interest would be more

12   impaired if its law were not applied." *Id*. at 590. Under California choice of law rules, "the place

13   of the wrong has the predominant interest," and "the place of the wrong" is "the state where the

14   last event necessary to make the actor liable occurred." *Id*. at 593-94. In *Mazza*, each car

15   purchaser's home state was the place of the wrong (and thus had the predominant interest)

16   because the last act necessary to make Honda liable—communication of the advertisements to

17   the putative class members and their reliance thereon in purchasing vehicles—took place in their

18   home states, not in California. *Id*. at 594.

19        Washington's choice of law approach—the Second Restatement's most significant

20   relationship test—is distinct from California's governmental interest test. Whereas California

21   choice of law rules apply the law of the state whose interests would be most impaired if their law

22   were not applied, Washington choice of law rules select the law of the state with the most

23   significant relationship to the claims under the factors listed in § 6(2) of the Second Restatement.

24   As explained below, and in contrast to the governmental interest test applied in *Mazza*, the

25   Second Restatement—and, likewise, Washington—does not choose applicable law based on

26   factors like the place of the wrong as determined by the last act necessary to establish liability.

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-13

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Instead, in Washington and under § 6(2) of the Second Restatement, the factors relevant to selecting the applicable law are:

(a)     the needs of the interstate and international systems,

(b)     the relevant policies of the forum,

(c)     the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d)     the protection of justified expectations,

(e)     the basic policies underlying the particular field of law,

(f)     certainty, predictability and uniformity of result, and

(g)     ease in the determination and application of the law to be applied.

Second Restatement § 6(2). These factors are not listed in order of importance, and varying weight can be given to particular factors or groups of factors. *Id*. cmt. c. Here, an assessment of these factors points to Washington as the state with the most significant relationship to the claims of all putative class members.

> ### a.     Factors (a) and (e): The needs of the interstate system and the basic policies underlying gambling law.

The first and fifth factors listed in § 6(2)—the needs of the interstate and international systems and the basic policies underlying the particular field of law—both point strongly to Washington law. "Probably the most important function of choice-of-law rules is to make the interstate and international systems work well." *Id.* 6 cmt. d. With respect to the particular field of gambling, this means preventing the use of interstate differences to circumvent applicable gambling law.

As Defendants correctly note, states are free to decide whether and how to regulate gambling. Mot. at 13-14. But this leads to a patchwork of state laws that can easily be circumvented by interstate conduct—especially over the internet. *See* 31 U.S.C. § 5361(a)(4) ("New mechanisms for enforcing gambling laws on the Internet are necessary because traditional

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-14

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

law enforcement mechanisms are often inadequate for enforcing gambling prohibitions or regulations on the Internet, especially where such gambling crosses State or national borders."). The way to deal with this problem and to "make the . . . system[] work," Second Restatement § 6 cmt. d, is to acknowledge that in any interstate gambling transaction, the gambling must be lawful in both states involved.

Indeed, that's the whole idea behind the federal Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361-67. "[T]he UIGEA does not prohibit otherwise legal gambling. But the UIGEA does create a system in which a bet or wager must be legal both where it is initiated and where it is received." *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 965 (9th Cir. 2018) (internal quotations omitted). "In effect, the UIGEA prevents using the internet to circumvent existing state and federal gambling laws." *Id.* Other federal laws are in accord. *See, e.g.*, 18 U.S.C. § 1084(b) ("Nothing in this section [barring interstate communication of wagering information] shall be construed to prevent . . . the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal."). Requiring an interstate gambling transaction to be legal in both states involved implements a "coherent federal policy . . . respect[ing] the policy choices of the people of each State on the controversial issue of gambling." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1483 (2018).

Consequently, when faced with deciding which state's law to apply to an interstate gambling issue where one state deems the gambling unlawful and the other doesn't, §§ 6(2)(a) and (e) of the Second Restatement point to the law of the state deeming the gambling unlawful. Here, that's Washington.

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-15

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1

        **b.**       **Factors (b) and (c): The relevant policies of interested states and their relative interests.**

2        The second and third factors of § 6(2)—the relevant policies of the interested states and

3  the relative interests of those states in the determination of the particular issue—also point to the

4  application of Washington law here.

5        These factors overlap with the false conflict analysis discussed above: to the extent all

6  states have a general interest in both regulating corporate conduct within their borders and

7  providing for the welfare of their citizens, those interests do not collide by application of

8  Washington law here. Allowing foreign class members to recover financial losses from a

9  Washington defendant under Washington law does not infringe on foreign states' interests in

10  their own citizens' welfare. *See supra* Part I.A; Second Restatement § 6 cmt. f ("[A]pplication of

11  a state's statute or common law rule which would absolve the defendant from liability could

12  hardly be justified on the basis of the state's interest in the welfare of the injured plaintiff.").

