The Honorable Robert S. Lasnik

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

ADRIENNE BENSON and MARY
SIMONSON, individually and on behalf of all
others similarly situated,

    *Plaintiffs*,

  *v.*

DOUBLEDOWN INTERACTIVE, LLC, a
Washington limited liability company,
INTERNATIONAL GAME TECHNOLOGY, a
Nevada corporation, and IGT, a Nevada
corporation,

    *Defendants*.

No. 18-cv-525-RSL

**PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF CLASS ACTION
SETTLEMENT AGREEMENT**

Noting Date: June 1, 2023

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ..................................................................................................2

    I.    Relevant Litigation History.................................................................3

        A.  Defendants' First Motion to Compel Arbitration and Related Appeal.......3

        B.  Defendants' Pleading Motions. ..............................................4

        C.  Plaintiffs' Motion for Class Certification and Preliminary Injunction. .....5

        D.  Discovery and Related Motion Practice.................................6

    II.    Settlement Negotiations and Mediation.................................7

    III.    The Settlement Now Before the Court.................................8

THE TERMS OF THE SETTLEMENT AGREEMENT .............................................8

        A.  Settlement Class Definition ................................................8

        B.  Monetary Benefits................................................................9

        C.  Prospective Relief................................................................10

        D.  Release................................................................................10

        E.  Attorneys' Fees, Expense Requests & Incentive Award Requests ..........10

ARGUMENT .......................................................................................................11

    I.    The Court Should Confirm Certification of the Settlement Class. .................11

    II.    Notice Satisfied Due Process. .................................................11

    III.    The Court Should Finally Approve the Settlement. .........................13

        A.  Class Counsel and the Class Representatives Have Adequately Represented the Class and Support the Settlement................14

        B.  The Settlement was Negotiated at Arm's Length and Shows no Signs of Collusion.................................................15

C.   The Amount Offered in the Settlement is Adequate, Given the
     Strength of Plaintiffs' Case and the Risks Inherent in Further
     Litigation.........................................................................................17

     i.    The Settlement Class would have faced significant delay
           before it could have recovered anything on the merits. ...........17

     ii.   Given the risks involved with further litigation, the amount
           offered in Settlement is outstanding. ..........................................19

D.   The Settlement Treats Settlement Class Members Equitably. ............20

E.   Class Counsel was Able to Reach an Informed Judgment About the
     Benefits of Settling and the Quality of the Settlement.........................22

F.   The Reaction of the Settlement Class has been Favorable..................23

CONCLUSION .................................................................................................23

PLS.' MOTION FOR FINAL APPROVAL
CASE 18-CV-525-RSL -

iii

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Aikens v. Panatte, LLC*,
    No. 2:17-cv-01519 (W.D. Wash. Feb. 5, 2019)....................................................... 11

*Askar v. Health Providers Choice, Inc.*,
    No. 19-CV-06125-BLF, 2021 WL 4846955 (N.D. Cal. Oct. 18, 2021)........................... 12

*Bayat v. Bank of the West*,
    No. C-13-2376 EMC, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ............................. 17

*Bennett v. SimplexGrinnell LP*,
    No. 11-cv-01854-JST, 2015 WL 1849543 (N.D. Cal. Apr. 22, 2015) ............................. 20

*Benson v. Double Down Interactive, LLC*,
    527 F. Supp. 3d 1267 (W.D. Wash. 2021)................................................................ 2

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ............................................................................ 11

*Churchill Vill., L.L.C. v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) .............................................................................. 13

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)........................................................................................... 11

*Evans v. Zions Bancorporation, N.A.*,
    No. 2:17-CV-01123 WBS DB, 2022 WL 16815301 (E.D. Cal. Nov. 8, 2022) ................. 15

*Ikuseghan v. Multicare Health Sys.*,
    No. 14-cv-05539-BHS, 2016 WL 3976569 (W.D. Wash. July 25, 2016)........................ 18

*In re Apple Inc. Device Performance Litig.*,
    50 F.4th 769 (9th Cir. 2022) .............................................................................. 13

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ............................................................................. 13

*In re Equity Funding Corp. of Am. Securities Litig.*,
    603 F.2d 1353 (9th Cir. 1979) ............................................................................ 21

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
    445 F. Supp. 3d 508 (N.D. Cal. 2020) .................................................................. 19

iv

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

*In Re: Daily Fantasy Sports Litig.*,
    No. 16-md-2677-GAO (D. Mass. Sep. 2, 2021) ..................................................... 1

*Jackson v. King Cnty.*,
    No. 21-CV-00995-LK-BAT, 2022 WL 168524 (W.D. Wash. Jan. 18, 2022) ................... 16

*Kater v. Churchill Downs Inc.*,
    886 F.3d 784 (9th Cir. 2018) ................................................................................. 3

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ................................................................................ 11

*Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ............................................................................... 19

*Pelletz v. Weyerhouser Corp.*,
    255 F.R.D. 537 (W.D. Wash. 2009) ..................................................................... 23

*Reed v. Scientific Games*,
    18-cv-565 (W.D. Wash. Aug. 12, 2022) ............................................................... 11

*Rinky Dink, Inc. v. World Bus. Lenders, LLC*,
    No. C14-0268-JCC, 2016 WL 3087073 (W.D. Wash. May 31, 2016) ........................ 18

*Rodriguez v. West Pub. Corp*,
    563 F.3d 948 (9th Cir. 2009) ............................................................................... 18

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ............................................................................. 13

*Schneider v. Wilcox Farms, Inc.*,
    No. 07-CV-01160-JLR, 2009 WL 10726662 (W.D. Wash. Jan. 12, 2009) ................... 23

*Scott v. United Servs. Auto. Ass'n*,
    No. 11-cv-1422-JCC, 2013 WL 12251170 (W.D. Wash. Jan. 7, 2013) ....................... 16

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ............................................................................. 16

*Walters v. Target Corp.*,
    No. 3:16-cv-1678-L-MDD, 2020 WL 6277436 (S.D. Cal. Oct. 26, 2020) ..................... 13

**FEDERAL RULES**

Federal Rules of Civil Procedure
    Rule 23 ............................................................................................... *passim*

## OTHER AUTHORITIES

2 McLaughlin on Class Actions
   §6.23 (17th ed. 2020)........................................................................................................21

Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain
   Language Guide*, at 3 (2010), *available at* https://www.fjc.gov/sites/default/files/2012/
   NotCheck.pdf.................................................................................................................. 11

**INTRODUCTION**

In November 2022, the Court granted preliminary approval of this $415 million settlement and authorized Class Counsel to proceed with the Court-approved notice and claims process. With that process now complete, Class Counsel are pleased to report a flawless execution and an overwhelmingly positive reaction from the Class.