13        Moving from the general to the specific leads to the same result. "State gaming policies

14  reflect a delicate trade-off between the economic boon of increased tax revenue and enhanced

15  employment on the one hand and the risk of moral rot, human exploitation, and political

16  corruption on the other." *Johnson v. Collins Entm't Co.*, 199 F.3d 710, 720 (4th Cir. 1999).

17  Washington has clearly chosen to forgo the tax and employment benefits of allowing gambling

18  operations within its borders in order to avoid the negative side effects that go along with it. *See*

19  *generally Rousso v. State*, 204 P.3d 243, 250-51 (Wash. Ct. App. 2009) ("Washington has from

20  its inception considered gambling to be an activity with significant negative effects and has

21  always strictly regulated gambling in order to minimize those effects."); RCW 9.46.010

22  (declaring the policy of the legislature as including "to safeguard the public against the evils

23  induced by common gamblers and common gambling houses engaged in professional

24  gambling").

25        Other states may have chosen differently, but when examining differing state policies in a

26  choice-of-law assessment, this Court "should seek to reach a result that will achieve the best

27

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1  possible accommodation of these policies." Second Restatement § 6 cmt. f. Application of

2  Washington law to all class members' claims against Defendants would further Washington's

3  stated goals of safeguarding against the "evils induced by" the operation of gambling houses and

4  preventing Washington companies from "seeking profit from professional gambling activities in

5  this state." RCW 9.46.10. And as the Second Restatement provides, "[i]f the purposes sought to

6  be achieved by a local statute or common law rule would be furthered by its application to out-

7  of-state facts, this is a weighty reason why such application should be made." Second

8  Restatement § 6 cmt. e. Furthermore, application of Washington law to foreign class member

9  claims against Defendants would not interfere with the policy goals of foreign states that

10  authorize gambling. Allowing foreign citizens to recover against a Washington casino and its

11  parent company does not affect the foreign state's tax base or employment levels. Those states

12  remain free to pursue policies encouraging gambling companies to come to those states to create

13  jobs and taxable revenue. If anything, authorizing recovery against Defendants would seem to

14  *further* foreign states' policy goals by giving those states a competitive advantage over

15  Washington in attracting gambling companies to locate in their state.

16      While applying Washington law here would further Washington's gambling policies

17  without interfering with foreign states' gambling policies (and perhaps even furthering them), the

18  same cannot be said of the reverse. If foreign law were applied to immunize Defendants against

19  claims by foreign users, great harm would be done to Washington policy goals with no

20  corresponding benefit to foreign policy goals: Washington would have to live with the gambling

21  operations it deems noxious within its state while foreign states would get no added tax or

22  employment benefits. It is clear that between these two choices, application of Washington law

23  here "achieve[s] the best possible accommodation" of differing state policies on gambling. *Id.* §

24  6 cmt. f.

25      Because IGT does not argue that the law of its home state, Nevada, applies to the claims

26  asserted against it in this case, but instead joins DoubleDown in arguing that the laws of each

27

proposed class member's home state apply, the Court need not engage in a different analysis as to IGT on this point. And even if IGT had asserted that Nevada law applies to the claims against it, that would be wrong. True enough, Nevada has apparently chosen the opposite side of the trade-off as Washington—obtaining the benefits of IGT's contribution to the state tax base and employment while tolerating the accompanying ills of gambling. But the fact that DoubleDown Casino is operated out of Washington means that Washington has a substantial interest in the claims against IGT. While IGT is located in Nevada, it continues to license its "authentic slot" content to DoubleDown and is consequently an integral partner to DoubleDown's Washington operations, thus interfering with Washington's anti-gambling policies. At best, the interests of the two states are a push. But even if Nevada's interests trumped Washington's with respect to claims against IGT, that would not outweigh the other § 6(2) factors, which point to applying Washington law to all claims, even against IGT.

### c. Factors (d) and (f): The protection of justified expectations and the predictability of result.

The fourth and sixth factors of § 6(2)—the protection of justified expectations and the certainty, predictability, and uniformity of result—also point to the application of Washington law. Defendants assert, without explanation, that "players . . . would reasonably expect the laws of their home state to govern any contracts they enter into online[.]" Mot. at 19. It is doubtful that players give much, if any, thought to what law governs their wagering at an internet casino, but, in any event, Defendants are looking to the wrong parties' expectations. It is not the players' expectations that matter here, but Defendants'.