To hit the highlights: more than 90% of the Class List received direct notice, and Class Members filed some 90,000 presumptively valid claims comprising nearly $600 million of alleged damages—resulting in an At-Issue Adjusted Claims Rate of approximately 27.11%.[1/2] By contrast, zero (0) objections were received, and just seven (7) individuals requested exclusion.[3]

It is difficult to overstate the triumph that this reaction from the Class demonstrates. But given the life-changing relief afforded under the settlement, the reaction—though exceptional—is unsurprising. As predicted in Class Counsel's preliminary approval papers, participating Class Members stand to recover substantial portions of their losses, with those who have lost the most standing to recover the *majority* of their losses. In light of the novelty of Plaintiffs' claims, Professor William B. Rubenstein has described these recoveries as an "astounding accomplishment." Dkt. #535 ¶ 2. This case was hard fought and the relief obtained here reflects that, outshining the recoveries achieved in the five prior social settlements obtained by Class Counsel and exceeding by several orders of magnitude any other comparator settlements. *See, e.g.*, *In Re: Daily Fantasy Sports Litig.*, No. 16-md-2677-GAO, Dkt. #459 at 6 (D. Mass. Sep. 2,

---

[1]    *See* Declaration of Reed Baessler ("Baessler Decl.") ¶¶ 16, 25; Declaration of Todd Logan ("Logan Decl."), ¶¶ 5-7. The timely submitted claims are associated with at least $594,423,645.63 million in Lifetime Spending Amount. *See* Baessler Decl. ¶ 24. From the beginning of the statute of limitations period (April 2014) through the date that the Court granted preliminary approval (November 14, 2022), Class Members spent approximately $2,192,764,808.51 in the DoubleDown games. *See* Logan Decl. ¶¶ 5-6. The former dollar figure divided by the latter produces an At-Issue Adjusted Claims Rate of 27.11%. (As an alternative measurement rubric, even accounting for the Class' *all-time* spending dating back to 2010—*i.e.*, including damages that were unrecoverable in this case—the Adjusted Claims Rate would still exceed 17.6%. *See* Baessler Decl. ¶¶ 7, 24.)

[2]    Class Counsel uses the phrase "presumptively valid claims" here because, while more than 130,000 claims were timely received, approximately 40,000 of them were filed by what appears to be a single person or entity using software to "spam" the settlement website with two waves of incomplete and presumptively invalid claim forms. *See id.* ¶ 26.

[3]    *See id.* ¶¶ 28-30.

1    2021) (settlement returning in-game currency and cash totaling $720,000 to consumers who

2    alleged companies were engaged in illegal gambling and caused them to lose hundreds of

3    millions of dollars).

4        This Settlement is fair, reasonable, and adequate. The Court should grant final approval.

5                                    **BACKGROUND**[4]

6        This Court is well-acquainted with Class Counsel's nearly-decade-long campaign on

7    behalf of consumers suffering in the grip of the social casino industry, including the seven class

8    action lawsuits filed in this District, five of which reached settlements that were approved by the

9    Court. This case, like the others, alleges that Defendants "own[] and operate[] several virtual

10   casinos that constitute illegal gambling enterprises under Washington law. [Plaintiffs] assert

11   claims under Washington's Recovery of Money Lost at Gambling Act ('RMLGA'),

12   Washington's Consumer Protection Act ('CPA'), and theories of unjust enrichment and seek to

13   recover their gambling losses." *Benson v. Double Down Interactive, LLC*, 527 F. Supp. 3d 1267,

14   1269 (W.D. Wash. 2021). Here, Plaintiffs sought to certify a nationwide class of consumers who

15   played Defendants' social casino games and to recover damages on their behalf. *Id.* at 1269-70.

16       Professor William B. Rubenstein, the author of *Newberg on Class Actions*, has

17   characterized Class Counsel's efforts across all of these cases and more broadly against the

18   social casino industry as "closer in form to a civil rights litigation campaign than it is to a series

19   of discrete class action settlements":

20          Class Counsel have pursued a dozen different cases, against at least 10 different
            defendants, in four different federal judicial districts located in four different
21          federal Circuits, testing whether these social casino games constituted gambling
            under the laws of more than a half dozen states. Class Counsel built websites to
22          help app users avoid forced arbitration clauses, lobbied legislators and regulators,
            and took their efforts to the media. When Class Counsel lost, they did not give up,
23          but changed tactics or forums and kept going. And they did all of this with their
            own funds, risking millions of dollars of their own money to end this practice.
24

25   ---
     [4]    The litigation background was previously detailed in Class Counsel's Motion For Award of Attorneys'
26   Fees and Expenses and Issuance of Incentive Awards, *see* Dkt. #533 at 2-14, and Plaintiffs' Unopposed Motion for
     Preliminary Approval of Class Action Settlement Agreement, *see* Dkt. #507 at 2-12. Plaintiffs repeat it here for the
27   Court's convenience.

1  *See* Dkt. #535, Rubenstein Decl. ¶ 2. Those years of efforts—both inside and outside the

2  traditional litigation context—were crucial to the landmark results achieved here.

3      Even against the backdrop of Class Counsel's noteworthy efforts in related litigation,

4  appeals, legislative advocacy efforts, media efforts, and prior settlements, this action stands out

5  as a "particularly hard-fought battle of [Class Counsel's] larger war." *Id.* This Section,

6  consequently, outlines the efforts that led to the extraordinary settlement now before the Court.

7  **I.**    **Relevant Litigation History.**

8      In the Spring of 2018, on the heels of the Ninth Circuit's decision in *Kater v. Churchill*

9  *Downs Inc.*, 886 F.3d 784 (9th Cir. 2018), Class Counsel filed this case on Plaintiffs' behalf,

10  alleging that Defendants' operation of social casino games constituted illegal gambling under

11  Washington's gambling laws and an unfair business practice under the Washington Consumer

12  Protection Act. *See* Dkt. #1.[5]

13      Over the ensuing years of litigation, Plaintiffs fought on behalf of the proposed class

14  against what Professor Rubenstein calls Defendants' "scorched-earth defense." Dkt. #535,

15  Rubenstein Decl. ¶ 22 ("I have been studying litigation for nearly four decades but find few

16  analogues to the Defendants' efforts in this matter."). Some of Plaintiffs' key victories against

17  that "scorched-earth defense" are summarized below. *Id.*

18      **A.**    **Defendants' First Motion to Compel Arbitration and Related Appeal.**

19      Defendants' first tactic was to move to compel arbitration and to stay the action, arguing

20  that Plaintiffs Benson and Simonson were on inquiry notice of the arbitration provision in

21  DoubleDown Casino's Terms of Use. *See* Dkt. #44. After full briefing, *see* Dkts. #49, #53, #55,

22  #56, the Court denied Defendants' motion in November 2018, *see* Dkt. #57. Defendants filed an

23  appeal with the Ninth Circuit, Dkt. #61, and the Court granted Defendants' contested motion to

---

[5]    The initial complaint in this case was brought solely by Adrienne Benson (on behalf of a putative class) and named DoubleDown Interactive, LLC and International Game Technology as Defendants. Class Counsel later filed an Amended Complaint adding Mary Simonson as a named Plaintiff, Dkt. #41, and then a Second Amended Complaint naming IGT, a wholly owned subsidiary of International Game Technology, as an additional Defendant, Dkt. #249.

1    stay pending appeal, Dkts. #63, #68, #70, #72, #77. The Parties submitted appellate briefing

2    along with supplemental briefing requested by the Ninth Circuit. *See generally Benson v.*

3    *DoubleDown Interactive, LLC*, No. 18-36015 (9th Cir.). In January 2020, the Ninth Circuit

4    affirmed the denial of Defendants' motion to compel. *See id.*; Dkt. #84.