The premise behind protecting justified expectations is that, "[g]enerally speaking, it would be unfair and improper to hold a person *liable* under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state." Second Restatement § 6 cmt. g (emphasis added). Because the choice of law issue here goes to *Defendants*' liability, the question is what law *Defendants* expected to govern. The answer to that question is Washington law. The DoubleDown Terms of Use have long included a Washington

choice of law clause. Defendants even argued to this Court and to the Ninth Circuit that those

Terms—including their Washington choice of law clause—were enforceable. *See* Dkt. 44 at 12

n.11 (seeking to enforce DoubleDown Terms; arguing that "Washington law applies here" in part

because those Terms "contain[] a Washington choice-of-law provision."); *accord Benson v.*

*DoubleDown*, No. 18-36015, Dkt. 19 (9th Cir. Mar. 6, 2019) (appealing denial of motion to

enforce Terms). While the Terms were ultimately held unenforceable, they demonstrate that

Defendants expected—indeed, *desired*—Washington law to govern their conduct. *See Erwin v.*

*Cotter Health Centers*, 167 P.3d 1112, 1123 (Wash. 2007).[13]

In any event, Defendants can hardly be surprised that Washington law applies to their

provision of DoubleDown Casino from DoubleDown's Seattle headquarters. *See, e.g.*, *Johnson*,

555 P.2d at 1001-02 (applying Washington law to claim of foreign plaintiff injured by product

designed and manufactured in Washington); *Zenaida-Garcia*, 115 P.3d at 1022-23 (same);

*Tomlin*, 650 F.2d at 1072 ("[Defendants] can hardly claim unfamiliarity with Washington law or

surprise that Washington law might be applied. . . . When a corporation is sued at its principal

place of business one would ordinarily expect that state's law to govern.").

Nor is application of Washington law to foreign users of DoubleDown Casino surprising

in light of a federal system that requires gambling to be lawful in all states involved in an

interstate wager. In short, application of Washington law here is completely in line with

principles of certainty, predictability, and uniformity, and doing so is not an unfair or improper

upending of any justifiable expectations of Defendants.

### d.    Factor (g): Ease of determination and application.

The final factor of § 6(2)—ease in the determination and application of the law to be

applied—"should not be overemphasized." Second Restatement § 6 cmt. j. Nevertheless, it is

clear that Washington law is easy to determine and apply here. *See* Dkt. 127 (denying motion to

---

[13]    Though IGT is not a signatory to the Terms, it too previously sought to enforce them. *See* Dkt. 53 at 9-11.

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-19

**TOUSLEY BRAIN STEPHENS PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

certify questions to Washington Supreme Court because this case does not present significantly new or substantial questions of Washington law).

## II.   APPLICATION OF WASHINGTON LAW TO THE CLAIMS OF ALL PROPOSED CLASS MEMBERS IS CONSTITUTIONAL.

As explained above, a routine choice of law analysis points to the application of Washington law to the claims of all proposed class members. Applying Washington law here also complies with constitutional requirements.

Citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), Defendants assert that applying Washington law to the proposed class members' claims would violate due process. (Mot. at 15-16.) That is wrong. "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1110-11 (9th Cir. 2013) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)). That is not a high bar. *Id.* at 1111 ("[T]he Court's decision in *Allstate* places only modest restrictions on the application of forum law, and most commentators have viewed *Allstate* as setting a highly permissive standard.") (internal quotation omitted). Consequently, a court "is rarely forbidden by the Constitution to apply its own state's law." *Id.* at 1113.

In *Shutts*, the Supreme Court found a due process violation where a court applied Kansas law to all claims in a class action involving natural gas royalty payments "notwithstanding that over 99% of the gas leases and some 97% of the plaintiff class members had no apparent connection to the state of Kansas except for this lawsuit." 472 U.S. at 814-15. Here, by contrast, 100% of the asserted claims are connected directly to Washington. Every at-issue transaction was made between a proposed class member and DoubleDown Casino—an illegal casino operated in Seattle by Seattle-based DoubleDown Interactive, where 150 engineers, designers, and others work to keep the casino churning. This is no "slight and casual" connection to Washington. *AT&T Mobility*, 707 F.3d at 1113. To the contrary, each class members' claim has a