5            **B.      Defendants' Pleading Motions.**

6            Defendants spent the next several months filing an onslaught of pleadings motions, but

7    Plaintiffs defeated each one—including Defendants' multiple follow-on motions for

8    reconsideration or interlocutory appeal. First, in June 2020, Defendants filed a Motion to Certify

9    Questions to the Washington Supreme Court, arguing that Plaintiffs' RMLGA and CPA claims

10   involved novel state-law questions that should be resolved by the state's highest court. Dkt.

11   #103. After full briefing, *see* Dkts. #111, #115, the Court denied the motion in August 2020, Dkt.

12   #127. Defendants filed a Motion for Reconsideration, Dkt. #133, the Parties submitted additional

13   briefing, Dkts. #154, #155, and the Court denied that motion in January 2021, Dkt. #156.

14          In August 2020, two days after the Court denied Defendants' Motion to Certify

15   Questions, Defendants filed a Motion to Strike Nationwide Class Allegations, arguing that

16   conflicts of law between Washington's and other states' gambling laws prohibited certification

17   of a nationwide class. Dkt. #128. The Parties submitted full briefing, Dkts. #141, #149 and the

18   Court denied the motion in March 2021, Dkt. #209. DoubleDown moved to certify that order for

19   interlocutory appeal, Dkt. #257; the Parties briefed that issue, Dkts. #269, #288, and the Court

20   denied the motion, Dkt. #338.

21          In September 2020, before Plaintiffs had an opportunity to respond to the Motion to

22   Strike, Defendants piled on an additional Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1) and a

23   Motion to Abstain, arguing that various abstention doctrines prevented the Court from exercising

24   jurisdiction and that it should allow the Washington state courts the opportunity to interpret state

25   gambling laws. Dkt. #138. After full briefing, Dkts. #150, #152, the Court denied the Motion in

26   March 2021, Dkt. #210. Defendants again moved to certify this order for interlocutory appeal,

27   Dkt. #230, then withdrew the motion on the day Plaintiffs' response was due, Dkt. #248.

1   Two additional pleadings motions remained pending when the case settled and was

2   stayed. In May 2021, after Plaintiffs filed a Second Amended Complaint adding IGT (a

3   subsidiary of International Game Technology) as a Defendant, Dkt. #249, IGT filed a Motion to

4   Dismiss under Rule 12(b)(6), Dkt. #289. The Parties submitted full briefing. Dkts. #326, #330.

5   Also in May 2021, DoubleDown filed a Renewed Motion to Compel Arbitration, arguing that

6   Plaintiffs Benson and Simonson testified at deposition that they had actual notice of

7   DoubleDown's terms of use. Dkt. #264. Again, the Parties fully briefed that motion. Dkts. #293,

8   #307.

9   In September 2020, DoubleDown and International Game Technology filed a separate

10  action in Washington Superior Court against Benson and Simonson, seeking a declaratory

11  judgment regarding the RMLGA and CPA claims in this action. *See DoubleDown Interactive,*

12  *LLC v. Benson*, No. 20-2-02023-34 (Wash. Super. Ct., Thurston Cty. Sept. 11, 2020); Dkt. #534-

13  1, (Complaint). Plaintiffs filed a Motion to Dismiss or Stay that action in February 2021. Dkt.

14  #534-2, (Motion to Dismiss). After full briefing on the motion, the Superior Court stayed the

15  case in July 2021, and then dismissed the case in August 2021. Dkt. #534-3 (Opposition), Dkt.

16  #534-4 (Reply), Dkt. #534-5 (Order).

17      **C.      Plaintiffs' Motion for Class Certification and Preliminary Injunction.**

18  Amid Defendants' repeated efforts to dismiss the case and change the venue, in February

19  2021, Class Counsel moved to certify a class under Fed. R. Civ. P. 23(b)(3) and to preliminarily

20  enjoin the sale of virtual chips in DoubleDown social casino games under Fed. R. Civ. P.

21  23(b)(2). Dkt. #164. Even the briefing schedule regarding this motion was contested, *e.g.*, Dkts.

22  #188, #195, #197, #206, but the Defendants eventually filed oppositions to class certification and

23  preliminary injunctive relief in May 2021. Dkts. #276, #281. Plaintiffs filed a reply brief, Dkt.

24  #298, marshaling significant discovery evidence in support of a preliminary injunction—

25  uncovered in the three months between the original motion and the reply, while Defendants were

26  simultaneously pursuing various pleading motions—and Defendants each filed surreply briefs,

27  Dkts. #308, #311. The motion remained pending at the time the parties reached a settlement and

1    the Court stayed this case.

2        **D.    Discovery and Related Motion Practice.**

3        Throughout 2021, the Parties exchanged significant written discovery, including

4    approximately 325,000 pages of documents. Logan Decl. ¶ 8. In addition, between March and

5    August 2021, Defendants took (and proposed Class Counsel defended) depositions of Adrienne

6    Benson, Mary Simonson, and six (6) other putative class members. *Id.* ¶ 9. During that same

7    period, Plaintiffs took (and Defendants' Counsel defended) Rule 30(b)(6) depositions of

8    DoubleDown, International Game Technology, and IGT, as well as depositions of four (4) other

9    DoubleDown employees and two (2) of Defendants' proposed expert witnesses. *Id.* ¶ 10.

10        The Parties also engaged in discovery-related motions practice during this period. In

11    March 2021, Plaintiffs moved to compel DoubleDown to produce documents responsive to RFP

12    No. 14, which sought documents containing "Life Event Phrases" (*i.e.*, pass* away, death,

13    suicide, debt, trauma, life event*, lonely, depress*, machine zone, middle age*, divorc*, elder*,

14    gambl*, and addict*), which Plaintiffs believed were relevant to Defendants' practice of

15    targeting vulnerable class members. Dkt. #211 at 2. In April 2021, Plaintiffs moved to compel

16    DoubleDown to produce documents responsive to RFP No. 26, which sought documents

17    containing "Addiction Phrases" (*i.e.*, addict*, continuous gaming activity, false win*, gambl*,

18    hook*, hook, return to player, red flag*, rtp, time on device, tod, pressur*, retain*, retention*,

19    sticky, stickiness, and whale*), which Plaintiffs likewise believed were relevant to Defendants'

20    practice of targeting vulnerable class members. Dkt. #244 at 2. After full briefing on both

21    motions, the Court granted both in July 2021 and compelled DoubleDown to produce responsive

22    documents within fourteen days. Dkts. #366, #367.

23        From June to August 2021, Plaintiffs filed the following additional discovery motions: (i)

24    Motion for Leave to Submit an Affirmative Expert Report and a Rebuttal Expert Report, Dkt.

25    #322; (ii) Motion to Compel the Production of Documents Responsive to Nine Requests, Dkt.

26    #340; (iii) Motion for Leave to Take Seven Additional Depositions, Dkt. #373; (iv) Motion to

27    Amend Stipulated ESI Agreement and Compel Production of a Post-Filing Privilege Log, Dkt.

#377; and (v) Motion to Compel Production of Documents Responsive to Thirteen Requests, Dkt. #381. Each of these motions was fully briefed, and they remained pending when the case settled.