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

significant connection to Washington such that the application of Washington law is "neither

arbitrary nor fundamentally unfair." *Id.* Defendants "cannot reasonably complain that the

application of [Washington] law is arbitrary or unfair when its alleged [conduct] took place, at

least in part, in [Washington]." *Id.*; *see also Allstate*, 449 U.S. at 317-18 ("By virtue of its

presence, Allstate can hardly claim unfamiliarity with the laws of the host jurisdiction and

surprise that the state courts might apply forum law to litigation in which the company is

involved."). Regardless of where putative class members reside, application of Washington law

to their claims involving wagers at DoubleDown Casino simply does not violate due process. *See*

*AT&T Mobility*, 707 F.3d at 1113-14 (holding that application of California antitrust law to

defendants who conspired in California to fix prices did not violate due process even though all

price-fixed goods were purchased outside California).

Defendants also argue that application of Washington law here violates the dormant

commerce clause. That, too, is wrong.

There are two strands to the dormant commerce clause: a prohibition on state laws that

benefit in-state economic interests by burdening out-of-state competitors, and a prohibition on

state laws that directly control extraterritorial commerce. *See generally Rocky Mountain Farmers*

*Union v. Corey*, 730 F.3d 1070, 1087, 1101 (9th Cir. 2013). Defendants here rely only on the

latter strand, arguing that application of Washington law to foreign class members' claims here

would allow Washington to unconstitutionally regulate extraterritorial commerce. (Mot. at 13-

15.) There are two problems with Defendants' argument.

First, it is not at all clear that the extraterritorial branch of the dormant commerce clause

applies outside of cases involving state statutes that attempt to fix the prices for products sold out

of state. *See generally N. Am. Meat Inst. v. Becerra*, 420 F. Supp. 3d 1014, 1029-32 (C.D. Cal.

2019) (discussing potentially contrary Ninth Circuit opinions on the issue). Second, even

assuming it could be applied to this type of case, the extraterritorial branch of the dormant

commerce clause only precludes state laws that regulate commerce that takes place "wholly

outside" the state's borders. *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323-24 (9th Cir. 2015) (quoting *Healy v. Beer Instit.*, 491 U.S. 324, 336 (1989)). The commerce at issue here—wagering between out-of-state class members and Washington-based DoubleDown—does not take place "wholly outside" of Washington, and Washington may constitutionally regulate it. *See Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1145 (9th Cir. 2015) ("[A] state may regulate commercial relationships in which at least one party is located in [that state]."); *Rousso*, 239 P.3d at 1090 ("[Washington law] does not prevent or hinder Internet gambling businesses from operating throughout the rest of the world.").

## III.   DEFENDANTS' PREDOMINANCE AND SUPERIORITY ARGUMENTS ARE PREMATURE, AND WILL BE ADDRESSED AT CLASS CERTIFICATION.

At the end of their motion, Defendants tack on an argument that the predominance and superiority requirements of Rule 23 cannot be met where a nationwide class will be subject to different states' laws. *See* Mot. at 22-24. If the Court determines—as it should for the reasons discussed above—that Washington law applies to all DoubleDown users nationwide, Defendants' arguments are foreclosed. But in any event, as the Court already noted, the only issue raised by Defendants' motion is a "pure[]" choice of law question. Dkt. 132 at 2. As Defendants concede, once the Court answers that question, the remainder of routine class certification issues—including not only predominance and superiority but also numerosity, commonality, typicality, and adequacy—are all reserved for Plaintiffs' forthcoming motion for class certification. *See* Mot. at 2 n.1.

## CONCLUSION

Defendants' motion to strike nationwide class allegations should be denied.

Respectfully Submitted,

**ADRIENNE BENSON and MARY SIMONSON,** individually and on behalf of all others similarly situated,

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Dated: September 14, 2020        By: /s/ Todd Logan

                                 Todd Logan*
                                 tlogan@edelson.com
                                 123 Townsend Street, Suite 100
                                 San Francisco, California 94107
                                 Tel: 415.212.9300
                                 Fax: 415.373.9435


                                 By: /s/ Cecily C. Shiel

                                 TOUSLEY BRAIN STEPHENS, PLLC
                                 Cecily C. Shiel
                                 cshiel@tousley.com
                                 1700 Seventh Avenue, Suite 2200
                                 Seattle, Washington 98101-4416
                                 Tel: 206.682.5600
                                 Fax: 206.682.2992


                                 *Admitted *pro hac vice*

                                 *Attorneys for Plaintiffs and the Putative Class*

PLAINTIFFS' OPP. TO MTN. TO STRIKE
Case No. 18-cv-00525-RSL-23

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992