Ultimately, Plaintiffs' discovery efforts forced Defendants to produce documents and information sufficient for proposed Class Counsel to make informed settlement-related decisions regarding the strengths and weaknesses of the Class's claims and potential claims against (i) the DoubleDown companies, (ii) the IGT companies, and (iii) the Platforms who DoubleDown and IGT partnered with to offer the DoubleDown apps (and who receive a release under the settlement).

## II. Settlement Negotiations and Mediation.

Plaintiffs engaged in intermittent settlement talks with the Defendants over the course of litigation, including in September 2021 at Court-ordered settlement conferences. *See* Dkt. #451. In June 2022, settlement talks renewed in earnest, and the Parties agreed to schedule a videoconference mediation session on July 28, 2022 with Niki Mendoza of Phillips ADR. Logan Decl. ¶ 12. In the weeks leading up to that July 28 mediation date, Class Counsel was in frequent communication with Defendants and with the Phillips ADR team, submitted mediation briefs, and supplemented that briefing with telephonic and written correspondence with Defendants and the Phillips ADR team. *Id.* ¶ 13. On July 28, Plaintiffs and Defendants participated in a more-than-full day mediation session via videoconference, but did not reach a resolution. *Id.* ¶ 14. Shortly thereafter, Plaintiffs filed and fully briefed a Temporary Restraining Order regarding certain foreign assets, which the Court denied. *See* Dkts. #482, #489, #493, #494, #495. With the benefit of the Court's order, the Parties—through the Phillips ADR team—re-engaged the settlement efforts and engaged in daily communication with Phillips ADR. Logan Decl. ¶ 15.

On August 23, 2022, the Parties reached an agreement in principle on the material terms of a class action settlement, and they executed a Term Sheet on August 26, 2022. *Id.* ¶ 16. For the next few weeks, the Parties continued negotiating the details of the full class action settlement, exchanged multiple rounds of a working settlement document and exhibits, met and

1    conferred telephonically to iron out remaining disputes, vetted and engaged a settlement

2    administrator, and began meeting and conferring with the Platform Providers to design a robust

3    notice and administration plan. *Id.* ¶ 17. On September 19, 2022, the Parties completed execution

4    of the Settlement Agreement, *id.* ¶ 18, and Plaintiffs filed an unopposed motion for preliminary

5    approval of that Agreement on November 11, 2022. Dkt. #507.

6    **III.    The Settlement Now Before the Court.**

7         On November 14, 2022, the Court preliminarily approved the terms of the Settlement,

8    including the creation of a $415 million, non-reversionary Settlement Fund from which every

9    Class Member who has ever lost money playing Defendants' social casino games is entitled to

10   recover a substantial portion of their losses back. *See* Dkts. #511; #508-1 §§ 1.35, 1.37 (the

11   "Agreement"). Class Members with higher levels of losses are entitled to recover increasingly

12   higher percentages of their losses, and the upper echelons of "VIP" players stand to recover more

13   than half of their losses. *See* Agreement §§ 1.38, 2.1(c), Ex. E. The Settlement also requires

14   DoubleDown to implement meaningful prospective relief, including by maintaining and

15   honoring a self-exclusion policy akin to what one might expect to see at the Emerald Queen or

16   the Muckleshoot casinos. *See id.* § 2.2. Class Counsel filed a separate motion for incentive

17   awards of up to $7,500 each for Plaintiffs Benson and Simonson, attorneys' fees of

18   approximately 29.3% of the Fund plus reimbursement of expenses, and the payment of

19   Settlement Administration expenses which—together with any Fee Award and Incentive

20   Awards—would not exceed 30% of the Settlement Fund. Dkts. #511; #533 at 2.

21            **THE TERMS OF THE SETTLEMENT AGREEMENT**

22        For the Court's convenience, the key terms of the Agreement are summarized below.

23        **A.    Settlement Class Definition:** At preliminary approval the Court certified the

24   Settlement Class, which is defined as follows: "all individuals who, in the United States (as

25   reasonably determined by IP address information, or other information furnished by Defendants

26

27

and Platform Providers), played the Applications on or before Preliminary Approval of the Settlement."[6] Agreement § 1.35.

**B.    Monetary Benefits:** Defendants have agreed to establish a non-reversionary, four-hundred-fifteen-million-dollar ($415,000,000.00) Settlement Fund from which each Settlement Class Member who files a valid claim will be entitled to recover a cash payment— calculated after deduction of costs and administrative expenses, any Fee Award to proposed Class Counsel, and any incentive payments to the Class Representatives. *See id.* § 1.37. Specifically, International Game Technology and IGT together shall contribute $269,750,000, and DoubleDown shall contribute $145,250,000 to the Settlement Fund. According to the Parties' agreement and Court order, Defendants have made a first payment of $100,000,000 into the Settlement Fund. *See* Dkt. #512.

No portion of the Settlement Fund will revert to the Defendants. *Id.* § 2.1(i). Any Settlement Class Member checks not cashed or electronic payments not processed within ninety (90) days of issuance will either be placed in a second distribution fund or donated to the Legal Foundation of Washington, as approved by the Court. *Id.* § 2.1(h). As described in detail in the Plan of Allocation, the amount of each Settlement Class Member's payment will vary based on the Settlement Class Member's Lifetime Spending Amount (those with higher Lifetime Spending Amounts are eligible to recover a greater percentage) and overall Settlement Class Member participation levels, *see id.* §§ 1.38, 2.1(c), except that no Class Member will recover more than their Lifetime Spending Amount unless all Class members do, *see* Exhibit E to the Settlement Agreement. Based on their experience with settlements in related cases, proposed Class Counsel anticipates that participating Settlement Class Members in the highest category of Lifetime Spending Amounts will likely recover gross payments in excess of 60% of their alleged

---

[6]    Excluded from the Settlement Class are (1) any Judge or Magistrate presiding over this Action and members of their families, (2) the Defendants, Defendants' subsidiaries, parent companies, successors, predecessors, and any entity in which a Defendant or its parent has a controlling interest and their current or former officers, directors, and employees, (3) persons who properly execute and file a timely request for exclusion from the Settlement Class, and (4) the legal representatives, successors or assigns of any such excluded persons. Agreement § 1.35.

losses from April 2014 through the present, and that participating Class Members in the smallest category of Lifetime Spending Amounts will likely recover gross payments in excess of 20% of their alleged losses from April 2014 through the present. *See* Logan Decl. ¶ 22. Settlement Class Members were able to quickly and easily estimate the amount of their potential recovery on the Settlement Website. *See* Agreement § 4.2(d); Baessler Decl. ¶ 19.

**C.    Prospective Relief:** DoubleDown has agreed to maintain a link to resources relating to video game behavior disorders within the Applications. *Id.* § 2.2. The link will be prominently available within the games, and DoubleDown's customer service representatives will provide the link to players who contact them and reference or seek help for video game behavior disorders. *Id.* DoubleDown also will maintain a voluntary self-exclusion policy, published on its website, that will allow players to exclude themselves from further gameplay. *See id.* DoubleDown has further agreed to enforce this policy through the use of Player IDs and other device or account-related identifiers. *Id.* In addition, in response to this litigation, DoubleDown has also made other changes to game mechanics such that when players run out of virtual chips, they do not need to purchase additional chips or wait to receive free additional chips to keep playing DoubleDown's games. *Id.*

**D.    Release:** In exchange for the relief described above, Defendants and other entities, including the Platform Providers (Amazon, Apple, Facebook, and Google), will be released from all claims raised in cases relating to the operation of Defendants' social casino games and the sale of virtual chips in those games, including claims that the games were illegal gambling or the chips were "things of value." The full release is contained at *id.* §§ 1.30, 3.1-3.4.

**E.    Attorneys' Fees, Expense Requests & Incentive Award Requests:** Separate from this motion, Class Counsel filed a motion for attorneys' fees, expenses, and incentive awards on March 13, 2023. *See* Dkt. #533. That brief was promptly posted on the Settlement Website where it could be easily accessed by class members. Baessler Decl. ¶ 20.

1

<b>ARGUMENT</b>

2

**I.     The Court Should Confirm Certification of the Settlement Class.**

3       Because no relevant facts have changed since the Court certified the Settlement Class,

4 Dkt. #511, the Court should confirm its prior certification of the Settlement Class for the purpose

5 of entering the final judgment. *See, e.g.*, *Reed v. Scientific Games*, No. 18-cv-565, Dkt. #197 at 1

6 (W.D. Wash. Aug. 12, 2022) (Lasnik, J.); *Aikens v. Panatte, LLC*, No. 2:17-cv-01519, Dkt. #54

7 at 2-3 (W.D. Wash. Feb. 5, 2019) (Lasnik, J.).

8

**II.     Notice Satisfied Due Process.**

9       Prior to granting final approval to this Settlement, the Court must consider whether the

10 Class Members received "the best notice that is practicable under the circumstances, including

11 individual notice to all members who can be identified through reasonable effort." Fed. R. Civ.

12 P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). "[T]he rule does

13 not insist on actual notice to all class members in all cases." *Briseno v. ConAgra Foods, Inc.*, 844

14 F.3d 1121, 1129 (9th Cir. 2017) (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 665 (7th

15 Cir. 2015)). Although what constitutes the "best notice practicable" is case-specific, the Federal

16 Judicial Center has noted that a notice campaign that reaches 70% of a class is often reasonable.

17 Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain*

18 *Language Guide*, at 3 (2010), *available at* https://www.fjc.gov/sites/default/files/2012/

19 NotCheck.pdf.

20       The Court already approved the comprehensive Notice Plan in the settlement. Dkt. #511

21 ¶¶ 5-6. That plan utilized both direct and publication notice to the Settlement Class. *Id.* To

22 provide direct notice to all who were eligible to submit a claim for payment from the Settlement,

23 Class Counsel worked with Defendants and also subpoenaed a variety of third parties to obtain

24 contact information for everyone who was entitled to make a claim against the Settlement Fund.

25 *See* Baessler Decl ¶¶ 7-8. This was not an easy process, requiring negotiations with and issuance

26 of subpoenas to Platform Providers. Logan Decl. ¶ 7. Apple, Google, Amazon, and Meta

27 ultimately provided Class Counsel with sufficient data to effectuate the Notice Plan. *See id.* Once

that data was collected, it was transmitted to JND Legal Administration ("JND"), the Settlement Administrator, to compile a complete Class List. JND then sent out four rounds of email notice, with the initial round reaching 87.2% of email recipients, the second round reaching 99.7% of recipients, the third reaching 99.7%, and the fourth reaching 97.4%. Baessler Decl. ¶¶ 9-13.

Additionally, using the information provided by Defendants and the Platform Providers, JND sent postcard notice via U.S. First Class mail to all accounts identified as having a Lifetime Spending Amount of $100 or more. *See id.* ¶ 14. As of April 28, 2023, at least 94.3% of these postcard notices were either successfully delivered to the original mailing address on record, forwarded by USPS to a forwarding address already in USPS's system, or re-mailed by JND to a new address obtained through JND's own advanced address searches. *See id.* ¶ 15.

Direct notice was supplemented by online publication notice in the form of digital advertisements targeted towards individuals most likely to be part of the Settlement Class. Given the extent to which social casino players are active on social media, JND purchased sponsored ads on Facebook, Instagram, Twitter, YouTube, and the Google Display Network. *See id.* ¶¶ 17-18. These social media ads, coupled with traditional Internet banner advertisements, generated more than 316 million impressions. *See id.*

Overall, the Notice Program, including direct email and postcard notice as well as best in-class tools and technology, reached at least 90% of the Class List. *See id.* ¶ 16. That figure far exceeds the constitutional due process requirement in this Circuit. *See, e.g., Askar v. Health Providers Choice, Inc.*, No. 19-CV-06125-BLF, 2021 WL 4846955, at *3 (N.D. Cal. Oct. 18, 2021) ("[N]otice plans estimated to reach a minimum of 70 percent are constitutional and comply with Rule 23.") (citation omitted).

Finally, all forms of notice accurately described the Settlement and directed the recipient to the Settlement Website, where Class Members could review the Plan of Allocation, use a calculation tool to estimate how much they are projected to recover through the Settlement, and file a claim. *See* Agreement § 4.2(d).

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

1    The Court should therefore find that the Notice Plan complied with Due Process.

2    **III.    The Court Should Finally Approve the Settlement.**

3    To approve the settlement of a class action as fair, reasonable, and adequate, Rule 23(e)

4    requires courts to consider "whether: (A) the class representatives and class counsel have

5    adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief

6    provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and

7    appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including

8    the method of processing class-member claims; (iii) the terms of any proposed award of

9    attorney's fees, including timing of payment; and (iv) any agreement required to be identified

10    under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

11    These factors largely encompass those identified by the Ninth Circuit for evaluating a class

12    settlement. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)

13    (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).[7]

14    The Committee Notes to the recent revision of Rule 23 make clear that the newly

15    enumerated factors were not intended to replace approval factors already used in courts around

16    the country, but "rather to focus the court and the lawyers on the core concerns of procedure and

17    substance that should guide the decision whether to approve the proposal." Thus, courts examine

18    the new Rule 23 factors alongside the traditional *Churchill* factors relevant to the particular case,

19    mindful that there is considerable overlap between the two. *See, e.g.*, *Walters v. Target Corp.*,

20    No. 3:16-cv-1678-L-MDD, 2020 WL 6277436, at *5 (S.D. Cal. Oct. 26, 2020).

21    When a settlement precedes class certification, as here, approval "requires a higher

22    standard of fairness" and "a more probing inquiry than may normally be required under Rule

23    23(e)." *Roes, 1-2*, 944 F.3d at 1048; *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769,

---

24

25    [7]    The *Churchill* factors are: "(1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount

26    offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the

27    proposed settlement." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019).

782 n.10 (9th Cir. 2022). In particular, "such settlement agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest." *Roes, 1-2*, 944 F.3d at 1049.

This settlement stands up to that probing inquiry: the Rule 23(e) and *Churchill* factors decisively support final approval,[8] and there are no signs of collusion or conflicts.

### A.    Class Counsel and the Class Representatives Have Adequately Represented the Class and Support the Settlement.

Class Counsel's representation of the Class's interests here was beyond adequate; it was extraordinary and began years before this case was filed. Class Counsel's efforts in all the prior litigations, appeals, legislative advocacy, media efforts, and settlements have certainly been noteworthy, but even against that backdrop, this action stands out as a "particularly hard-fought battle of [Class Counsel's] larger war." Dkt. #535, Rubenstein Decl. ¶ 2. For example, Class Counsel briefed and won numerous motions: they defeated multiple attempts by Defendants to move this litigation into arbitration and state court and defeated an onslaught of pleading motions. Class Counsel also engaged in contentious discovery battles that resulted in the exchange of over 325,000 pages of documents, conducted and defended depositions, filed and briefed over ten discovery motions, and engaged in extensive settlement talks that resulted in the extraordinary settlement now before this court. *See* Background, *supra*. And these efforts all built on Class Counsel's nearly-ten-year-long advocacy campaign for consumers harmed by social casinos. After achieving the landmark Ninth Circuit ruling in *Kater*, Class Counsel has had to defend Washington's gambling laws from repeated attacks both in the WSGC and the Washington State Legislature. All the while, Class Counsel successfully defended against various social casino defendants' efforts to knock the cases out of federal court or otherwise dismiss the cases. *See* Background, *supra.* Time and time again, Class Counsel held the line, moved the cases closer to class certification and trial, and achieved the five social casino class

---

[8]       There is no governmental participant here, so that *Churchill* factor is neutral.

settlements previously approved by this Court. These efforts all served the interests of the Class in this case, leading to a hard-fought settlement that far exceeds the relief secured in the other cases. All of these efforts demonstrate that Class Counsel provided more than adequate service to the Class.

Class Representatives Benson and Simonson likewise adequately represented the Class. Both made substantial contributions to the Class, including by stepping forward to serve as class representatives and named Plaintiffs, staying in regular communication with Class Counsel, sitting for depositions, timely responding to requests for information, and closely reviewing the Settlement Agreement before approving it. *See* Dkt. #536 (Declaration of Adrienne Benson) ¶¶ 4-5; Dkt. #537 (Declaration of Mary Simonson) ¶¶ 4-5. Their services were more than adequate.

In addition, while the Court should not apply any presumption of fairness based on counsel's views, the "experience and views of counsel" remain factors that the Court may consider. *Roes, 1-2*, 944 F.3d at 1048; *see also Evans v. Zions Bancorporation, N.A.*, No. 2:17-CV-01123 WBS DB, 2022 WL 16815301, at *3 (E.D. Cal. Nov. 8, 2022). Class Counsel here are the only lawyers with significant experience prosecuting these types of social casino claims, and it is their considered judgment that this Settlement represents an outstanding result for the Settlement Class. *See Evans*, 2022 WL 16815301, at *3-4 (applying "heightened scrutiny" and finding that "the sophistication and experience of plaintiff's counsel" weighed in favor of final approval).

**B.    The Settlement was Negotiated at Arm's Length and Shows no Signs of Collusion.**

The Settlement here was negotiated at arm's length and was the product of non-collusive negotiations—as the Court found at preliminary approval. *See* Dkt. #511 at 1. The Settlement was reached after months of arm's-length negotiations, during which time the Parties were in regular communication with the Phillips ADR team and exchanged substantial briefing on the core legal issues, and after a full-day, in-person mediation session with Ms. Niki Mendoza. *See*

1  *Jackson v. King Cnty.*, No. 21-CV-00995-LK-BAT, 2022 WL 168524, at *2-3 (W.D. Wash. Jan.

2  18, 2022) (applying "heightened scrutiny" to pre-certification settlement and finding that

3  mediation before "an experienced third-party neutral . . . who had mediated negotiations during

4  the precursor [] litigation" supported a finding of arm's-length negotiations).

5     Moreover, this Settlement contains none of the red flags the Ninth Circuit has identified

6  as indicative of possible collusion: (1) "when counsel receive a disproportionate distribution of

7  the settlement, or when the class receives no monetary distribution but class counsel are amply

8  rewarded," (2) "when the parties negotiate a 'clear sailing' arrangement," and (3) "when the

9  parties arrange for fees not awarded to revert to defendants rather than be added to the class

10  fund." *In re Bluetooth*, 654 F.3d at 947 (quotations and citations omitted). Class Counsel's fees

11  will be determined separately, but as explained in the motion for attorneys' fees and expenses,

12  they seek a percentage recovery that is within the "usual range" for fees in this Circuit—

13  approximately 29.3% of the Settlement Fund. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043,

14  1047 (9th Cir. 2002); *see generally* Dkt. #533. And far from receiving coupons or *cy pres*-only

15  relief, Class Members will receive substantial individual cash recoveries.[9] The Settlement does

16  not contain a "clear sailing" agreement; Defendants were free to object to Class Counsel's fee

17  petition if they so desired. *See* Agreement § 8.1. Perhaps most illustrative of the lack of collusion

18  here is the litigation activity immediately preceding the Parties' settlement: on August 9, 2022,

19  Plaintiffs moved for a temporary restraining order seeking to restrain Defendants' assets. The

20  Court denied that motion on August 17, 2022, and the Parties reached a settlement in principle

21  just nine days thereafter. *See* Dkts. #482, #489, #493, #494, #495. Finally, there is no reversion

22  in this settlement. All Settlement funds will go to Class Members, less Class Counsel's fees and

23  Settlement Administration costs. *See* Agreement §§ 1.35, 2.1(i).

24

25  [9]     Aside from the Class Representatives' right to petition the Court for reasonable incentive awards, no Class
26  Member will be given preferential treatment at the expense of another. *See Scott v. United Servs. Auto. Ass'n*, No.
11-cv-1422-JCC, 2013 WL 12251170, at *1 (W.D. Wash. Jan. 7, 2013) (noting preliminary approval generally
27  granted absent "obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of
the class") (internal citations omitted).

Ultimately, there are no signs of collusion here because there was no collusion. This Settlement is the product of serious, informed, non-collusive negotiations. Therefore, even under heightened scrutiny, this settlement merits final approval. *See* Dkt. #535, Rubenstein Decl. ¶ 24 ("This settlement, although achieved efficiently, raises no concerns that it might be collusive.").

### C.    The Amount Offered in the Settlement is Adequate, Given the Strength of Plaintiffs' Case and the Risks Inherent in Further Litigation.

Even before the revised Rule 23 highlighted that the Court should consider the amount offered in settlement, courts recognized that the size of any settlement, compared to the likelihood of full recovery, "is generally considered the most important" factor in evaluating a settlement. *See Bayat v. Bank of the West*, No. C-13-2376 EMC, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015). Here, the risks of continued litigation, when contrasted with the scope of relief this Settlement provides to the Class, demonstrate that the Settlement easily qualifies as fair, reasonable, and adequate.

### i.    The Settlement Class would have faced significant delay before it could have recovered anything on the merits.

To be frank, Class Counsel is confident in the merits of this case. The key legal questions, particularly under the RMLGA, are straightforward, and in Class Counsel's view have been conclusively answered by the Ninth Circuit's decision in the appeal in the *Kater* matter. Nevertheless, the case presented legal risks.

The most significant of these risks, as Plaintiffs explained at preliminary approval, was legislative, *i.e.*, the chance that the ISGA's lobbying efforts may eventually lead to a retroactive change in Washington gambling law. *See* Dkt. #508, Declaration of Todd Logan in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement Agreement ¶ 28. Class Counsel have thus far fended off the ISGA's lobbying efforts, but the ISGA and its members—many of them billion-dollar gambling corporations—are formidable opponents. If this case does not settle now, then during each legislative cycle, the Class will be at risk of having its claims eviscerated in the name of "remov[ing] . . . economic uncertainty" by "clarifying" that proposed

1   Class Members cannot recover under the RMLGA. *See, e.g.*, H.B. 2720, 66th Leg., Reg. Sess.

2   (Wash. 2020). And in addition to lobbying-related risks, it is also of course possible—as with

3   any litigation—that the Defendants could prevail on any number of future motions at subsequent

4   litigation stages, including, for example, renewed motions to compel arbitration based on revised

5   Terms of Service.

6           Even assuming Plaintiffs' Counsel could fend off the ISGA and Defendants' litigation

7   efforts long enough for Plaintiffs to try this case to verdict, Defendants' inevitable appeals would

8   take years, further delaying the relief to the Class. *See Rodriguez v. West Pub. Corp*, 563 F.3d

9   948, 966 (9th Cir. 2009) ("Inevitable appeals would likely prolong the litigation, and any

10  recovery by class members, for years. This factor, too, favors the settlement."); *Ikuseghan v.*

11  *Multicare Health Sys.*, No. 3:14-cv-05539-BHS, 2016 WL 3976569, at *4 (W.D. Wash. July 25,

12  2016) ("[T]he outcome of trial and any appeals are inherently uncertain and involve significant

13  delay. The [s]ettlement avoids these challenges."). Perhaps the most obvious evidence of this risk

14  is the fact that, at each juncture of this litigation, Defendants chose not to resolve the case but

15  instead to redouble their litigation efforts. For example, Defendants moved to compel arbitration

16  *twice* and pursued a Ninth Circuit appeal on the issue. Given this history, it is likely that

17  Defendants would pursue a Rule 23(f) appeal on a class certification decision and would

18  potentially renew their efforts to pursue arbitration. The substantial expense and burden

19  associated with litigating this case not only through trials but also through inevitable appeals

20  further militate in favor of granting final approval. *See* Logan Decl. ¶ 19.

21          In sum, the relief offered by the Settlement, when considered against the risks and

22  expenses of continued litigation, weighs strongly in favor of final approval. Fed. R. Civ. P.

23  23(e)(2)(C)(i); *Rinky Dink, Inc. v. World Bus. Lenders, LLC*, No. C14-0268-JCC, 2016 WL

24  3087073, at *3 (W.D. Wash. May 31, 2016) (concluding that that the risk of further litigation,

25  the amount offered in settlement, and "the benefit to Settlement Class Members of avoiding

26  individual litigation" all weighed in favor of settlement approval); *Ikuseghan*, 2016 WL

27

3976569, at *4 ("Absent the proposed [s]ettlement, [c]lass [m]embers would likely not obtain relief, if any, for a period of years.").

### ii. Given the risks involved with further litigation, the amount offered in Settlement is outstanding.

The most significant aspect of the agreement secured by this Settlement is the $415 million non-reversionary common fund, which will be used to help Settlement Class Members recoup their losses. The "amount offered in settlement" here undeniably favors approval. *Churchill*, 361 F.3d at 575; Fed. R. Civ. P. 23(e)(2)(C). The $415 million common fund reflects approximately 20% of the Settlement Class's alleged losses from April 1, 2014 (*i.e.*, within a four-year statute of limitations period) through June 30, 2022 (the date the Parties used when they were negotiating this settlement). *See* Agreement § 7.3. This result far surpasses even the historic settlement achieved in *Kater*—the only other nationwide class settlement in the social casino landscape—in which the $155 million settlement fund represented approximately 14.35% of that settlement class's spending within the statutory period until the date of the execution of the settlement agreement. *See Kater*, Dkts. #280, #218-1 § 1.18. The fact that this settlement recovers a substantially higher portion of the Class's damages, even though damages here were nearly twice as large as in *Kater*, speaks to the strength of this result for the Class.

These are indisputably "excellent" results in comparison to other cases of this magnitude. *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 445 F. Supp. 3d 508, 522 (N.D. Cal. 2020) (finding $240 million common fund, representing a 6.9 to 9.6 percent recovery on the estimated $2.5 to $3.5 billion in losses was an "excellent result."). And four hundred fifteen million dollars is, no matter how sliced or diced, a significant recovery. It is a significant enough sum that Class Members with the largest Lifetime Spending Amounts stand likely to recover more than 60% of their alleged losses from April 2014 through the present, and no participating Class Member is likely to recover less than 20% of the same. *See* Logan Decl. ¶ 22; *compare with Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982) ("It is well-settled law that a cash settlement amounting to only a fraction of the

potential recovery will not per se render the settlement inadequate or unfair"). Particularly in the current economic climate, these recoveries will be life-changing for many Class Members.

The Settlement's prospective relief buttresses the fairness of the Settlement. *See Bennett v. SimplexGrinnell LP*, No. 11-cv-01854-JST, 2015 WL 1849543, at *7 (N.D. Cal. Apr. 22, 2015) (noting "the significant value of the prospective relief also obtained in the settlement agreement" warranted preliminary approval). The Settlement requires DoubleDown to place resources relating to video game behavior disorders within the Applications, to maintain and make publicly available a voluntary self-exclusion policy that will allow players to exclude themselves from making further purchases, and to provide a link to that policy and the resources within the games and on DoubleDown's website. *See* Agreement § 2.2. These changes, intended to generally mirror the sorts of voluntary self-exclusion programs that states often require casinos to implement, reflect a pioneering—and, in proposed Class Counsel's view, long-overdue—advancement in social casino self-regulation. And as relevant here, these changes to DoubleDown's conduct—in conjunction with the cash fund—militate in favor of approval. *See Officers for Justice*, 688 F.2d at 628 ("It is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness.").[10] In sum, the amount offered in the Settlement, when compared with the risks and expense of further litigation, strongly supports final approval.

### D.    The Settlement treats Settlement Class Members equitably.

Revised Rule 23 further asks courts to assess whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The Rule's revised text makes clear that *equal* treatment is not required, but fair treatment is instead the goal. The Settlement here achieves that goal.

---

[10]    As to the final Rule 23(e) sub-factor, the only other agreement made between the Parties in connection with this Settlement was the Stipulated Motion Re: Settlement Fund, which required Defendants to make an initial payment of $100 million into the Settlement Fund fourteen days after preliminary approval. Dkt. #509. This agreement bolstered the adequacy of the Settlement because it secured earlier payment of a sizeable portion of the Settlement Fund and ensured that the Settlement Administrator had sufficient funds to effect the robust Notice Plan.

As Class Counsel explained at preliminary approval, and as hashed out in detail in the Plan of Allocation, a given Settlement Class Member's total recovery will depend on the extent of their losses (*i.e.*, those with greater losses will recover a higher proportion of their losses). *See* Agreement §§ 1.38, 2.1(c); Exhibit E to the Agreement. The Plan of Allocation therefore distributes settlement funds according to those who have suffered the greatest harm.

Allocating settlement funds in this way achieves an equitable result. Settlement Class Members with tens or hundreds of thousands of dollars in losses have frequently suffered serious collateral harms, such as alienation from family or friends or the accrual of huge interest-bearing debts, that were not suffered by those who may have purchased $10 or $20 worth of chips. And even though all Settlement Class Members have equally strong RMLGA claims, Settlement Class Members with particularly significant losses may have stronger Consumer Protection Act claims—including stronger potential claims for treble damages—to release here. So while the Class stands largely on equal footing, a clear-eyed assessment of the risks that lay ahead demonstrates that certain claims may be stronger than others, something appropriately reflected in the Plan of Allocation. *See In re Equity Funding Corp. of Am. Securities Litig.*, 603 F.2d 1353, 1365 (9th Cir. 1979) (concluding that the district court's approval of certain offsets "in [a] Plan of Allocation was a component of its duty to insure the equitable distribution of the settlement proceeds"); 2 McLaughlin on Class Actions § 6.23 (17th ed. 2020) ("Allocation formulas, including certain discounts for certain types of claims within a class, may properly take into consideration the comparative strengths and values of different categories of the settled and released claims.").

Likewise, the provision of incentive awards for the Class Representatives is consistent with the equitable treatment of Class Members. Adrienne Benson and Mary Simonson seek modest awards of $7,500 each, which reflect their service to the Class. As stated above, both made substantial contributions to the Class, including stepping forward to serve as class representatives and named Plaintiffs, staying in regular communication with Class Counsel, sitting for depositions, timely responding to requests for information, and closely reviewing the

1    Settlement Agreement before approving it. *See* Dkt. #536 (Declaration of Adrienne Benson) ¶¶

2    4-5; Dkt. #537 (Declaration of Mary Simonson) ¶¶ 4-5. In addition, both made substantial

3    personal sacrifices for the benefit of the Class, including the fact that anyone who Googles their

4    names now sees pages of websites talking about their involvement in these lawsuits. *See* Dkt.

5    #536 ¶ 4; Dkt. #537 ¶ 4. The risk of reputational injury was higher here than in many other class

6    action suits, given the subject matter of the lawsuit. As set forth in the previously filed motion

7    for incentive awards, awards of this size are in line with other awards given to class

8    representatives and fairly reflect Benson's and Simonson's service to the Class. Given that their

9    efforts were key to ensuring that the Class recovered anything, the modest proposed incentive

10   awards are fully consistent with equity.

11           In sum, the Settlement treats all Class Members equitably relative to each other, which

12   supports final approval.

13        **E.      Class Counsel was Able to Reach an Informed Judgment About the Benefits
                    of Settling and the Quality of the Settlement.**
14

15           Next, through nearly a decade of litigation in parallel lawsuits, four years of hard-fought

16   litigation in this case, as well as a painstaking negotiation and mediation process here, the Parties

17   and their counsel "had enough information to make an informed decision about the strength of

18   their cases and the wisdom of settlement." *Rinky Dink*, 2016 WL 3087073, at *3. To begin,

19   formal discovery efforts resulted in a rich discovery record in this case. As discussed above, the

20   record includes documents and information sufficient for proposed Class Counsel to make

21   informed settlement-related decisions regarding the strengths and weaknesses of the Class's

22   alleged and potential claims. Logan Decl. ¶¶ 7-11.

23           In addition to a rich record of formal oral and written discovery, the Parties also

24   exchanged written opening and response mediation briefs and spoke frequently by telephone to

25   clarify the relevant facts and hone the Parties' negotiation positions. *See* Logan Decl. ¶ 13. And

26   then, of course, the Parties engaged in a full-day mediation facilitated by the skilled Phillips

27   ADR team, in which all information necessary to make an informed settlement decision was

1    fleshed out at length. *Id.* ¶ 14. Consequently, the Parties negotiated the Settlement with a clear

2    understanding of the strengths and weaknesses of their respective claims and defenses. *See id.*;

3    *Ikuseghan*, 2016 WL 3976569, at *3 (approving settlement reached "between experienced

4    attorneys who are familiar . . . with the legal and factual issues of this case in particular"). This

5    factor, too, thus supports final approval.

6          **F.**    **The Reaction of the Settlement Class has been Favorable.**

7          Finally, and perhaps most importantly, claims data indicates that the Class has responded

8    favorably to the Settlement, warranting final approval. The Settlement Administrator received

9    more than 90,000 claims associated with at least $594.4 million in lifetime spend, reflecting an

10   At-Issue Adjusted Claims Rate exceeding 27.11

11   %. Baessler Decl. ¶ 25; Logan Decl. ¶ 6. By contrast, zero (0) Class Members objected to the

12   settlement, and just seven (7) individuals requested exclusion. Baessler Decl. ¶¶ 28, 30.

13         These numbers speak volumes regarding the fairness and adequacy of the Settlement.

14   "When few class members object, a court may appropriately infer that a class action settlement is

15   fair, adequate, and reasonable." *Schneider v. Wilcox Farms, Inc.*, No. 07-CV-01160-JLR, 2009

16   WL 10726662, at *3 (W.D. Wash. Jan. 12, 2009); *accord Pelletz v. Weyerhaeuser Co.*, 255

17   F.R.D. 537, 543-44 (W.D. Wash. 2009) (lauding "positive response" of Settlement Class of

18   110,000 to 140,000 members where nineteen excluded themselves from the settlement, and three

19   objected); *see also Churchill Vill.*, 361 F.3d at 577 (affirming approval of class action settlement

20   where 45 of 90,000 class members objected).

21         Given the participation rates here and the absence of any objections to the Settlement, the

22   Court should find that the reaction of the Settlement Class favors final approval.

23                              **CONCLUSION**

24         The Court should grant final approval. For the Court's convenience, a [Proposed] Order

25   is attached hereto.

26

27

Respectfully submitted,

Dated: May 2, 2023

**ADRIENNE BENSON and MARY SIMONSON**, individually and on behalf of all others similarly situated,

By: /s/ Todd Logan

Rafey S. Balabanian*
rbalabanian@edelson.com
Todd Logan, WBSA #60698
tlogan@edelson.com
Brandt Silver-Korn*
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300 / Fax: 415.373.9435

By: /s/ Alexander G. Tievsky

Jay Edelson*
jedelson@edelson.com
Alexander G. Tievsky, WSBA #57125
atievsky@edelson.com
Amy B. Hausmann*
abhausmann@edelson.com
EDELSON PC
350 N LaSalle Street, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370 / Fax: 312.589.6378

By: /s/ Cecily C. Jordan

Cecily C. Jordan, WSBA #50061
cjordan@tousley.com
TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Tel: 206.682.5600

*Class Counsel and Plaintiffs' Attorneys*

*Admitted pro hac vice*

1

**LCR 7(e) Certification**

2      I certify that this memorandum contains 8,321 words, in compliance with the Local Civil

3   Rules.

4                           /s/ Todd Logan